**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL SECURITY COUNSELORS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CENTRAL INTELLIGENCE AGENCY, *et al.*, <br><br> Defendants. | Civil Action No. 12-284 (BAH) <br><br> Judge Beryl A. Howell |

## MEMORANDUM OPINION

The plaintiffs—a group consisting of journalists, academics, and government watchdog groups—bring this action against the defendants Central Intelligence Agency ("CIA") and Office of the Director of National Intelligence ("ODNI") pursuant to, *inter alia*, the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq.* The plaintiffs each submitted at least one FOIA request or Mandatory Declassification Review ("MDR") request to the CIA between July 2011 and January 2012, and they challenge the CIA's responses to those requests in a number of ways. In addition to issues related to specific FOIA requests, the plaintiffs claim that the CIA is engaging in a variety of policies or practices that constitute ongoing and systematic violations of the FOIA. Furthermore, the plaintiffs challenge the CIA's promulgation of a final rule regarding how fees are assessed for MDR requests, without first subjecting the rule to notice-and-comment procedures. The CIA has now moved to dismiss nine of the twenty-six causes of action pleaded in the plaintiff's First Amended Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). This partial motion to dismiss will be granted in part and denied in part.

I.      **BACKGROUND**

This case, in its entirety, ultimately implicates over thirty separate FOIA and MDR

requests submitted by the plaintiffs, along with four alleged policies or practices of the CIA and

one final rule promulgated by the CIA.  *See* First Am. Compl. ("FAC") ¶¶ 19–233, ECF No. 9.

The CIA's pending partial motion to dismiss, however, only touches upon fourteen of these

specific requests,[1] in addition to the four policies or practices and the single final rule.

Therefore, the Court will only set forth the facts that are relevant to deciding the pending motion.

A.      <u>**Specific FOIA Requests**</u>

On October 20, 2010, plaintiff National Security Counselors ("NSC") submitted to ODNI

a FOIA request "for all FOIA Referral Memos sent to other government agencies in Fiscal Year

2010 and any subsequent correspondence with the agencies regarding these memos or the

records to which they refer."  *Id.* ¶ 221.  In response to this request, on July 20, 2011 ("Request

#1") and November 4, 2011 ("Request #2"), the ODNI "referred an unknown amount of CIA

material to CIA for review and direct response to NSC."[2]  *See id.* ¶¶ 222, 225.  On March 13,

2012 and March 15, 2012, the CIA "withheld all information" from Request #1 and Request #2,

respectively, citing FOIA Exemptions 3 and 5.  *Id.* ¶¶ 229–30.  NSC did not file an

administrative appeal of these withholding determinations.  Nevertheless, NSC claims that the

CIA's denial letters for Request #1 and Request #2 were "legally insufficient" to trigger an

administrative appeal because they did not "provide an estimate of the volume of any denied

_____

[1] Nine of these fourteen specific requests are implicated, however, not because the plaintiffs challenge the CIA's
responses to the individual requests *per se*, but because the plaintiffs cite the CIA's responses to the requests in
order to allege the existence of a larger policy or practice within the CIA, *see, e.g.*, FAC ¶¶ 68–77 (Count Five), or
to illuminate the context of their APA challenge to the CIA's promulgation of a final rule regarding fees assessed to
MDR requesters, *see id.* ¶¶ 19–39 (Count One).  Only four of the counts challenged in the pending partial motion to
dismiss are substantive challenges to the CIA's responses to specific FOIA requests.  *See id.* ¶¶ 159–68 (Count
Nineteen); *id.* ¶¶ 176–94 (Counts Twenty-One and Twenty-Two); *id.* ¶¶ 220–33 (Count Twenty-Six).

[2] The CIA assigned each of these referrals a unique request number, and thus the First Amended Complaint treats
them as separate requests for information under the FOIA.  *See* FAC ¶¶ 222, 225.

2

matter" pursuant to 5 U.S.C. § 552(a)(6)(F).  *See* FAC ¶¶ 231–32.  Therefore, NSC alleges that it

has constructively exhausted its administrative remedies because "twenty working days have

elapsed without a substantive determination by CIA which meets the volume estimate

requirement of FOIA."  *See id.* ¶ 232.

On September 6, 2011, plaintiff Kathryn Sack submitted a FOIA request ("Request #3")

that sought "thirty-two specified documents currently published in the CIA Records Search Tool

('CREST')."  *Id.* ¶ 177.  This request specified that "'[r]ecords which are currently published in

CREST in redacted form should be reviewed for full release under FOIA,'" and requested a

public-interest fee waiver and production of any responsive records in an electronic format.  *See*

*id.*  On September 13, 2011, the CIA "released paper copies of the redacted versions of the

thirty-two documents which were published in CREST" and also "denied Sack's request for a

public interest fee waiver and assessed a duplication fee of $13, stating that there could be no

public interest in releasing records which were already published in CREST."  *Id.* ¶ 178.  On

September 26, 2011, Sack "[administratively] appealed all redactions in the thirty-two

documents" and the fee-waiver denial.  *Id.* ¶ 179.  On October 18, 2011, the CIA responded to

Sack's administrative appeal, stating that "[i]t was not clear that you were requesting a re-review

of these documents," though "we can open a new request to address this re-review if you wish."

*Id.* ¶ 180.  The CIA's response also stated that "you were not given appeal rights in the earlier

response, and, as such, we cannot accept your appeal."  *Id.*  The plaintiffs challenge this response

by the CIA, both because "Sack has a legal right . . . to obtain the information she seeks" and

because "Sack has a legal right . . . to receive a public interest fee waiver."  *See id.* ¶¶ 181–82.

Specifically, the plaintiffs allege that "there is no legal basis for CIA to simply provide records

which had been previously processed when Sack explicitly specified in her initial request letter

that all records currently published in redacted form were to be re-processed for release under FOIA." *Id.* ¶ 181.[3]

Also on September 6, 2011, NSC submitted a FOIA request to the CIA ("Request #4") that was related to one of its previous requests. *See id.* ¶ 161.  In particular, the CIA's response to a prior FOIA request had stated that review of certain documents "would impose an excessive and unreasonable burden on the [CIA], and pursuant to relevant precedent, we must decline to process such requests.'"  *See id.* ¶ 160.  Hence, Request #4 requested "records pertaining to the 'relevant precedent' to which this letter referred."  *Id.* ¶ 161.  On October 21, 2011, the CIA "released one document comprised solely of the paragraph which had been used in the response letter to" the previous request and "did not list the records withheld in their entirety."  *See id.* ¶ 163.  On December 29, 2011, NSC sent a letter to the CIA, requesting a list that "identifies the records being withheld and describes the reasons for their withholding in general terms."  *Id.* ¶ 164.  NSC's letter further stated that "[u]ntil we obtain such a list, we do not consider your response to constitute a proper final determination response and reject your appeal deadline."  *Id.* Similar to its challenge to Request #1 and Request #2, discussed above, NSC contends that it constructively exhausted its administrative remedies regarding Request #4 because "twenty working days have elapsed without a substantive determination by CIA which meets the volume estimate requirement of FOIA."  *See id.* ¶ 167.

On May 4, 2010, NSC submitted a FOIA request to the CIA for, *inter alia*, "the 15 FOIA requests received by the [CIA] during Fiscal Year 2008 that were classified as full denials because the Records were not Reasonably Described in" the CIA's 2008 Annual Report.  *See id.* ¶ 184 (internal quotation marks omitted); *see also* Defs.' Ex. C at 1, ECF No. 14-3.  That same

---

[3] Similarly, the plaintiffs allege that "CIA's denial of Sack's request for a public interest fee waiver was predicated on an incorrect assumption that [Sack] had requested the thirty-two records *as they were published in CREST*." FAC ¶ 182 (emphasis in original).

day, NSC also submitted a similar FOIA request to the CIA that sought, *inter alia*, "[t]he 290

FOIA requests received by the CIA during Fiscal Year 2008 that were classified as full denials

because they were considered Improper FOIA Requests for Other Reasons" in the CIA's 2008

Annual Report.  *See* Defs.' Ex. D at 1 (internal quotation marks omitted), ECF No. 14-4; FAC

¶ 187; *see also* Decl. of Martha Lutz ¶ 65, *Nat'l Sec. Counselors v. CIA*, No. 11-444 (D.D.C.

Dec. 20, 2011).  NSC agreed to combine these two requests into one, and the CIA provided NSC

with records responsive to the merged request on August 31, 2011.  *See* FAC ¶¶ 186, 188.  NSC

alleges that "it is not possible to discern from the records themselves which records are

responsive to which request," and so NSC "asked CIA several times to identify the fifteen

records which were responsive to" the first request, but "CIA refused to provide any

clarification."  *See id.* ¶ 189.  NSC therefore submitted a new FOIA request on October 12, 2011

("Request #5"), which sought "the first page of the initial response letter for each of the fifteen

FOIA requests identified in" its first May 4, 2010 FOIA request.  *Id.* ¶ 190.  The CIA

nevertheless "refused to process the request, stating that it was a duplicate of one of the line

items of the merged [r]equest."  *See id.* ¶ 191.  NSC attempted to appeal this determination by

the CIA not to process Request #5, but the CIA "refused to accept NSC's appeal" because the

request was never processed.  *See id.* ¶¶ 192–93.  NSC challenges the CIA's response to Request

#5 and asserts that it has a legal right to the information sought in that request.  *See id.* ¶ 194.

**B.**     **Alleged Policies or Practices Violating the FOIA**

The plaintiffs also challenge what they allege are four separate policies or practices of the

CIA that constitute ongoing violations of the FOIA.  The Court will summarize below the

plaintiffs' allegations regarding each claimed policy or practice.

1.      *Policy or Practice of Requiring Commitment to Pay Applicable Fees*

Between September 6, 2011 and September 14, 2011, NSC submitted five FOIA requests to the CIA.  *See* FAC ¶ 69.  In response to each of these requests, the CIA notified NSC that "[w]e determined that your request falls into the 'all other' fee category, which may require you to pay charges to cover the cost of searching for and reproducing responsive records (if any) beyond the first 100 pages of reproduction and the first two hours of search time, which are free."  *Id.* ¶ 70.  The CIA's letters also stated that "we will need your commitment to pay all applicable fees before we can proceed with our searches."  *Id.*  NSC sought clarification of these letters, asking the CIA, via letter on October 4, 2011, to "[p]lease confirm that you mean that you will conduct the first two hours of search regardless of our promise to pay, since we are entitled to that by law, and that you will not conduct any further searches absent a promise to pay."  *Id.* ¶ 71 (emphasis omitted).  The CIA responded to NSC's request on October 7, 2011, stating that "it is not possible to limit our searches for records on a particular topic to precisely two hours" since "some of the searches are automated, whereas others are not," and therefore "the total search effort cannot be limited in an arbitrary way, such as the maximum amount that can be performed as you requested."  *Id.* ¶ 72.  In light of this correspondence, the plaintiffs allege that "CIA's refusal to provide two free hours of search time to 'all other' requesters who refuse to pay any fees represents an ongoing policy, practice, or Standard Operating Procedure ('SOP')," which "is in violation of FOIA."  *See id.* ¶¶ 74–75.[4]

---

[4] The term "all other" FOIA requester is a reference to the CIA's FOIA fee categories, and the "all other" category consists of all individuals who are not "commercial" requesters, "non-commercial educational or scientific institution" requesters, or "representatives of the news media" requesters, as those terms are defined in the CIA's FOIA regulations.  *See* 32 C.F.R. § 1900.02(h).

### 2.    *Policy or Practice of Charging Search Fees for Automated Searches*

The second alleged policy or practice of the CIA challenged by the plaintiffs is based on the same facts just discussed.  Specifically, the plaintiffs point to the language in the CIA's October 7, 2011 response letter, which stated that "it is not possible to limit our searches for records on a particular topic to precisely two hours" since "some of the searches are automated, whereas others are not."  *Id.* ¶ 72.  From this language the plaintiffs claim that "[t]he fact that some of the searches are automated has no bearing on the length of the search for fee purposes unless CIA counts the time that a computer takes to perform an automated search with no human participation as part of the search time."  *See id.* ¶ 80.  Accordingly, the plaintiffs allege that "CIA's reference to automated searches indicates an ongoing policy, practice, or SOP," and "[a] policy, practice, or SOP of counting for fee purposes the time spent by a computer performing an automated search with no human participation is in violation of FOIA."  *See id.* ¶¶ 81–82.

### 3.    *Policy or Practice of Refusing to Provide Electronic Records*

The third alleged CIA policy or practice challenged by the plaintiffs relates to the format in which records are produced to FOIA requesters.  The plaintiffs allege that they "have never received electronic records from CIA in response to FOIA requests."  *Id.* ¶ 134.  In this regard, the plaintiffs also allege that "CIA admits that it has a blanket policy of considering every record 'not readily reproducible in electronic format' with the exception of a select few categories of frequently requested records."  *Id.* ¶ 135.  According to the plaintiffs, "CIA defends this policy with the argument that its FOIA processing software is only located on its classified computer system, and that after processing records for release using that software it is unduly burdensome to then remove the records from the classified system and burn them to digital media."  *Id.*[5]  The

---

[5] In support of this contention, the plaintiffs generally cite the CIA's "filings in Case Nos. 11-443, 11-444."  *See* FAC ¶ 135.  Those two related cases are also currently pending before this Court.

plaintiffs thus allege that "[a] policy, practice, or SOP of refusing to provide *any* releasable records in electronic format (with the exception of a select few predefined categories) is in violation of FOIA." *See id.* ¶ 136 (emphasis in original).

### 4. *Policy or Practice of Invoking FOIA Exemption 3 Without Authorization*

The final alleged CIA policy or practice challenged by the plaintiffs has to do with the CIA's authority to invoke the National Security Act, 50 U.S.C. §§ 401, *et seq.*, as a withholding statute under FOIA Exemption 3, 5 U.S.C. § 552(b)(3). "Prior to 2004, the National Security Act vested the Director of Central Intelligence ('DCI') with the authority to protect intelligence sources and methods." FAC ¶ 208. According to the plaintiffs, "[i]n 2004, the Intelligence Reform and Terrorism Prevention Act ('IRTPA') transferred this authority to make such a decision from the DCI to the newly-created [Director of National Intelligence, or 'DNI']." *Id.* ¶ 209. Thus, the plaintiffs allege that, after 2004, the CIA would only have the authority to invoke the "protect intelligence sources and methods" clause of the National Security Act as an Exemption (b)(3) withholding statute in one of two instances: "(1) it consulted with ODNI in each instance and ODNI authorized each invocation; or (2) ODNI authorized CIA to independently make such invocations." *See id.* ¶ 210. The plaintiffs claim that, although "[s]ince 2004, CIA has repeatedly invoked the 'protect intelligence sources and methods' clause of the National Security Act" pursuant to Exemption 3, "CIA possesses no independent authority to withhold records from FOIA requests under Exemption (b)(3) to protect intelligence sources and methods." *See id.* ¶¶ 211, 214. This is so because, according to the plaintiffs, "the DNI has not authorized CIA to independently invoke the National Security Act as an Exemption (b)(3) withholding statute," and therefore "every time CIA invokes the 'intelligence sources and methods' language of the National Security Act as an Exemption (b)(3) withholding statute at the

administrative stage, it is doing so without authorization from the agency vested with that authority." *Id.* ¶¶ 215–16.  Based on these allegations, the plaintiffs claim that "[a] policy, practice, or SOP of invoking an Exemption (b)(3) withholding statute without proper authorization is in violation of FOIA." *Id.* ¶ 217.

With respect to each of these four alleged policies or practices, the plaintiffs allege that they "stand to continue to be harmed by this ongoing policy in the future, as they regularly file FOIA requests with CIA and will continue to do so in the future." *See id.* ¶¶ 137, 218; *see also id.* ¶¶ 76, 83 (making same allegations with respect to NSC only).  The plaintiffs also allege in each of these policy-or-practice claims that they are "entitled to relief in the form of a declaratory order that CIA is in violation of its statutory responsibilities under FOIA and an injunction compelling CIA" to cease each unlawful policy or practice.  *See id.* ¶¶ 77, 84, 138, 219.

### C.  CIA's Rule Regarding Fees Charged to MDR Requesters

The final claim that the CIA has moved to dismiss is the plaintiffs' challenge, under the APA, to the CIA's decision to promulgate a final rule without notice-and-comment procedures. On June 16, 1997 the CIA promulgated an "interim rule" to "implement its obligations under the [FOIA], the Privacy Act, and Executive Order 12958 (or successor Orders) provisions relating to classification challenges by authorized holders, requests for mandatory declassification review, and access by historical researchers."  *See* Freedom of Information Act; Privacy Act; and Executive Order 12958; Implementation ("Interim Rule"), 62 Fed. Reg. 32,479 (June 16, 1997) (codified as amended at 32 C.F.R. pts. 1900–01, 1907–09); *see also* FAC ¶ 20.[6]

---

[6] MDR requests are requests filed with government agencies that "seek[] declassification review of records" that are classified but that, according to the requesters, should now be available to the public.  *See* FAC ¶ 12; *see also* Exec. Order No. 13,526 § 3.5(a), 75 Fed. Reg. 707, 717–18 (Dec. 29, 2009) ("[A]ll information classified under this order or predecessor orders shall be subject to a review for declassification by the originating agency if, [*inter alia*,] . . . the request for a review describes the document or material containing the information with sufficient specificity to enable the agency to locate it with a reasonable amount of effort . . . .").

Two sections of this 1997 Interim Rule described the CIA's fee structure for FOIA and MDR requests.  The section regarding fees for FOIA requests stated, in pertinent part, that "[r]ecords will be furnished without charge or at a reduced rate whenever the Agency determines," *inter alia*, that "it is in the public interest because it is likely to contribute significantly to the public understanding of the operations or activities of the United States Government and is not primarily in the commercial interest of the requester."  *See* Interim Rule, 62 Fed. Reg. at 32,483.  In this same vein, the Interim Rule delineated three categories of FOIA requesters:  (1) "[c]ommercial use" requesters, who were to be charged for "the full direct costs of searching for, reviewing, and duplicating responsive records (if any)," (2) "[e]ducational and non-commercial scientific institution" and "representatives of the news media" requesters who were to be charged only for "reproduction beyond the first 100 pages," and (3) "[a]ll other" requesters, who were to be charged "the full direct cost of searching for and reproducing responsive records (if any) beyond the first 100 pages of reproduction and the first two hours of search time which will be furnished without charge."  *Id.* at 32,484.  The Interim Rule further stated that "[MDR] [r]equests made directly to [the CIA] will be liable for costs in the same amount and under the same conditions as specified in 32 CFR part 1900," *id.* at 32,496, which is the portion of the CIA's regulations dealing with FOIA requests, *see* 32 C.F.R. § 1900.01 ("This part is issued under the authority of and in order to implement the [FOIA and other related statutes].").

The plaintiffs allege that "prior to 23 September 2011, CIA rarely if ever charged fees to process MDR requests" and "[o]f the multiple frequent MDR requesters surveyed by Plaintiffs, none recalled ever being charged by CIA for MDR requests."  *See* FAC ¶ 23.  On September 23, 2011, however, the CIA published in the *Federal Register* a final rule that amended the CIA's

regulations regarding fees for MDR requests.  *See* Mandatory Declassification Review ("Final Rule"), 76 Fed. Reg. 59,032 (Sept. 23, 2011) (codified at 32 C.F.R. pt. 1908).  The Final Rule added 32 C.F.R. § 1908.14, which sets forth several provisions governing whether and how fees are assessed for MDR requests.  In relevant part, the new provisions (1) assess reproduction fees for all MDR requests, including a fee of fifty cents per page, $10 per CD, and a minimum fee of $15 per request for reproductions; and (2) assess search and review fees of between $20 and $72 per hour for all MDR requests, which are due "even if our search locates no responsive information or some or all of the responsive information must be withheld under applicable authority."  *See* 32 C.F.R. § 1908.14; *see also* FAC ¶ 25.

Since the passage of this rule, the plaintiffs allege that "CIA began responding to MDR requests with demands that requesters commit to pay all search, review, and duplication fees at the new fee schedule described in 32 C.F.R. § 1908.14."  FAC ¶ 26.  Specifically, three of the plaintiffs (NSC, Stein, and Mark Zaid) each submitted one or more MDR requests to the CIA following promulgation of the Final Rule, and the CIA responded to each request by asking the requester to commit to pay the fees outlined in 32 C.F.R. § 1908.14 and holding the request in abeyance until such a commitment was given.  *See id.* ¶¶ 27–35.  Based on these allegations, the plaintiffs claim that "CIA violated the APA by publishing a Final Rule substantially altering [the former 32 C.F.R. § 1908.13] without first using a Proposed Rule subject to notice and comment."  *Id.* ¶ 38.  The plaintiffs further allege that the CIA's Final Rule "does not meet the narrow requirements for an interpretive rule that is exempt from the notice and comment requirement."  *Id.*  To remedy this alleged violation, the plaintiffs seek, *inter alia*, vacatur of the Final Rule.  *See id.* ¶ 39.

## II.     LEGAL STANDARDS

### A.     Subject-Matter Jurisdiction

When faced with a motion to dismiss for lack of subject-matter jurisdiction under Rule

12(b)(1), a court has "an affirmative obligation to consider whether the constitutional and

statutory authority exist" for it to hear the case.  *James Madison Ltd. v. Ludwig*, 82 F.3d 1085,

1092 (D.C. Cir. 1996) (internal quotation marks omitted).  For this reason, "the [p]laintiff's

factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion

than in resolving a 12(b)(6) motion for failure to state a claim."  *Grand Lodge of Fraternal*

*Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (internal quotation marks

omitted).  When the purported lack of jurisdiction stems from a lack of standing, however, the

court "must assume that [the plaintiff] states a valid legal claim."  *Info. Handling Servs., Inc. v.*

*Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003).  The proponent of

jurisdiction bears the burden of proving that jurisdiction exists, *Khadr v. United States*, 529 F.3d

1112, 1115 (D.C. Cir. 2008), and while "the district court may consider materials outside the

pleadings," it must "still accept all of the factual allegations in the complaint as true."  *Jerome*

*Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citations and internal

quotation marks omitted).

### B.     Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead "enough

facts to state a claim to relief that is plausible on its face" and to "nudge[] [his or her] claims

across the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007); *see also* FED. R. CIV. P. 12(b)(6).  "[A] complaint [does not] suffice if it tenders 'naked

assertion[s]' devoid of 'further factual enhancement.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Twombly*, 550 U.S. at 557).  Instead, the complaint must plead facts that are more than "'merely consistent with' a defendant's liability." *Id.* (quoting *Twombly*, 550 U.S. at 557).  Rather, "the plaintiff [must] plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *accord Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  The Court "must assume all the allegations in the complaint are true (even if doubtful in fact) . . . [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008) (citations and internal quotation marks omitted).

C.     **FOIA**

Congress enacted the FOIA to promote transparency across the government.  *See* 5 U.S.C. § 552; *Quick v. U.S. Dep't of Commerce, Nat'l Inst. of Standards & Tech.*, 775 F. Supp. 2d 174, 179 (D.D.C. 2011).  The Supreme Court has explained that the FOIA is "a means for citizens to know 'what their Government is up to.'  This phrase should not be dismissed as a convenient formalism.  It defines a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–172 (2004) (citation and internal quotation marks omitted).  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  As a result, the FOIA requires federal agencies to release all records responsive to a request for production.  *See* 5 U.S.C. § 552(a)(3)(A).  Federal courts are authorized under the FOIA "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." *Id.* § 552(a)(4)(B).

This strong interest in transparency must be tempered, however, by the "legitimate governmental and private interests [that] could be harmed by release of certain types of information." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010) (internal quotation marks omitted); *see also Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc).  Accordingly, Congress included nine exemptions permitting agencies to withhold information from FOIA disclosure.  *See* 5 U.S.C. § 552(b).  "These exemptions are explicitly made exclusive, and must be narrowly construed." *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1262 (2011) (citations and internal quotation marks omitted); *see also Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010) ("FOIA allows agencies to withhold only those documents that fall under one of nine specific exemptions, which are construed narrowly in keeping with FOIA's presumption in favor of disclosure." (citations omitted)).  When a FOIA requester properly exhausts its administrative remedies, it may file a civil action challenging an agency's response to its request.  *See* 5 U.S.C. § 552(a)(4)(B); *Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004) (per curiam).  Once such an action is filed, the agency generally has the burden of demonstrating that its response to the plaintiff's FOIA request was appropriate.

The D.C. Circuit has also recognized that, separate from claims seeking relief for specific requests made under the FOIA, requesting parties may also assert a "claim that an agency *policy or practice* will impair the party's lawful access to information in the future."  *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988) (emphasis in original); *accord Newport Aeronautical Sales v. Dep't of the Air Force*, 684 F.3d 160, 164 (D.C. Cir. 2012).  The Court in *Payne* held that a policy-or-practice claim is viable "[s]o long as an agency's refusal to supply information evidences a policy or practice of delayed disclosure or some other failure to abide by

14

the terms of the FOIA, and not merely isolated mistakes by agency officials." *Payne*, 837 F.2d

at 491.  To state a claim for relief under the doctrine articulated in *Payne*, a plaintiff must

plausibly demonstrate that the agency in question has adopted, endorsed, or implemented a

policy or practice that constitutes an ongoing "failure to abide by the terms of the FOIA."  *See id.*

## III.    DISCUSSION

The defendants raise two grounds in support of their partial motion to dismiss.[7]  First,

they contend that the plaintiffs lack Article III standing to sue regarding each of the plaintiffs'

four policy-or-practice claims (Counts Five, Six, Fifteen, and Twenty-Five).  Second, the

defendants argue that three of the plaintiffs' claims (Counts Five, Nineteen, and Twenty-Six (in

part)) must be dismissed for failure to exhaust administrative remedies.  Finally, the defendants

contend that seven of the plaintiffs' claims (Counts One, Five, Six, Fifteen, Twenty-One,

Twenty-Two, and Twenty-Five) must be dismissed for failure to state a claim upon which relief

may be granted.  When a federal court is faced with both a challenge to its Article III jurisdiction

to hear certain claim as well as a challenge to the merits of those claims, the court must address

the jurisdictional question before addressing any question of the merits.  *See Steel Co. v. Citizens*

*for a Better Env't*, 523 U.S. 83, 101 (1998); *accord Pub. Citizen v. U.S. Dist. Ct. for the Dist. of*

*Columbia*, 486 F.3d 1342, 1346 (D.C. Cir. 2007) ("'Article III jurisdiction is always an

antecedent question' to be answered prior to any merits inquiry." (quoting *Steel Co.*, 523 U.S. at

101)).  Therefore, the Court will begin by discussing the defendants' standing arguments before

---

[7] Although the pending partial motion to dismiss was filed by both defendants, the remaining claims challenged in that motion are limited to causes of action pled against the CIA.  The defendants' motion originally moved for dismissal of Count Twenty-Three of the First Amended Complaint, which is the only claim pled against the ODNI, for insufficient service of process.  *See* Defs.' Partial Mot. to Dismiss at 1, ECF No. 14.  The plaintiffs later effectuated service on ODNI, *see* Pls.' Opp'n to Defs.' Partial Mot. to Dismiss ("Pls.' Opp'n") at 2. n.2, ECF No. 18, which all parties agree renders the defendants' challenge to Count Twenty-Three moot, *see id.*; Defs.' Reply in Supp. of Partial Mot. to Dismiss ("Defs.' Reply") at 1 n.1, ECF No. 23.

discussing administrative exhaustion and the defendants' other argument for dismissal pursuant to Rule 12(b)(6).

### A.  <u>Standing</u>

Article III of the United States Constitution limits the federal judicial power to the resolution of "Cases" and "Controversies."  U.S. CONST. art. III, § 2.  "In limiting the judicial power to 'Cases' and 'Controversies,' Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).  In other words, "[t]he case-or controversy doctrines state fundamental limits on federal judicial power in our system of government."  *Allen v. Wright*, 468 U.S. 737, 750 (1984).  "The Art[icle] III doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important of these doctrines."  *Id.*

As the Supreme Court has explained, "the irreducible constitutional minimum of standing contains three elements."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  First, the plaintiff must have suffered an "injury in fact," *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Id.* (citations and internal quotation marks omitted).  Second, there must be "a causal connection between the injury and the conduct complained of," *i.e.*, the injury alleged must be fairly traceable to the challenged action of the defendant.  *Id.*  Finally, it must be likely that the injury will be redressed by a favorable decision.  *Id.* at 561.

Moreover, when a plaintiff seeks prospective declaratory or injunctive relief, allegations of past harms are insufficient.  *See, e.g.*, *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).  Rather, when declaratory or injunctive relief is sought, a plaintiff "must show he is suffering an

ongoing injury or faces an immediate threat of [future] injury." *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).  When a plaintiff seeks injunctive or declaratory relief specifically for the purpose of challenging an alleged policy or practice of a government agency, it must also demonstrate that it is "'realistically threatened by a repetition of [its] experience.'" *Haase v. Sessions*, 835 F.2d 902, 910–11 (D.C. Cir. 1987) (quoting *Lyons*, 461 U.S. at 109).  To plead a "threat of repetition," a plaintiff must make "more than a nebulous assertion of the existence of a 'policy,'" and that it is "likely to be subjected to the policy again." *Id.* at 911. This threat must be "real and immediate," or, alternatively, "realistic[]" in nature. *See Lyons*, 461 U.S. at 102; *Golden v. Zwickler*, 394 U.S. 103, 109 (1969); *see also Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1274 (D.C. Cir. 1994) (collecting cases and observing that the standard for judging likelihood of future injury has been formulated as "likely," "fairly probable," and "certainly impending").

In the instant action, the CIA argues that the plaintiffs lack standing to pursue their *Payne* policy-or-practice claims because "[n]one of the plaintiffs allege any specific plans to file FOIA requests in the future that would implicate the alleged policies and practices they seek to challenge."  Mem. in Supp. of Defs.' Partial Mot. to Dismiss ("Defs.' Mem.") at 7–8 (emphasis omitted), ECF No. 14.  Instead, the CIA contends, the plaintiffs' "claims of future injury rest entirely on the bare allegation that they are frequent FOIA requesters." *Id.* at 8.  According to the CIA, "[p]laintiffs' status as frequent FOIA requesters cannot transform speculation and conjecture into cases or controversies," and thus this Court lacks jurisdiction to entertain the plaintiffs' policy-or-practice claims. *See id.* at 10.  The plaintiffs' response to these arguments is quite cursory.  In addition to spending several pages attempting to distinguish various precedents from this Circuit cited by the CIA, which the Court discusses further below, the plaintiffs simply

state, without further elaboration or support, that they "have made the same assertions that Judge Kennedy found sufficient in" *Citizens for Responsibility & Ethics in Washington v. Executive Office of the President* ("*CREW/EOP*"), 587 F. Supp. 2d 48 (D.D.C. 2008) (Kennedy, J.). *See* Pls.' Opp'n to Defs.' Partial Mot. to Dismiss ("Pls.' Opp'n") at 19, ECF No. 18.

To put the parties' arguments in context, the Court will briefly discuss the handful of cases from this Circuit that the parties discuss in their briefing, both for and against standing.  In addition to *CREW/EOP*, the parties focus their attention on three cases:  *Quick v. U.S. Department of Commerce, National Institute of Standards & Technology*, 775 F. Supp. 2d 174 (D.D.C. 2011); *Citizens for Responsibility & Ethics in Washington v. U.S. Department of Homeland Security* ("*CREW/DHS*"), 527 F. Supp. 2d 101 (D.D.C. 2007); and *American Historical Association v. National Archives & Records Administration*, 310 F. Supp. 2d 216 (D.D.C. 2004).  *See* Defs.' Mem. at 8–10; Pls.' Opp'n at 16–19.  Although none of these cases is on all fours with the instant action, the cases are helpful in elucidating certain principles that govern standing in the context of FOIA policy-or-practice claims.

First, the *Quick* case stands for the uncontroversial proposition that, even assuming that an alleged policy or practice exists and some FOIA requesters may have been subject to that policy, FOIA plaintiffs must establish that they have personally been subject to the alleged policy to have standing to challenge it.  *See Quick*, 775 F. Supp. 2d at 187 (observing that the record was "clear" that "even assuming that individuals other than [the plaintiff] may have been subject to the alleged 'pattern or practice,'" the plaintiff had not been subject to it and thereby lacked standing).  Additionally, *Quick*, *CREW/DHS*, and *American Historical Association* establish that plaintiffs do not have standing to pursue policy-or-practice claims if they cannot demonstrate that they have any outstanding FOIA requests (other than the requests challenged in

the litigation) that are likely to implicate the alleged policies and lead to future injury. *See id.* at

187 (finding no standing where plaintiff stated that he "plan[ned] to file additional FOIA

requests to the [defendant] in the future," though none had actually been filed); *CREW/DHS*, 527

F. Supp. 2d at 106 (finding no standing where plaintiff "[did] not allege anywhere in its

complaint or opposition brief that it has a FOIA request pending with the DHS"); *American*

*Historical Association*, 310 F. Supp. 2d at 228 (finding no standing where "Plaintiffs have no

outstanding requests for presidential records"). Other cases, including *CREW/EOP*, have

clarified that, where FOIA requesters challenge an alleged ongoing policy or practice and can

demonstrate that they have pending FOIA requests that are likely to implicate that policy or

practice, future injury is satisfied. *See Citizens for Responsibility & Ethics in Wash. v. U.S. Sec.*

*& Exch. Comm'n* ("*CREW/SEC*"), 858 F. Supp. 2d 51, 60 (D.D.C. 2012) (holding that

"outstanding FOIA requests that involve documents that likely will be unavailable due to the

challenged policy" are sufficient to allege future injury); *CREW/EOP*, 587 F. Supp. 2d at 60–61

(holding that, because plaintiffs "each allege that they have FOIA requests for e-mails currently

pending with the [defendant agencies] and intend to file future requests," their allegations of

future injury were "real and immediate" (quoting *Pub. Citizen v. Carlin*, 2 F. Supp. 2d 1, 6

(D.D.C. 1997))); *see also Nat'l Sec. Counselors v. CIA*, Nos. 11-443, 11-444, 11-445, 2012 WL

4903377, at *18–20 (D.D.C. Oct. 17, 2012) (holding that plaintiff had standing to pursue policy-

or-practice claims when "it had already submitted fifteen FOIA requests to the CIA since filing

the Complaints" which were "likely to implicate the claimed policies and practices at issue

because the pending and future requests appear to be of the same character as the specific

requests that form the basis of the plaintiff's current claims").

The plaintiffs' contention that they "have made the same assertions that Judge Kennedy found sufficient in *CREW v. EOP*," *see* Pls.' Opp'n at 19, however, is unsupported by the allegations in the First Amended Complaint or any other materials submitted by the plaintiffs. Unlike the plaintiff in *CREW/EOP*, the plaintiffs in the instant action have not alleged or demonstrated that "they have FOIA requests for [records likely to implicate the challenged policies] currently pending with the [allegedly offending agency]." *See CREW/EOP*, 587 F. Supp. 2d at 60–61.  Indeed, the instant action is also readily distinguishable from the related cases analyzed by this Court in *National Security Counselors v. CIA*, 2012 WL 4903377.  In those related actions, NSC similarly challenged a number of allegedly unlawful policies or practices of the CIA pursuant to the FOIA.  *See* 2012 WL 4903377, at *2–9 (summarizing twelve policies or practices alleged).  NSC stated, in contrast with the instant action, that "it had already submitted fifteen FOIA requests to the CIA since filing the Complaints in these actions," which this Court found were "likely to implicate the claimed policies and practices at issue because the pending and future requests appear to be of the same character as the specific requests that form the basis of the plaintiff's current claims."  *See id.* at *19.  In *NSC v. CIA*, this Court also observed that NSC had "displayed a clear intent to continue filing FOIA requests with the CIA, supported by its consistent habit of filing such requests both before *and after* the commencement of this litigation and its stated mission 'to obtain records about national security issues.'"  *Id.* (emphasis added).  Although in *NSC v. CIA* this Court cited NSC's "clear intent to continue filing FOIA requests with the CIA" as a basis to conclude that NSC had standing to pursue its policy-or-practice claims, that "clear intent" was only concretely apparent because of the outstanding FOIA requests that NSC was still pursuing with the CIA, which were themselves likely to implicate the challenged policies in the future.  *See id.*

By contrast, in this case, the plaintiffs have merely alleged that they "stand to continue to be harmed" because "they regularly file FOIA requests with CIA and will continue to do so in the future."  FAC ¶ 137; *see also id.* ¶ 76 ("As a frequent FOIA requester to CIA, NSC stands to continue to be harmed by this ongoing practice in the future."); *id.* ¶ 83 ("NSC stands to continue to be harmed by this ongoing policy in the future, as it regularly files FOIA requests with CIA and will continue to do so in the future."); *id.* ¶ 218 ("Plaintiffs stand to continue to be harmed by this ongoing policy in the future, as they regularly file FOIA requests with CIA (many of which CIA denies citing this 'intelligence sources and methods' language) and will continue to do so in the future.").  These general statements about a "regular" course of conduct and an expressed intention to "continue to do so in the future" do not establish the same concrete likelihood of injury that emanates from allegations of specific, pending FOIA requests that are likely to be subject to an agency's challenged policies.  This concrete likelihood of future injury was extant in the cases discussed above where standing was found, *see Nat'l Sec. Counselors*, 2012 WL 4903377, at *18–20; *CREW/SEC*, 858 F. Supp. 2d at 60; *CREW/EOP*, 587 F. Supp. 2d at 60–61, and the generalized statements offered by the plaintiffs in the instant case are not sufficiently concrete for the Court to conclude that the plaintiffs are likely to be subjected to these alleged policies or practices in the future.[8]  *See, e.g.*, *Summers*, 555 U.S. at 496 (holding that plaintiff's "vague desire to return is insufficient to satisfy the requirement of imminent injury"); *Lujan*, 504 U.S. at 564 (holding that "the affiants' profession of an 'intent' to return to

---

[8] The Court does not doubt that, as allegedly prolific FOIA requesters, the plaintiffs may very well have concrete plans to file future FOIA requests, or may have FOIA requests currently pending with the CIA, which are likely to implicate the policies or practices claimed in this action.  Nevertheless, the burden of establishing jurisdiction lies with the party who contends that jurisdiction exists, *Khadr*, 529 F.3d at 1115, and therefore it is the plaintiffs' burden to come forth with evidence or allegations that establish jurisdiction.  It is not for the Court to make assumptions about the plaintiffs' FOIA activities based solely on their status as "frequent" or "regular[]" FOIA requesters.  *See* FAC ¶¶ 76, 83, 137, 218.  Indeed, the Supreme Court in *Summers* rejected a similar approach in the context of organizational standing.  *See Summers*, 555 U.S. at 497 (rejecting the "hitherto unheard of test for organizational standing" whereby standing exists by virtue of "a statistical probability that some of [an organization's] members are threatened with concrete injury").

the places they had visited before . . . is simply not enough" because "[s]uch 'some day'

intentions—without any description of concrete plans, or indeed any specification of *when* the

some day will be—do not support a finding of the 'actual or imminent' injury that our cases

require" (emphasis in original)); *Haase*, 835 F.2d at 911 ("[I]t will not do for [the plaintiff] to

assert generally that he might one day return to Nicaragua.  More immediate and concrete plans

are necessary.").  The Court thus concludes that the plaintiffs have failed to establish that they

have Article III standing to bring their policy-or-practice claims, and the Court must therefore

dismiss those claims, pleaded in Counts Five, Six, Fifteen, and Twenty-Five of the First

Amended Complaint, for lack of subject-matter jurisdiction.[9]

## B.      Exhaustion of Administrative Remedies

"'Exhaustion of administrative remedies is generally required before filing in federal

court so that the agency has an opportunity to exercise its discretion and expertise on the matter

and to make a factual record to support its decision.'"  *Hidalgo v. FBI*, 344 F.3d 1256, 1258

(D.C. Cir. 2003) (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 61 (D.C. Cir. 1990)).

Although the exhaustion requirement under the FOIA is not jurisdictional, "as a jurisprudential

doctrine, failure to exhaust precludes judicial review if 'the purposes of exhaustion' and the

'particular administrative scheme' support such a bar."  *Id.* at 1258–59 (quoting *Oglesby*, 920

F.2d at 61); *see also Wilbur*, 355 F.3d at 677 (holding that "[e]xhaustion of administrative

remedies is generally required before seeking judicial review"); *Sinito v. U.S. Dep't of Justice*,

176 F.3d 512, 516 (D.C. Cir. 1999) (recognizing that "FOIA requires each requestor to exhaust

administrative remedies" (citing *Oglesby*, 920 F.2d at 61)); *Dettmann v. U.S. Dep't of Justice*,

---

[9] Since the Court dismisses Counts Five, Six, Fifteen, and Twenty-Five for lack of standing, the Court need not
address the CIA's other arguments for dismissal of those claims.  *See* Defs.' Mem. at 10–16, 20–32, 37–39 (arguing
for dismissal of Counts Five, Six, Fifteen, and/or Twenty-Five on grounds of ripeness, availability of adequate
remedies at law, and failure to state a claim).

802 F.2d 1472, 1476 (D.C. Cir. 1986) ("It goes without saying that exhaustion of remedies is required in FOIA cases.").

Under the FOIA, there are two ways for a requester to exhaust administrative remedies: actual exhaustion and constructive exhaustion.  Actual exhaustion is required when an agency responds to a request and determines, within twenty working days, whether and how to comply with that request, and in that situation a requester dissatisfied with the agency's determination must administratively appeal it to the head of the agency before filing suit.  *See* 5 U.S.C. § 552(a)(6)(A); *see also Oglesby*, 920 F.2d at 65 ("[F]oregoing an administrative appeal will preclude the [FOIA] requester from ever bringing suit on that request because the individual will not have exhausted his administrative remedies . . . ."); *Weisberg v. U.S. Dep't of Justice* ("*Weisberg I*"), 745 F.2d 1476, 1497 (D.C. Cir. 1984) (holding that appellant "did not exhaust his administrative remedies" where he "pretermitted the administrative stage of the processing of FOIA requests").  For purposes of actual exhaustion, the D.C. Circuit has held that "[a] response is sufficient for purposes of requiring an administrative appeal" if it includes "the agency's determination of whether or not to comply with the request; the reasons for its decision; and notice of the right of the requester to appeal to the head of the agency if the initial agency decision is adverse." *Oglesby*, 920 F.2d at 65.  When an agency fails to respond to a request within twenty working days, however, a requester "shall be deemed to have exhausted his administrative remedies with respect to such request," 5 U.S.C. § 552(a)(6)(C), and may therefore immediately seek judicial review in federal district court.  *See, e.g., Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003) ("A requester is considered to have constructively exhausted administrative remedies and may seek judicial review immediately if . . . the agency fails to answer the request within twenty days.").  This kind of "constructive

exhaustion" is "a special provision virtually unique to FOIA."  *Spannaus v. U.S Dep't of Justice*, 824 F.2d 52, 58 (D.C. Cir. 1987).

In the instant case, the CIA argues that NSC failed to exhaust its administrative remedies in connection with the FOIA request at issue in Count Nineteen and two of the three FOIA requests at issue in Count Twenty-Six of the First Amended Complaint.[10]  *See* Defs.' Mem. at 16–20.  It is apparent from the face of the First Amended Complaint that NSC did not file an administrative appeal of these three FOIA requests.  *See* FAC ¶¶ 164–66, 229–31.  Instead, NSC alleges that it constructively exhausted its administrative remedies.  *See id.* ¶¶ 167, 232. Specifically, NSC contends that it was not required to file an administrative appeal for these three FOIA requests because the CIA's denial letter "did not meet the procedural requirements of 5 U.S.C. § 552(a)(6)(F)," *see* Pls.' Opp'n at 38, which states:

> In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request, unless providing such estimate would harm an interest protected by the exemption in subsection (b) pursuant to which the denial is made.

5 U.S.C. § 552(a)(6)(F).  Since the CIA's denial letters did not contain the volume estimate set forth in this provision, the plaintiffs allege that those denial letters were "legally insufficient" and did not trigger the requirement to file an administrative appeal.  *See* FAC ¶¶ 166, 231; Pls.' Opp'n at 38–40.  Thus, the plaintiffs' contention that NSC constructively exhausted its administrative remedies is premised on the allegation that "twenty working days [had] elapsed without a substantive determination by CIA which [met] the volume estimate requirement of FOIA."  *See* FAC ¶¶ 167, 232.

---

[10] The two requests from Count Twenty-Six that the CIA contends were not exhausted are FOIA Request Nos. F-2011-1891 and F-2012-318.  *See* FAC ¶¶ 229–32.

At first blush, the D.C. Circuit's holding in *Oglesby* appears to foreclose the plaintiff's argument out of hand.  As discussed above, *Oglesby* held that:

> A response is sufficient for purposes of requiring an administrative appeal if it includes:  the agency's determination of whether or not to comply with the request; the reasons for its decision; and notice of the right of the requester to appeal to the head of the agency if the initial agency decision is adverse.

*Oglesby*, 920 F.2d at 65.  *Oglesby*, however, was decided in 1990—six years prior to the 1996 Electronic FOIA Amendments, which added the volume-estimate provision contained in 5 U.S.C. § 552(a)(6)(F).  *See* Electronic FOIA Amendments, Pub. L. No. 104-231, § 8(c), 110 Stat. 3048, 3052 (1996).  Thus, the Court must decide whether the holding in *Oglesby* continues to comport with the FOIA and whether 5 U.S.C. § 552(a)(6)(F) must be satisfied before an agency's response is sufficient for purposes of requiring an administrative appeal.

At the outset, the Court observes that the narrow question presented is whether an agency's response to a FOIA request which lacks a volume estimate requires actual exhaustion or instead permits constructive exhaustion.  With that in mind, the Court need only look to the plain language of the FOIA, and in particular the FOIA's requirements for resorting to constructive exhaustion, to resolve the issue.  The FOIA's constructive exhaustion provision states that "[a]ny person making a request to any agency for records under [5 U.S.C. §§ 552(a)(1)–(3)] shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph."  5 U.S.C. § 552(a)(6)(C)(i).  This provision's reference to "the applicable time limit provisions of this paragraph" is clearly a reference to the time limits contained in 5 U.S.C. § 552(a)(6)(A).  Indeed, 5 U.S.C. § 552(a)(6)—the "paragraph" referred to in 5 U.S.C. § 552(a)(6)(C)(i)—only contains one set of "time limit provisions," and those are the time limits contained in 5 U.S.C. § 552(a)(6)(A).  Therefore, in order to foreclose constructive exhaustion

and require a requester to file an administrative appeal, an agency need only satisfy the requirements of 5 U.S.C. § 552(a)(6)(A), which is precisely what the D.C. Circuit held in *Oglesby*. *See* 920 F.2d at 65; *see also* 5 U.S.C. § 552(a)(6)(A)(i) (requiring agency to "determine within 20 days . . . after the receipt of any [FOIA] request whether to comply with such request" and "immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination"). Additionally, as the CIA points out, the D.C. Circuit did not incorporate into its holding in *Oglesby* "another longstanding statutory requirement for agency decision letters," *see* Defs.' Mem. at 19 n.3, which obligates agencies to "set forth the names and titles or positions of each person responsible for the denial of such request," *see* 5 U.S.C. § 552(a)(6)(C)(i). The Court finds the fact that the D.C. Circuit excluded this requirement from its holding in *Oglesby* to undercut the plaintiff's argument regarding the volume-estimate requirement in 5 U.S.C. § 552(a)(6)(F).

The plaintiffs resist this conclusion by contending that "*Oglesby* is itself contradicted by binding Supreme Court precedent." Pls.' Opp'n at 39. In support of this argument, the plaintiffs cite the Supreme Court's recent decision in *Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885 (2011). *See* Pls.' Opp'n at 39. That case dealt with the question of "whether a federal agency's written response to a request for records under the [FOIA] constitutes a 'report' within the meaning of the public disclosure bar" in the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq. Schindler Elevator*, 131 S. Ct. at 1889. The Supreme Court held that such a written response did qualify as a "report" under the FCA because it "plainly is 'something that gives information,' a 'notification,' and an 'official or formal statement of facts.'" *See id.* at 1893. In arriving at that holding, the majority observed that "[w]hen an

agency denies a [FOIA] request in whole or in part, it must additionally . . . 'make a reasonable effort to estimate the volume of any denied matter,' and 'provide any such estimate to the person making the request.'"  *Id.* (quoting 5 U.S.C. § 552(a)(6)(F)).

The Court does not read this statement from *Schindler Elevator* as a holding that a volume estimate of withheld material is required before a FOIA requester's obligation to file an administrative appeal is triggered.  It cannot be disputed, and the CIA does not dispute, that an agency is required to provide an estimate of the volume of any withheld material "[i]n denying any request for records, in whole or in part," *see* 5 U.S.C. § 552(a)(6)(F); *see also, e.g.*, *Mobley v. Dep't of Justice*, 845 F. Supp. 2d 120, 124 (D.D.C 2012), but, importantly, the FOIA does not tie that obligation to the statute's separate provision dealing with constructive exhaustion. Constructive exhaustion in the FOIA is a privilege granted only to individuals whose requests for records have essentially been ignored by the agency, and it is a privilege reserved for a situation in which agency neglect has resulted in a "fail[ure] to comply with the applicable time limit provisions of" 5 U.S.C. § 552(a)(6).[11]  *See* 5 U.S.C. § 552(a)(6)(C)(i); *see also, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. FEC*, 839 F. Supp. 2d 17, 24 (D.D.C. 2011) ("Constructive exhaustion is not intended to supplant the agency's authority under the FOIA with premature judicial oversight.").  That is not the case here.  The Court is sympathetic to the fact that failing to provide an estimate of the volume of material withheld will likely render an agency's administrative appeal process less meaningful because the requester will not know how much potentially responsive material is at issue.  Yet, that same conclusion applies with equal force to

---

[11] In fact, cases from this Circuit have held that, even where an agency fails to comply with the time-limit provisions of 5 U.S.C. § 552(a)(6), the agency can still require a requester to file an administrative appeal before filing suit if, for example, the agency substantively responds to the request before the requester filed suit, *see, e.g.*, *Rossotti*, 326 F.3d at 1310; *Love v. FBI*, 660 F. Supp. 2d 56, 59–60 (D.D.C. 2009), or even where the agency merely notifies the requester "that the agency is processing the request and intends to produce responsive documents," *see Citizens for Responsibility & Ethics in Wash. v. FEC*, 839 F. Supp. 2d 17, 25 (D.D.C. 2011).

other facts that are not required to be given prior to an administrative appeal, such as a *Vaughn* index listing and describing the withheld documents. *See, e.g.*, *Mobley*, 845 F. Supp. 2d at 124. The Court finds no evidence from the statutory text or case law to suggest that an agency's failure to provide an estimate of the volume of material withheld permits a FOIA requester to invoke constructive exhaustion and forego an administrative appeal before filing a lawsuit.[12]  As a result, the Court concludes that NSC failed to exhaust its administrative remedies regarding the FOIA request at issue in Count Nineteen and two of the three FOIA requests at issue in Count Twenty-Six of the First Amended Complaint.

Having concluded that NSC failed to exhaust its administrative remedies, the Court must consider whether permitting NSC now to challenge the CIA's responses to these three FOIA requests would undermine either the "particular administrative scheme" or the "purposes of exhaustion." *See Hidalgo*, 344 F.3d at 1258–59.  The Court concludes that permitting NSC's challenge to these three FOIA requests would, at the very least, frustrate the purposes of administrative exhaustion, and therefore, the Court will dismiss NSC's challenges to these requests on that basis.

The D.C. Circuit has stated that non-jurisdictional exhaustion serves three primary purposes:  "giving agencies the opportunity to correct their own errors, affording parties and courts the benefits of agencies' expertise, [and] compiling a record adequate for judicial review." *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004) (internal quotation marks omitted); *accord Wilbur*, 355 F.3d at 677 (holding that the "purposes and policies underlying the exhaustion requirement" are "to prevent premature interference with agency processes, to give the parties and the courts [the] benefit of the agency's experience and expertise and to compile

_____

[12] Indeed, an administrative appeal is the proper place to raise, in the first instance, a challenge to an agency's failure to provide a volume estimate in accordance with 5 U.S.C. § 552(a)(6)(F), for it is through such an administrative appeal process that the agency has the opportunity to correct its errors before a federal case is made out of them.

an adequate record for review"). "Exhaustion concerns apply with particular force when the action under review involves exercise of the agency's discretionary power or when the agency proceedings in question allow the agency to apply its special expertise." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992), *superseded by statute on other grounds*, Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321.  Administrative exhaustion is designed "to give the agency a fair and full opportunity to adjudicate [a party's] claims," which "'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (emphasis in original) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)).

Two cases from this Circuit—*Hidalgo v. FBI* and *Wilbur v. CIA*—elucidate the concerns at play in the doctrine of FOIA administrative exhaustion.  In *Hidalgo*, a prisoner filed a FOIA request seeking records related to an FBI informant who had helped the government prosecute him.  *Hidalgo*, 344 F.3d at 1257.  While the plaintiff's request was still pending within the twenty-day statutory response period, he filed an "appeal," erroneously asserting that the FBI had failed to respond to his request within the statutory time limit.  *Id.*  Less than two weeks later, the FBI sent the plaintiff a response denying his FOIA request.  *Id.* at 1258.  The plaintiff then filed a civil action challenging the FBI's denial of his request, and the district court granted summary judgment to the government on the ground that FOIA Exemption 6 precluded disclosure of the information sought.  *Id.*  The D.C. Circuit vacated and remanded, however, holding that the plaintiff's complaint should have been dismissed for failure to exhaust his administrative remedies.  *Id.*  The Circuit held that although "Hidalgo's appeal may have been timely, in a literal sense, it did not promote the purposes of the exhaustion doctrine" because the administrative appeal was filed "before the FBI acted on his request" and thus "the appeal could

not and did not place the substance of the FBI's response before the [FBI's Office of Information and Privacy, or 'OIP']." *Id.* at 1259. The OIP, in response to his untimely administrative appeal, had specifically advised Hidalgo that he could administratively appeal any final action, and because Hidalgo "did not heed the OIP's directive," to "permit him to ignore the OIP's directive 'would cut off the agency's power to correct or rethink initial misjudgments or errors,' and frustrate the policies underlying the exhaustion requirement." *Id.* at 1259–60 (quoting *Oglesby*, 920 F.2d at 64).

By contrast, *Wilbur* involved a scenario where, although the plaintiff's filing of his FOIA request and the CIA's denial of that request both occurred in 1994, the plaintiff did not file an administrative appeal of the denial until January 1999. *See Wilbur*, 355 F.3d at 676. Nevertheless, the Court held that the appeal to federal district court was appropriate because the CIA "received and accepted for consideration" the plaintiff's administrative appeal, even though it was several years tardy, and thus the plaintiff had ultimately exhausted his administrative remedies. *Id.* at 676–77. The Circuit distinguished the scenario presented in *Wilbur* from that presented in *Hidalgo* because "Wilbur did not bypass the administrative review process but pursued it to its end; he was simply late (albeit four years late)." *Id.* at 677. In other words, because the CIA had accepted and processed Wilbur's administrative appeal and was able to review its initial determination, "the policies underlying the exhaustion requirement [were] served." *Id.*

From *Wilbur* and *Hidalgo*, a clear principle emerges: Failure to exhaust administrative remedies is *not* a mere technicality, and a court must decline to decide the merits of an unexhausted FOIA claim when the plaintiff fails to comply with procedures for administrative review, denying the agency an opportunity to review its initial determination, apply its expertise,

correct any errors, and create an ample record in the process.  This principle applies with full force to this case.  With respect to the three unexhausted FOIA requests in Counts Nineteen and Twenty-Six, the CIA has had no opportunity to develop an administrative record regarding the aspects of the CIA's responses that the plaintiffs are challenging, let alone an opportunity to correct any errors that may have been the source of the plaintiffs' grievances.  This is why administrative exhaustion is particularly important in FOIA cases, since there are a number of areas in which a requester can challenge an agency's response, including the validity of its claimed exemptions, the adequacy of its search efforts, and the correctness of its refusal to provide a fee-waiver request.  Thus, requiring a FOIA requester to exhaust administrative remedies crystalizes the scope of the requester's challenge in a way that puts the agency on notice of what aspects of the agency's response are contested.  None of that was able to occur in this case due to NSC's failure to file an administrative appeal, despite being notified of its right to do so.  Therefore, the Court concludes that NSC's failure to exhaust its administrative remedies undermines the purposes of administrative exhaustion.  As a result, the Court will grant the CIA's motion to dismiss the plaintiffs' challenges regarding the FOIA request at issue in Count Nineteen and two of the three FOIA requests at issue in Count Twenty-Six of the First Amended Complaint.[13]

---

[13] The plaintiffs contend, in a supplemental filing, that the CIA has improperly moved to dismiss for failure to exhaust administrative remedies pursuant to Rule 12(b)(1), rather than Rule 12(b)(6).  *See* Pls.' Supplemental Brief Regarding Defs.' Partial Mot. to Dismiss at 1, ECF No. 37.  The plaintiffs are correct that failure to exhaust administrative remedies is not a jurisdictional defect, but instead is grounds for dismissal under Rule 12(b)(6).  *See, e.g., Hidalgo*, 344 F.3d at 1260.  Although the plaintiff is correct that the CIA's exhaustion arguments are contained within Part II of its opening brief, which generally addresses jurisdictional issues, *see* Defs.' Mem. at 6–23, the CIA did not specifically contend that 12(b)(1) was the basis of its exhaustion argument with regard to Counts Nineteen and Twenty-Six, and the Court takes the CIA at its word when it says that it "moves to dismiss Counts . . . 19, . . . and 26 (in part) of Plaintiffs' First Amended Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction *and* Rule 12(b)(6) for failure to state a claim upon which relief can be granted." *See* Defs.' Partial Mot. to Dismiss at 1, ECF No. 14 (emphasis added).  Even if the CIA had not grounded its exhaustion arguments in a motion to dismiss under Rule 12(b)(6), the Court would still dismiss the plaintiffs' challenges regarding the three unexhausted FOIA requests *sua sponte* under Rule 12(b)(6).  *See Toensing v. U.S. Dep't of Justice*, No. 11-1215, 2012 WL 4026099, at *16 (D.D.C. Sept. 13, 2012).

C.    **Failure to State a Claim**

Finally, the Court will address the CIA's arguments for dismissing Counts One, Twenty-One, and Twenty-Two of the First Amended Complaint for failure to state a claim upon which relief may be granted.  The Court will begin by addressing Counts Twenty-One and Twenty-Two before moving to the plaintiffs' APA challenge contained in Count One.

1.    *County Twenty-One:  Construction Plaintiffs' FOIA Request*

The CIA moves to dismiss County Twenty-One of the First Amended Complaint, which challenges the CIA's response to Request #3 discussed above, which sought "thirty-two specified documents currently published in the CIA Records Search Tool ('CREST')" and asked that "'[r]ecords which are currently published in CREST in redacted form should be reviewed for full release under FOIA.'"  *See* FAC ¶ 177.  In response to this request, the CIA "released paper copies of the redacted versions of the thirty-two documents which were published in CREST."  *Id.*  After plaintiff Sack "[administratively] appealed all redactions in the thirty-two documents," as well as the denial of her fee-waiver request, the CIA responded by refusing to accept the appeal, stating that "[i]t was not clear you were requesting a re-review of these documents."  *Id.* ¶¶ 179–80.  The CIA argues that this claim should be "dismissed because the CIA's interpretation of plaintiff's request for previously released documents was reasonable and because Ms. Sack was not entitled to a waiver of the assessed duplication costs."  Defs.' Mem. at 32.  The plaintiffs argue, however, that "CIA's interpretation was patently unreasonable" because Sack's request "specified that she wanted any redacted records to be reviewed for full release and did not want CIA to simply provide documents in the redacted form in which they were published in CREST."  Pls.' Opp'n at 41.

The D.C. Circuit has established that an agency "has a duty to construe a FOIA request liberally," *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995), and are

"bound to read it as drafted" not as "agency officials . . . might wish it was drafted," *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984).  In this regard, it is clear that, for example, when a FOIA requester "seek[s] all of a certain set of documents" while also "evincing a heightened interest in a specific subset thereof," such a request "is reasonably susceptible to the broader reading" of seeking the entire set of documents despite the fact that a specific subset of documents is named.  *See LaCedra v. Exec. Office for U.S. Attorneys*, 317 F.3d 345, 348 (D.C. Cir. 2003); *see also Nation Magazine*, 71 F.3d at 890 (holding that FOIA request seeking records "'pertaining to' [Ross] Perot" and specifically "ask[ing] for records indexed under Perot's name" was "sufficient to alert the agency that appellants sought information about Perot, even if it was not indexed under his name").  Even so, "[a]n agency may decide to limit the scope of an ambiguous request as long as the narrowed scope is a reasonable interpretation of what the request seeks."  *Wilson v. U.S. Dep't of Transp.*, 730 F. Supp. 2d 140, 154 (D.D.C. 2010) (citing *Larson v. Dep't of State*, 565 F.3d 857, 869 (D.C. Cir. 2009)), *aff'd*, No. 10-5295, 2010 WL 5479580 (D.C. Cir. Dec. 30, 2010).  The standard, as with many aspects of the FOIA, is reasonableness.

Thus, the CIA's motion to dismiss Count Twenty-One boils down to whether or not the CIA reasonably interpreted the scope of plaintiff Sack's FOIA request.  The Court, however, cannot conclude that the CIA's interpretation of Ms. Sack's FOIA request was reasonable as a matter of law.  The CIA focuses its reasonableness argument on the first sentence of the FOIA request, which asked for "copies of **the attached thirty-two documents in the [CIA] CREST system**."  *See* Defs.' Mem. at 33 (emphasis in original) (quoting Defs.' Ex. A at 1, ECF No. 14-1).  In light of this one sentence, the CIA contends that "it was faced with a clear request for 'copies' of 'thirty two documents' listed in the 'CREST system.'"  *Id.*  The CIA gives short

shrift, however, to the remaining sentences of the opening paragraph of Ms. Sack's FOIA request. In particular, the CIA selectively omits the sentence of the FOIA request, which stated that "records which are currently published in CREST in redacted form should be reviewed for full release under FOIA." Defs.' Ex. A at 1.[14] The CIA attempts to minimize this critical contextual sentence by arguing that "plaintiff's request was internally contradictory and emphasized the previously released information database," and therefore "the CIA reasonably construed it to be a request for copies of all of the identified documents." Defs.' Reply in Supp. of Partial Mot. to Dismiss ("Defs.' Reply") at 21, ECF No. 23.

The CIA's arguments, however, are unpersuasive. It is true that Ms. Sack's FOIA request was not a model of clarity. If she were seeking a re-review of the CREST documents at issue, she should have ideally stated that she was seeking *unredacted* copies of those documents, rather than only saying she was seeking "copies." In fact, if all Ms. Sack had said in her FOIA request were that she was seeking "copies" of the specified CREST documents, the CIA's construction of her request as one for redacted, previously released versions of the specified records would have been a reasonable one. Yet, that is *not* all that Ms. Sack said in her request. Rather, she clarified what she meant by "copies" in the very same paragraph, stating that any redacted versions of the requested records "should be reviewed *for full release*." Defs.' Ex. A at 1 (emphasis added).[15] It was unreasonable for the CIA to ignore such clear instructions

---

[14] "While a court may not consider 'matters outside the pleadings' in evaluating a motion to dismiss under Rule 12(b)(6) without converting the motion to one for summary judgment under Rule 56, documents that are referenced in, or are an integral part of, the complaint are deemed not 'outside the pleadings.'" *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 179 n.20 (D.D.C. 2012) (citation omitted) (citing *Mead v. Lindlaw*, 839 F. Supp. 2d 66, 70 (D.D.C. 2012)). Request #3 was explicitly incorporated by reference into the First Amended Complaint, *see* FAC ¶¶ 177–78, and thus the Court's consideration of the text of that request does not convert the defendants' motion to dismiss into a motion for summary judgment.

[15] It is for this reason that the CIA is incorrect to assert that Ms. Sack's request was "internally contradictory." *See* Defs.' Reply at 21. Seeking "copies" of certain records, while also asking for any redacted copies to be "reviewed for full release," is not internally inconsistent because "copies" and "unredacted copies" are not mutually exclusive. The latter is merely a subset of the former.

conveying the intended scope of a FOIA request, at least insofar as those instructions were contained within the four corners of the request itself. *See Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996) (holding that agencies must follow "clear and certain" leads for responsive records that are contained within "the four corners of the request"). Indeed, cases within this Circuit have often disapproved of agencies narrowing the scope of a FOIA request to exclude materials reasonably within the description provided by the requester. *See, e.g.*, *LaCedra*, 317 F.3d 345, 348; *Nation Magazine*, 71 F.3d at 890; *Nicholls v. U.S. Office of Personnel Mgmt.*, 863 F. Supp. 2d 4, 10–11 (D.D.C. 2012) (requiring agency to read FOIA request for "appeals" to include "records relating to reconsiderations" of appeals); *Charles v. Office of Armed Forces Med. Exam'r*, 730 F. Supp. 2d 205, 215–16 (D.D.C. 2010) (finding unreasonable agency's decision to interpret request for "autopsy reports 'commenting on, discussing or indicating' fatal bullet wounds" to include only "documents containing explicit 'statements' about these topics"). Accordingly, the Court concludes that the CIA's construction of Request #3 was not reasonable, and therefore the defendants' motion to dismiss will be denied with respect to Count Twenty-One.

## 2. *County Twenty-Two: Producing Duplicative Records*

Next, the CIA moves to dismiss Count Twenty-Two of the First Amended Complaint. That count, as discussed above, challenges the CIA's response to Request #5, which sought "the first page of the initial response letter for each of the fifteen FOIA requests identified" in a prior FOIA request. *See* FAC ¶ 190. NSC submitted Request #5 because it previously agreed to combine two prior FOIA requests, which sought two separate categories of records. The first category consisted of fifteen FOIA requests from 2008 that were denied because they did not "reasonably describe[]" the records sought, while the second category consisted of 290 FOIA requests from 2008 that were deemed improper for other reasons. *See* Defs.' Mem. at 36. The

plaintiffs allege that "it is not possible to discern from the records themselves which records are responsive to which request," and after informally seeking clarification from the CIA on this issue, NSC filed Request #5 to determine definitively which records were responsive to which request. *See* FAC ¶¶ 189–90.  There is no dispute that the records sought in Request #5 are duplicative of records already produced by the CIA to NSC, and it appears that the only purpose for submitting Request #5 was to "identify which of the hundreds of records responsive to [the previous combined FOIA request] were the fifteen requests specifically mentioned in the 2008 Annual Report." *See id.* ¶ 194.

The CIA moves for dismissal of Count Twenty-Two, contending that "plaintiff filed a deliberately redundant request with the intent of forcing the CIA to answer its question," and "[t]he CIA is not obligated to produce redundant records to the same requester."  Defs.' Mem. at 35, 37 (citing *Weisberg v. U.S. Dep't of Justice* ("*Weisberg II*"), 848 F.2d 1265, 1271 (D.C. Cir. 1988), *overruled on other grounds by King v. Palmer*, 950 F.2d 771, 785 (D.C. Cir. 1991) (en banc)).  The CIA also cites the principle that "the FOIA does not oblige the CIA to create new records or to answer questions about agency records, so the CIA was not required to explain the produced records to plaintiff."  Defs.' Reply at 21.  NSC concedes "that it made an error in judgment by initially allowing CIA to combine its initial requests," but it maintains nonetheless that it is not seeking an explanation from the CIA, but rather is seeking "a piece of *information* which was lacking from the previous requests—which fifteen requests were denied in Fiscal Year 2008 because the information sought was not 'reasonably described.'" *See* Pls.' Opp'n at 44 (emphasis in original).  NSC argues that Request #5 was "the least invasive FOIA request it could devise to receive the records that would allow it to divine the information it required,"

even "offer[ing] to withdraw the request if CIA provided a simple list of the requested documents." *Id.*

The Court agrees with the plaintiffs on this issue. The CIA is correct that the FOIA does not obligate agencies to create records, *see, e.g.*, *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 4 n.3 (D.C. Cir. 2011), or answer questions*, see, e.g.*, *Moore v. FBI*, 883 F. Supp. 2d 155, 163 (D.D.C 2012) (citing *Hudgins v. IRS*, 620 F. Supp. 19, 21 (D.D.C. 1985)). The CIA extends its argument too far, however, when it contends that it "is not obligated to produce redundant records to the same requester." *See* Defs.' Mem. at 37. In certain limited factual circumstances, this statement of law by the CIA could be accurate. For example, where a single requester fails to exhaust his administrative remedies with regard to certain withheld records, and then files a duplicative FOIA request for the exact same records in order to revive the unexhausted issues for purposes of litigation, the agency is not required to re-review the same records to indulge the requester. *See Toensing*, 2012 WL 4026099, at *15 ("[A]fter agency employees have already processed a FOIA request and made withholding decisions, requiring the same or yet another agency employee to plow the same ground all over again, while a backlog of requesters remain waiting for attention, is not an efficient use of agency resources."). That, however, is not the situation here. The CIA also somewhat misleadingly cites to language from the D.C. Circuit's opinion in *Weisberg II*, which affirmed the district court's denial of a FOIA requester's motion to compel production of records that had already been produced pursuant to a court order. *See* 848 F.2d at 1270–71. The Circuit's statements in *Weisberg II*, however, were in the context of whether a FOIA requester had "substantially prevailed" for purposes of awarding attorneys' fees, *see id.*, not whether the FOIA obligates agencies to produce duplicative records to the same requester.[16]

---

[16] The cases that the CIA cites from other circuits are similarly inapposite. *See* Defs.' Mem. at 37; Defs.' Reply at 22. In *CareToLive v. FDA*, 631 F.3d 336, 343–44 (6th Cir. 2011), the Sixth Circuit held that an agency was not

Unlike the situation presented in *Toensing*, the CIA is not refusing to produce the records sought in Request #5 because it does not want to re-review the records and make new withholding determinations.  Indeed, the CIA does not indicate that it would need to withhold any information from the fifteen specific records sought in Request #5, which appear to consist entirely of routine correspondence from the CIA to FOIA requesters.  *See* Defs.' Mem. at 35–36. The FOIA states categorically that, so long as a request for records "reasonably describes such records" and complies with agency rules regarding the submission of FOIA requests, the agency "shall make the [requested] records promptly available to any person," *see* 5 U.S.C. § 552(a)(3)(A), subject of course to the exemptions contained in 5 U.S.C. § 552(b).  Thus, absent some contention that the production of redundant records to the same requester would run afoul of the FOIA by imposing an undue burden upon the CIA or requiring the CIA to create records, the Court concludes that the plaintiffs' claim in County Twenty-Two regarding the CIA's response to Request #5 can go forward.  The Court finds nothing in the FOIA that would foreclose an individual from seeking the production of records already disclosed to him, particularly in a situation like the instant case where an individual seeks redundant documents in order to obtain a new piece of information.[17]  In such a situation, the agency is free to charge the

---

required to attempt to recover certain deleted electronic files in response to a FOIA request.  Thus, its statement that "when the data retrieved would only be cumulative of items already produced, attempting to perform this type of data retrieval is unnecessary" was in the context of the adequacy of an agency's *search*, not an agency's obligation to *produce* duplicative records that had already been located.  *See id.*  In *Stewart v. U.S. Department of the Interior*, 554 F.3d 1236, 1243 (10th Cir. 2009), where an agency denied a fee-waiver request at least in part because the FOIA request sought the search of backup tapes which potentially contained records already produced, the Tenth Circuit stated that the agency did not need "to catalogue the e-mails already produced" in order to support the fee-waiver denial.  Aside from the fact that this statement from *Stewart* is pure dicta, it was also written in the completely separate context of a fee-waiver denial and thus has no persuasive force regarding an agency's obligation to produce redundant records to a single requester.

[17] A number of cases from this Circuit have recognized the closely related principle that FOIA requesters may submit entirely duplicative requests in order to cure certain defects in their original requests.  *See, e.g.*, *Spannaus*, 824 F.2d at 61 (observing that requester "can simply refile his FOIA request tomorrow and restart the process" since "nothing prevents him from requesting the same withheld documents decade after decade without ever bringing a timely suit to compel disclosure"); *Abuhouran v. U.S. State Dep't*, 843 F. Supp. 2d 73, 77 n.1 (D.D.C. 2012) ("The

requester for the cost of locating and copying the records in accordance with its regulations, and the agency is not necessarily required to reassess any prior withholding determinations regarding the redundant records, *see Toensing*, 2012 WL 4026099, at *15, but the agency cannot flatly refuse to process the request on the theory that "the FOIA does not require an agency to indulge a requester who repeatedly seeks the same records," Defs.' Reply at 22.

### 3.   *Count One:  Whether Notice-and-Comment Procedures Were Required to Change the CIA's MDR Fee Structure*

The final claim at issue in the defendants' motion to dismiss is Count One, which is brought pursuant to the APA and therefore stands apart from the preceding analysis.  In Count One, the plaintiffs allege that the CIA violated the APA by promulgating a final rule, which modified the CIA's structure for charging fees associated with MDR requests, without first making the rule the subject of notice-and comment procedures.  *See* FAC ¶¶ 20–39.  The CIA moves to dismiss this claim, contending that "[t]he final rule issued by the CIA does not violate the APA because it is a 'rule of agency procedure and interpretation' not subject to the notice and comment requirements."  Defs.' Mem. at 1.  In particular, the CIA argues that the Final Rule "is not a 'legislative rule' subject to notice and comment," but is instead a "rule[] of agency organization, procedure, or practice."  *See id.* at 3; *see also* 5 U.S.C. § 553(b).  The plaintiffs contend, however, that the CIA's Final Rule is a "legislative rule" because it (1) takes away their "right to receive preferential treatment as non-commercial requesters" and their "right to receive public interest fee waivers where appropriate," and (2) "encoded the substantive value judgment that non-commercial requesters were no longer different from commercial requesters, with full knowledge that changing CIA's longstanding practice in this manner would effectively remove non-commercial requesters' ability to file MDR requests."  Pls.' Opp'n at 9–10.

---

disposition of this case does not preclude plaintiff from resubmitting his request to [the agency] with the proper waiver . . . .").

The APA generally requires that all "rule makings" be subject to the procedures outlined in 5 U.S.C. § 553, which principally include (1) notice published in the *Federal Register*; and (2) an opportunity for "interested persons" to "participate in the rule making through submission of written data, views, or arguments." *See* 5 U.S.C. § 553.[18]  These notice-and-comment procedures, however, explicitly do not apply, *inter alia*, to "rules of agency organization, procedure, or practice." *See id.* § 553(b).  This statutory exception for procedural rules "was provided to ensure that agencies retain latitude in organizing their internal operations." *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980).

"Procedure and its opposite, substance," however, "are not talismanic labels or given premises.  Rather, they are legal conclusions which depend upon their settings for definition." *Neighborhood TV Co. v. FCC*, 742 F.2d 629, 637 (D.C. Cir. 1984) (internal quotation marks omitted); *see also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1450 (2010) (Stevens, J., concurring) ("The line between procedural and substantive law is hazy, and matters of procedure and matters of substance are not mutually exclusive categories with easily ascertainable contents." (citations and internal quotation marks omitted)); *Nat'l Motor Freight Traffic Ass'n v. United States*, 268 F. Supp. 90, 96 (D.D.C. 1967) (three-judge panel) ("The characterizations 'substantive' and 'procedural'—no more here than elsewhere in the law—do not guide inexorably to the right result, nor do they really advance the inquiry very far."), *aff'd*, 292 U.S. 18 (1968).  Indeed, our Circuit has candidly confessed that it has

---

[18] The CIA only relies upon this procedural rule exception and does not rely on the APA's other exceptions to notice-and-comment procedures, such as the exceptions for "interpretative rules" or "general statements of policy." *See* Defs.' Reply at 3 ("[T]he question here is simply whether [the Final Rule] falls within the procedural rule exception as construed by this Court's binding precedent."); *see also* 5 U.S.C. § 553(b) (listing other exceptions). For this reason, the plaintiffs' arguments based on the D.C. Circuit's four-factor test in *American Mining Congress v. Mine Safety & Health Administration*, 995 F.2d 1106, 1108–12 (D.C. Cir. 1993), *see* Pls.' Opp'n at 5–9, are inapposite because *American Mining Congress* addressed the distinction between legislative rules, on the one hand, and "interpretive rules" and "general statements of policy" on the other.  Indeed, the D.C. Circuit never referenced the APA's procedural rule exception in *American Mining Congress*, and therefore that case is neither binding nor persuasive authority in deciding the issue raised by the CIA's motion to dismiss in the instant action.

"struggled with the distinction between 'substantive' and 'procedural' rules," *JEM Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994),[19] and has held that, in order for a court's analysis to "improve[] upon semantic play," it must "focus on the underlying purposes of the procedural requirements at issue," *Batterton*, 648 F.2d at 703. The two primary underlying purposes of the APA's notice-and-comment procedures are "to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies, and to assure that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987) (citations and internal quotation marks omitted); *see also Chamber of Commerce of U.S. v. U.S. Dep't of Labor*, 174 F.3d 206, 211 (D.C. Cir. 1999) ("[W]e apply § 553(b)(3)(A) with an eye toward balancing the need for public participation in agency decisionmaking with the agency's competing interest in retaining latitude in organizing its internal operations." (internal quotation marks omitted)).

Cognizant of the statutory purposes underlying notice and comment, the D.C. Circuit has held that the procedural rule exception's "critical feature is that it covers agency actions that do not themselves alter the rights or interests of the parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *Batterton*, 648 F.2d at 334. This articulation reflects an analysis that "is functional, not formal." *See Chamber of Commerce*, 174 F.3d at 212. Importantly, this functional analysis requires courts "to identify the 'substantive rights and interests' that may be altered without prior opportunity for notice and

---

[19] *See also Chamber of Commerce of U.S. v. U.S. Dep't of Labor*, 174 F.3d 206, 211 (D.C. Cir. 1999) (noting that "[t]his distinction is often difficult to apply, as even a purely procedural rule can affect the substantive outcome of an agency proceeding"); *Orengo Caraballo v. Reich*, 11 F.3d 186, 194 (D.C. Cir. 1993) ("The distinction between rules or statements which are subject to the notice and comment requirements of § 553 and rules or statements which are exempt from those procedures is notoriously 'hazy.'"); *Neighborhood TV*, 742 F.2d at 637 ("Courts have not had an easy time deciding whether particular agency rules were 'procedural' or 'substantive.'"); *Batterton*, 648 F.2d at 702–03, 707 (observing that the categories excepted from notice and comment "have 'fuzzy perimeters' and 'establish no general formula,'" and noting that the procedural rule exception "may be the hardest to define").

comment" because "not every interest so qualifies, since every change in rules will have some effect on those regulated." *Neighborhood TV*, 742 F.2d at 637.  The analysis has also "gradually shifted focus from asking whether a given procedure has a 'substantial impact' on parties to inquiring more broadly whether the agency action also encodes a substantive value judgment or puts a stamp of approval or disapproval on a given type of behavior." *Bowen*, 834 F.2d at 1047.

From these broader themes, certain, more concrete, principles have emerged to guide the application of the APA's exemption for procedural rules.  First, "[i]n determining whether a rule is substantive, [a court] must look at [the rule's] effect on those interests ultimately at stake in the agency proceeding." *Neighborhood TV*, 742 F.2d at 637.  Hence, agency rules that impose "derivative," "incidental," or "mechanical" burdens upon regulated individuals are considered procedural, rather than substantive.  *See Bowen*, 834 F.2d at 1051.  More broadly, the D.C. Circuit has held that "an otherwise-procedural rule does not become a substantive one, for notice-and-comment purposes, simply because it imposes a burden on regulated parties." *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000).

Another principle that has emerged in this Circuit to identify procedural rules is that, although a procedural rule generally may not "encode[] a substantive value judgment or put[] a stamp of approval or disapproval on a given type of behavior," *see Bowen*, 834 F.2d at 1047, "the fact that the agency's decision was based on a value judgment about procedural efficiency does not convert the resulting rule into a substantive one," *Glickman*, 229 F.3d at 282; *see also JEM Broadcasting*, 22 F.3d at 328 ("[Appellant's] reasoning threatens to swallow the procedural exception to notice and comment, for agency housekeeping rules often embody a judgment about what mechanics and processes are most efficient.").  A corollary to this principle is that rules are generally considered procedural so long as they do not "change the *substantive standards* by

which the [agency] evaluates" applications which seek a benefit that the agency has the power to provide. *See JEM Broadcasting*, 22 F.3d at 327 (emphasis in original). For example, in the context of the FOIA, the D.C. Circuit has held that an agency's policy imposing a cut-off date for searches was procedural because it "ma[de] no distinctions between requests on the basis of subject matter" and hence "clearly encode[d] no 'substantive value judgment.'" *See Pub. Citizen v. Dep't of State*, 276 F.3d 634, 641 (D.C. Cir. 2002).

a)   *Effect on Rights and Interests of MDR Requesters*

With these principles in mind, the Court begins by considering whether the Final Rule adversely affects "those interests ultimately at stake in the agency proceeding." *See Neighborhood TV*, 742 F.2d at 637. The CIA argues that the Final Rule is procedural because it does not affect any of the rights or interests provided to members of the public through the MDR program, as promulgated in Executive Order 13,526. *See* Defs.' Mem. at 3–4. In particular, the CIA contends that "[p]laintiffs' ability to request the declassification of documents is unchanged." *Id.* at 4. The CIA further states that "[t]he executive order confers no rights on [the plaintiffs] to pay, for example, only a certain rate for duplication of the documents they requested," but "[i]nstead, that rate is a quintessentially procedural matter." *Id.* The plaintiff, however, argues that "'[t]he government focuses on the wrong right.'" Pls.' Opp'n at 9 (quoting *Benten v. Kessler*, 799 F. Supp. 281, 289 (E.D.N.Y. 1992)). In this regard, the plaintiffs contend that "CIA's own promulgation of 32 C.F.R. [§] 1908.13 in 1997 'borrowing the FOIA fee structure'" conveyed upon them "a right to receive preferential fee treatment as non-commercial requesters" and "a right to receive public interest fee waivers where appropriate." *See id.* at 9–10. According to the plaintiffs, "it is *those* rights which were taken away by the [Final] Rule." *Id.* at 10.

At the outset, the Court is skeptical whether either of the "rights" articulated by the plaintiffs are, in fact, benefits that any individual was *entitled to* under the previous MDR fee structure.  The "preferential fee treatment" accorded to non-commercial requesters under the previous MDR fee structure was dependent upon a requester establishing that, among other things, "the information [sought] will be used in a specific scholarly or analytical work, will contribute to the advancement of public knowledge, and will be disseminated to the general public."  *See* 32 C.F.R. § 1900.02(h)(2).  Additionally, the availability of a fee waiver under the previous MDR fee structure was a matter of agency discretion, just as it is in the context of the FOIA.  *See, e.g.*, *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 35 (D.C. Cir. 1998) (noting an agency's "discretion under [the FOIA's] fee waiver provision").  Even taking the plaintiffs' "rights" argument at face value, the relevant question for purposes of the APA is not whether the Final Rule burdens or even eliminates *any* rights or interests, but rather whether the Final Rule adversely affects "those interests *ultimately at stake* in the agency proceeding."  *See Neighborhood TV*, 742 F.2d at 637 (emphasis added).  There can be no question that *those* interests are the ones focused on by the CIA—namely, the public's interest in being able to seek the declassification of "information that no longer meets the standards for classification."  *See* Exec. Order 13,526 § 3.5(c); Defs.' Mem. at 4; Defs.' Reply at 4.

The plaintiffs refer to this interest in their opposition brief, stating that the Final Rule "effectively remove[s] non-commercial requesters' ability to file MDR requests" because "[t]he sheer magnitude of review fees would be enough to effectively prevent non-commercial requesters . . . from filing any but the simplest MDR requests."  Pls.' Opp'n at 10.  Executive Order 13,526 provides that, under the MDR program "all information classified under this order or predecessor orders *shall* be subject to a review for declassification" if a request meets certain

conditions, and agencies conducting an MDR "*shall* declassify information that no longer meets the standards for classification." *See* Exec. Order. 13,526 § 3.5(a), 3.5(c) (emphasis added). As discussed above, these are substantive interests. *See, e.g.*, *Nat'l Ass'n of Waterfront Emp'rs v. Solis*, 665 F. Supp. 2d 10, 17 (D.D.C. 2009) (holding that "informational interests are substantive and are entitled to APA protection" (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979))). Thus, although the Final Rule's effective foreclosure of the public's interest in seeking the review of classified material for declassification would raise a serious question about the procedural nature of the Rule, the plaintiffs simply do not allege such a foreclosure in their First Amended Complaint. In fact, the First Amended Complaint is completely silent regarding the Final Rules' infringement of the plaintiffs' interest in being able to seek the declassification of documents through the MDR program or the public's interest in having access to information that no longer meets the standards for classification. Indeed, it is unclear whether the plaintiffs would even be *capable* of alleging the practical effects of the CIA's new MDR fee structure: the First Amended Complaint indicates that the plaintiffs have steadfastly refused to pay the fees required by the Final Rule for each of the MDR requests that they have submitted since the Final Rule was promulgated, *see* FAC ¶¶ 29, 31, 34, but nowhere alleges that the plaintiffs would be unable to pay the fees imposed by the Final Rule or that, if forced to pay such fees, the magnitude of the fees would affect the scope or volume of their MDR requests. Thus, although it is clear that charging search, review, and duplication fees to non-commercial entities imposes a burden—perhaps even a heavy burden—on certain MDR requesters, the plaintiffs have failed to allege (and thus the Court has no basis to conclude) that that burden has adversely affected "those interests ultimately at stake in the agency proceeding."[20] *See Neighborhood TV*, 742 F.2d

---

[20] Although the plaintiff raises the argument regarding the effective preclusion of non-commercial MDR requests in its opposition brief, "'it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to

at 637; *see also Glickman*, 229 F.3d at 281 ("[A]n otherwise-procedural rule does not become a substantive one, for notice-and-comment purposes, simply because it imposes a burden on regulated parties."); *Nat'l Whistleblower Ctr. v. Nuclear Regulatory Comm'n*, 208 F.3d 256, 262–63 (D.C. Cir. 2000) (rule intended to expedite license renewal proceedings "resulted in tight schedules" for applicants but was nevertheless procedural because applicants "were not denied an effective opportunity to be heard" and the rule "did not foreclose effective opportunity to be heard"); *Batterton*, 648 F.2d at 702 (observing that non-legislative rules do not "foreclose alternate courses of action or conclusively affect rights of private parties"); *Ranger v. FCC*, 294 F.2d 240, 244 (D.C. Cir. 1961) (holding the FCC's cut-off policy was procedural even though "failure to observe it might cause the loss of substantive rights").  *Compare Reeder v. FCC*, 865 F.2d 1298, 1305 (D.C. Cir 1989) (holding rule was substantive where it "changed the substantive criteria for substitution and permanently foreclosed the petitioners from pursuing their upgrade plans").

### b)  Substantive Value Judgment

The Court must also consider the related question of whether the CIA's elimination of the commercial/non-commercial distinction (for fee purposes) "encodes a substantive value judgment or puts a stamp of approval or disapproval on a given type of behavior." *Bowen*, 834 F.2d at 1047.  On this score, the CIA maintains that "its MDR Program regulation does not make value judgments or distinguish between relevant members of the public," but rather "the fee schedule distinguishes only on the basis of the costs incurred by the agency for reproduction, search, and review to satisfy the request." *See* Defs.' Mem. at 5–6.  It argues that the distinctions between commercial and non-commercial requesters "are simply not distinctions 'on the basis of

---

dismiss.'" *See, e.g., Freedom Watch, Inc. v. Obama*, 859 F. Supp. 2d 169, 173 (D.D.C. 2012) (quoting *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003)).

subject matter.'" *See* Defs.' Reply at 5 (quoting *Public Citizen*, 276 F.3d at 640).  The plaintiffs

contend, however, that "it is the very fact that [the Final Rule] does *not* distinguish between

relevant members of the public that is the substantive value judgment." *See* Pls.' Opp'n at 10.

In others words, the plaintiffs argue that, in the Final Rule, "the CIA encoded the substantive

value judgment that non-commercial requesters were *no longer* different from commercial

requesters" for purposes of charging fees in conjunction with MDR requests. *See id.* (emphasis

in original).  The plaintiffs' argument on this count is supported to some degree by the

allegations in the First Amended Complaint that the plaintiffs are non-commercial requesters

who have "rel[ied] on CIA's long practice of not charging MDR fees." *See* FAC ¶ 27.

      It is certainly possible that the Final Rule's intent, at a high enough level of generality,

was to "put[] a stamp of . . . disapproval" on the mission of non-commercial requesters, *see*

*Bowen*, 834 F.2d at 1047, since it makes it more costly for non-commercial requesters to secure

the declassification of information than it used to be under the old fee structure.  Yet, as our

Circuit has counseled, "[*a*]*ll* decisions, to the extent that they derive from reasons, necessarily

are based on the value judgment that the chosen option is better, in some relevant way, than its

alternatives." *See Glickman*, 229 F.3d at 282.  The Final Rule in the instant action does not make

it any more costly for non-commercial requesters to secure declassification of information than it

does for any other members of the public, and requiring *all* MDR requesters to pay the same fees

in order for the CIA to recoup the costs of searching, reviewing, and duplicating requested

material can hardly be called a "substantive value judgment" under our Circuit's precedents

because the classification of requesters has no connection whatsoever to the *substance* of a

request.  A simple example demonstrates why this is so:  Professor A seeks the declassification

of a piece of information for the purpose of writing a scholarly article that favors a given

government policy, while Professor B simultaneously seeks declassification of the same piece of information for the purpose of writing a scholarly article that *dis*favors the same government policy. Both persons face the exact same costs to pursue their missions, even though their missions are, in substance, diametrically opposed to one another, and that conclusion would be true *regardless* of whether the professors made their MDR requests before or after the Final Rule went into effect.

Additionally, although the parties do not raise this point, the Court finds instructive a parallel body of authority that addresses whether rules requiring the payment of court filing fees are procedural or substantive. The Supreme Court has characterized uniform court filing fees to initiate legal actions as "reasonable procedural requirements for triggering the right to an adjudication." *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437 (1982). The D.C. Circuit has made a similar characterization in the context of the Prison Litigation Reform Act's ("PLRA's") "three-strikes provision," which "specifies that, after having three times filed suits or appeals that were dismissed on one of the enumerated grounds, a prisoner must pay" the requisite filing fee. *See Ibrahim v. District of Columbia*, 208 F.3d 1032, 1036 (D.C. Cir. 2000). In *Ibrahim*, the Circuit held that the "three strikes" provision was "a procedural rule" because it "neither divests a prisoner of his right to bring a claim nor changes the law in a way that adversely affects his prospects for success on the merits of the claim." *See id.*; *accord Lisenby v. Lear*, 674 F.3d 259, 263 (4th Cir. 2012); *Funtanilla v. Downs*, 131 F. App'x 536, 537 (9th Cir. 2005). Rather, the "three-strikes" provision requires an indigent prisoner to "pay his own way like any other litigant." *Ibrahim*, 208 F.3d at 1036.

It would make little sense to hold that the PLRA's three-strikes provision is a mere procedural rule but also hold that the Final Rule in the instant case is a substantive one. There is

no meaningful practical distinction between an indigent prisoner being required to "pay his own

way like any other litigant," *see id.*, and a non-commercial MDR requester being required to pay

the same search, review, and duplication fees as every other MDR requester.  The contexts of the

two rules are certainly distinguishable—for example, the three-strikes provision was passed by

Congress, while the Final Rule was promulgated by an unelected agency—but their functional

effects are nearly identical.  *See Chamber of Commerce*, 174 F.3d at 212 ("[T]he question

whether a rule is substantive or procedural for the purposes of § 553(b) is functional, not

formal.").  Thus, much like court filing fees addressed in *Ibrahim* and the cut-off provision in

*Public Citizen*, the CIA's uniform MDR fee structure encodes no substantive value judgments,

despite the fact that it eliminates preferences previously granted to certain groups of MDR

requesters.  *See Public Citizen*, 276 F.3d at 641("Because the [State] Department's cut-off policy

applies to all FOIA requests, making no distinction between requests on the basis of subject

matter, it clearly encodes no 'substantive value judgment.'"); *see also Kaspar Wire Works, Inc.

v. Sec'y of Labor*, 268 F.3d 1123, 1131–32 (D.C. Cir. 2001) (holding that OSHA's imposition of

penalties on a "per instance" basis was a procedural rule under the APA).

c)      *The Purposes of Requiring Notice and Comment*

Finally, the Court must assess whether the Final Rule affects potential MDR requesters

"to a degree sufficient to implicate the policy interests animating notice-and-comment

rulemaking."  *See Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.* ("*EPIC*"), 653 F.3d 1,

6 (D.C. Cir. 2011).  In *EPIC*, the D.C. Circuit considered whether the Transportation Security

Administration's ("TSA's") decision "to screen airline passengers by using advanced imaging

technology [or 'AIT'] instead of magnetometers" qualified for the APA's procedural rule

exception.  *See id.* at 2–3.  It was "clear that by producing an image of the unclothed passenger,

49

an AIT scanner intrudes upon his or her personal privacy in a way a magnetometer does not." *Id.*
at 6.  Thus, the Circuit held that "regardless whether this is a 'new substantive burden,' the
change substantively affects the [privacy interests of the] public to a degree sufficient to
implicate the policy interests animating notice-and-comment rulemaking." *Id.*

In evaluating whether the Final Rule likewise "has the hallmark of a substantive rule,"
*see id.*, the "critical question is whether the agency action jeopardizes the rights and interests of
parties," *Batterton*, 648 F.2d at 708.  Before exempting a rule from notice-and-comment
procedures, the Court must assure itself that this is one of the "limited situations where
substantive rights are not at stake," otherwise it is imperative that potentially affected parties be
given a chance to raise concerns and suggest how the agency should craft its rule to protect the
substantive rights implicated.  *See Bowen*, 834 at 1044–45.  In *EPIC*, the interests implicated by
the TSA's rule were the public's "privacy interests." *See* 653 F.3d at 6.  Even though the AIT
scanners imposed no "new substantive burden" on members of the public—since they imposed
the same "requirement that a passenger pass through a security checkpoint" and "prohibition
against boarding a plane with a weapon or an explosive" that the magnetometers had—the AIT
scanners "intrude[d] upon [the public's] personal privacy in a way a magnetometer does not."
*Id.*  Thus, the Court reads *EPIC* to stand for the proposition that, even where a rule does not
adversely affect "those interests ultimately at stake in the agency proceeding," *see Neighborhood
TV*, 742 F.2d at 637, it may still be subject to notice and comment if it intrudes upon other,
important or fundamental rights or interests held by affected parties.

Even so, the Court concludes that, based on the allegations in the First Amended
Complaint, the principle articulated in *EPIC* is not applicable to the instant case.  As discussed
above, the plaintiffs have not sufficiently alleged that the CIA's Final Rule has any adverse

effect on "those interests ultimately at stake in the agency proceeding," *see id.*, and the plaintiffs have likewise failed to allege that the Final Rule infringes upon any other important rights or interests held by MDR requesters, such as personal privacy, freedom of speech, or the equal protection of the law.  Therefore, the Court concludes that the situation presented by this case is one "where the policies promoted by public participation in rulemaking are outweighed by the countervailing considerations of effectiveness, efficiency, expedition and reduction in expense." *See Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 662 (D.C. Cir. 1978).  As such, although this case presents a close question under the D.C. Circuit's limited guidance on this issue, the Court concludes that, based on the allegations in the First Amended Complaint, the plaintiffs have not sufficiently alleged that the Final Rule fails to qualify as a procedural rule that was exempt from the APA's notice-and-comment procedures.  For that reason, the plaintiffs' claim in Count One of their First Amended Complaint must be dismissed for failure to state a claim upon which relief may be granted.

## IV.    CONCLUSION

As the foregoing discussion establishes, the defendants' partial motion to dismiss will be granted in part and denied in part.  The Court will grant the defendants' motion as to the plaintiffs' FOIA policy-or-practice claims in Counts Five, Six, Fifteen, and Twenty-Five because the plaintiffs lack standing to bring those claims, and thus the Court lacks subject-matter jurisdiction to hear them.  Further, the Court grants the defendants' motion, pursuant to Rule 12(b)(6), as to the plaintiffs' claim in Counts Nineteen and as to two of the three FOIA requests challenged in Count Twenty-Six because the plaintiffs failed to exhaust their administrative remedies with respect to the three FOIA requests underlying those claims.  Finally, the Court grants the defendants' motion as to the plaintiffs' claim in Count One challenging the CIA's

promulgation of its Final Rule regarding its MDR fee structure without notice and comment because the plaintiffs have not sufficiently alleged that the Rule fails to qualify as a procedural rule, which is exempt from the notice-and-comment requirement.  The Court denies the defendants' motion, however, with respect to the plaintiffs' claims in Counts Twenty-One and Twenty-Two because, in those counts, the plaintiffs have successfully pleaded claims for which relief may be granted.

An appropriate Order accompanies this Memorandum Opinion.

Date: March 20, 2013

/s/ *Beryl A. Howell*

BERYL A. HOWELL
United States District Judge