## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL SECURITY COUNSELORS, *et al.*, | |
| Plaintiffs, | Civil Action No. 12-284 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| CENTRAL INTELLIGENCE AGENCY, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

The plaintiffs, a Virginia-based non-profit organization called National Security Counselors ("NSC") and three individuals (collectively, the "plaintiffs"), brought this action against the Central Intelligence Agency ("CIA") and the Office of the Director of National Intelligence ("ODNI") (collectively, the "defendants"), pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500, *et seq.*, and related statutes, challenging the defendants' responses to numerous FOIA requests and requests for Mandatory Declassification Review ("MDR") of classified agency records, as well as various practices and policies employed by the defendants in responding to such requests generally. While this action initially comprised more than two dozen separate claims under six federal statutes, seven of the plaintiffs' pattern or practice challenges have already been dismissed in whole or in part. *Nat'l Sec. Counselors v. CIA* (*NSC I*), 931 F. Supp. 2d 77 (D.D.C. 2013). Pending before the Court are two motions: the defendants' Renewed Motion for Summary Judgment as to all of the plaintiffs' remaining claims and the plaintiffs' Cross-Motion

1

for Partial Summary Judgment.  For the reasons set out below, the defendants' renewed motion is granted in part and denied in part, and the plaintiffs' motion is denied.

## I.      BACKGROUND

Much of the relevant factual background underlying the present motions is described in this Court's prior opinion resolving the defendants' motion to dismiss nine of the plaintiffs' claims.  *See NSC I*, 931 F. Supp. 2d 77 (D.D.C. 2013).  Consequently, the relevant factual and procedural history underlying the pending motions is again summarized only briefly below.

This case stems from the plaintiffs' submission of more than thirty FOIA and MDR requests to the CIA and ODNI between July 2011 and January 2012.[1]  Seeking to challenge the defendants' responses to these specific requests, as well as various overarching practices allegedly used by the defendants in responding to such requests, the plaintiffs filed this action in February 2012.  Compl., ECF No. 1.  After amending their complaint to add four additional causes of action, the plaintiffs eventually alleged twenty-six separate claims against the defendants.  First Am. Compl. ("FAC"), ECF No. 9.  Upon motion by the defendants for partial dismissal of the plaintiffs' claims, see Defs.' Partial Mot. Dismiss Pls.' FAC, ECF No. 14, the Court dismissed six of the plaintiffs' claims in full, with a seventh claim dismissed in part.  *NSC I*, 931 F. Supp. 2d at 112.  As a result, following resolution of the defendants' initial motion to dismiss, nineteen of the plaintiffs' original claims remained pending, in whole or in part, against the defendants.[2]

---

[1]      In addition to the present action, NSC separately filed three related actions in February 2011 stemming from dozens of additional FOIA and MDR requests submitted to numerous intelligence and national defense agencies.  *See Nat'l Sec. Counselors v. CIA (NSC II)*, 960 F. Supp. 2d 101 (D.D.C. 2013).  These earlier-filed cases raised certain legal and factual issues also presented in the instant action, but this opinion addresses only the plaintiffs' claims in the above-captioned matter.

[2]      The plaintiffs sought reconsideration of the dismissal of certain claims, *see* Pls.' Mot. for Reconsideration, ECF No. 54, which was denied for reasons detailed in a Memorandum and Order, ECF No. 60.

Thereafter, the defendants moved for summary judgment on each of the plaintiffs' remaining claims, *see* Defs.' Mot. Summ. J., ECF No. 63, but this motion was denied without prejudice, Min. Order, dated Nov. 8, 2013, after the parties indicated in a joint status report that the defendants were revising their withholdings and reprocessing documents, requiring the filing of an "updated summary judgment motion," *see* Joint Mot. Extension Time File Proposed Briefing Schedule, at 2, ECF No. 72. The defendants then filed a renewed motion for summary judgment, *see* Defs.' Renewed Mot. Summ. J., ECF No. 74, and the plaintiffs cross-moved for summary judgment on certain of these claims, *see* Pls.' Cross-Mot. Part. Summ. J., ECF No. 78. During the course of briefing these outstanding motions, the parties continued to engage in negotiations in an effort to narrow the issues requiring resolution by the Court. *See* Sec. Joint Mot. Amend Summ. J. Briefing Schedule at 1, ECF No. 82. In light of these ongoing discussions, the Court stayed these actions and directed the parties to inform the Court of any issues still in dispute when their negotiations were complete. *See* Min. Order, dated March 16, 2015.

On April 2, 2015, the parties jointly notified the Court of the resolution of many of their remaining disputes. Despite this substantial progress, however, the parties reported that they continue to disagree as to five outstanding issues: (1) whether the CIA's MDR Fee Structure violates the terms of the Independent Offices Appropriations Act, 31 U.S.C. § 9701 ("IOAA"), and thus was adopted in violation of the APA (Count Two); (2) whether NSC failed to exhaust administratively its challenge to the CIA's response to a FOIA request seeking agency correspondence regarding certain earlier MDR requests (Count Four); (3) whether the CIA conducted adequate searches for agency records responsive to two of the plaintiffs' FOIA requests (Counts Seven and Sixteen); (4) whether the CIA properly issued a *Glomar* response to

a FOIA request seeking information regarding agency records lost at the World Trade Center site following the September 11, 2001, attacks (Count Eleven); and (5) whether the CIA and ODNI wrongfully withheld, in full or in part, ninety-five agency records identified in an updated *Vaughn* index. *See* Joint Summ. Remaining Disputes ("Joint Summ.") at 3, ECF No. 95; *id.*, Ex. Combined *Vaughn* Index and Chart ("Combined *Vaughn* Index") at 1–18, ECF No. 95-1.[3] Each of these remaining issues has now been fully briefed by the parties and is ripe for consideration.

On November 1, 2016, the Court directed the defendants to provide an unredacted copy of one partially withheld document identified in the updated *Vaughn* index for *in camera* inspection. *See* Min. Order, dated Nov. 1, 2016. The defendants submitted the document for *in camera* inspection on November 3, 2016. *See* Notice of Filing, ECF No. 97.

## II.   LEGAL STANDARDS

### A.   Summary Judgment in FOIA Cases

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of demonstrating the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.* (*Liberty Lobby*), 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on

---

[3]        In their cross-motion, the plaintiffs moved for partial summary judgment on two issues: the MDR Fee Structure challenged in Count Two and the CIA's production of electronic records. *See* Pls.' Cross-Mot. Part. Summ. J. at 1.  Prior to the instant decision, however, the plaintiffs conceded "that CIA's production of all responsive records in electronic form render[ed] the second part of their Cross-Motion moot."  Pls.' Reply Supp. Cross-Mot. Part. Summ. J. at 2 n.2, ECF No. 87.  Consequently, of the issues for which the plaintiffs cross-moved for summary judgment, only the MDR Fee Structure remains in contention.

summary judgment, appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477 U.S. at 248)). "[T]hese general standards under rule 56 apply with equal force in the FOIA context," *Washington Post Co. v. U.S. HHS*, 865 F.2d 320, 325 (D.C. Cir. 1989), and the D.C. Circuit has observed that "the vast majority of FOIA cases can be resolved on summary judgment,'" *Brayton v. Office of the United States Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

The FOIA was enacted "to promote the 'broad disclosure of Government records' by generally requiring federal agencies to make their records available to the public on request," *DiBacco v. U.S. Army,* 795 F.3d 178, 183 (D.C. Cir. 2015) (citing *Dep't of Justice v. Julian,* 486 U.S. 1, 8 (1988)). Reflecting the necessary balance between the public's interest in governmental transparency and "legitimate governmental and private interests that could be harmed by release of certain types of information," *United Techs. Corp. v. U.S. Dep't of Def.,* 601 F.3d 557, 559 (D.C. Cir. 2010), the FOIA contains nine exemptions set forth in 5 U.S.C. § 552(b), which "are explicitly made exclusive and must be narrowly construed," *Milner v. U.S. Dep't of Navy,* 562 U.S. 562, 565 (2011) (internal quotation marks and citations omitted); *see also Murphy v. Exec. Office for U.S. Attys.,* 789 F.3d 204, 206 (D.C. Cir. 2015); *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice* (*CREW*), 746 F.3d 1082, 1088 (D.C. Cir. 2014); *Pub. Citizen, Inc. v. Office of Mgmt. & Budget,* 598 F.3d 865, 869 (D.C. Cir. 2010). "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose,* 425 U.S. 352, 361 (1976).

In litigation challenging the sufficiency of "the release of information under the FOIA, the agency has the burden of showing that requested information comes within a FOIA exemption." *Public Citizen Health Research Group v. FDA*, 185 F.3d 898, 904 (D.C. Cir. 1999)

(internal quotations omitted); *see also Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979) (agency invoking exemption bears the burden "to establish that the requested information is exempt"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989); *DiBacco*, 795 F.3d at 195; *CREW*, 746 F.3d at 1088; *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014); *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003). This burden does not shift even when the requester files a cross-motion for summary judgment because "the Government ultimately [has] the onus of proving that the [documents] are exempt from disclosure," while "[t]he burden upon the requester is merely to establish the absence of material factual issues before a summary disposition of the case could permissibly occur." *Public Citizen Health Research Group*, 185 F.3d at 904–05 (internal quotations and citations omitted; brackets in original).

An agency may carry its burden of properly invoking an exemption by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld, to enable the court to fulfill its duty of ruling on the applicability of the exemption, and to enable the adversary system to operate by giving the requester as much information as possible, on the basis of which the requester's case may be presented to the trial court.[4] *See Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (internal quotation marks omitted) ("In FOIA cases, summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith."); *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) ("The description

---

[4]   "A *Vaughn* index describes the documents withheld or redacted and the FOIA exemptions invoked, and explains why each exemption applies." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015).

and explanation the agency offers should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection[,] . . . [which] serves the purpose of providing the requestor with a realistic opportunity to challenge the agency's decision."); *CREW,* 746 F.3d at 1088 (noting that agency's burden is sustained by submitting affidavits that "'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith'" (quoting *Larson v. U.S. Dep't of State,* 565 F.3d 857, 862 (D.C. Cir. 2009)). While "an agency's task is not herculean[]" it must "describe the justifications for nondisclosure with reasonably specific detail and demonstrate that the information withheld logically falls within the claimed exemption." *Murphy,* 789 F.3d at 209 (internal quotation marks omitted) (citing *Larson,* 565 F.3d at 862). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.,* 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *Am. Civil Liberties Union v. U.S. Dep't of Def.,* 628 F.3d 612, 619 (D.C. Cir. 2011)); *Larson,* 565 F.3d at 862 (quoting *Wolf v. CIA,* 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

The FOIA provides federal courts with the power to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant," 5 U.S.C. § 552(a)(4)(B), and "directs district courts to determine *de novo* whether non-disclosure was permissible," *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.,* 777 F.3d 518, 522 (D.C. Cir. 2015), by reviewing the *Vaughn* index and any supporting declarations "to verify the validity of each claimed exemption," *Summers v. U.S. Dep't of Justice,* 140 F.3d 1077, 1080 (D.C. Cir. 1998).

District courts also have an "affirmative duty" to consider whether the agency has produced all segregable, non-exempt information. *Elliott v. U.S. Dep't of Agric.,* 596 F.3d 842, 851 (D.C. Cir. 2010) (referring to court's "affirmative duty to consider the segregability issue *sua sponte*") (quoting *Morley v. CIA,* 508 F.3d 1108, 1123 (D.C. Cir. 2007)); *Stolt–Nielsen Transp. Grp. Ltd. v. United States,* 534 F.3d 728, 734 (D.C. Cir. 2008) ("[B]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld.") (quoting *Sussman v. U.S. Marshals Serv.,* 494 F.3d 1106, 1116 (D.C. Cir. 2007)); *Trans–Pac. Policing Agreement v. U.S. Customs Serv.,* 177 F.3d 1022, 1028 (D.C. Cir. 1999) ("[W]e believe that the District Court had an affirmative duty to consider the segregability issue *sua sponte* . . . even if the issue has not been specifically raised by the FOIA plaintiff."); *see also* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").

### B. Administrative Procedure Act

Under the APA, a reviewing court must set aside a challenged agency action that is found to be, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); or "without observance of procedure required by law," *id.* § 706(2)(D); *Otis Elevator Co. v. Sec'y of Labor,* 762 F.3d 116, 120–21 (D.C. Cir. 2014) (citing *Fabi Constr. Co. v. Sec'y of Labor,* 370 F.3d 29, 33 (D.C. Cir. 2004)). The arbitrary or capricious provision, under subsection 706(2)(A), "is a catchall, picking up administrative misconduct not covered by the other more specific paragraphs" of the APA. *Ass'n of Data*

*Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.* (*ADPSO*), 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.).

The scope of review under the "arbitrary and capricious standard is 'highly deferential,'" *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir. 2013) (quoting *Am. Wildlands v. Kempthorne,* 530 F.3d 991, 997 (D.C. Cir. 2008)); *Envtl. Def. Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C. Cir. 1981) (same), and "narrow," such that "a court is not to substitute its judgment for that of the agency," *Judulang v. Holder*, 132 S. Ct. 476, 483 (2011); *see also Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1135 (D.C. Cir. 2014) (same); *Agape Church, Inc. v. FCC*, 738 F.3d 397, 408 (D.C. Cir. 2013) (same). When "an agency has acted in an area in which it has 'special expertise,' the court must be particularly deferential to [the agency's] determinations." *Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan,* 512 F. Supp. 2d 32, 37 (D.D.C. 2007) (quoting *Bldg. & Constr. Trades Dep't, AFL–CIO v. Brock,* 838 F.2d 1258, 1266 (D.C. Cir. 1988)). Yet, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang*, 132 S. Ct. at 483–84. Simply put, "the agency must explain why it decided to act as it did." *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

In evaluating agency actions under the "arbitrary and capricious" standard, courts "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Ore. Natural Res. Council,* 490 U.S. 360, 378 (1989) (citation and internal quotation marks omitted); *Citizens to Preserve Overton Park, Inc. v. Volpe* (*Overton Park),* 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183, 195 (D.C. Cir. 2013). When an agency "'fail[s] to provide a

reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.'" *Cty. of Los Angeles v. Shalala,* 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting *BellSouth Corp. v. FCC,* 162 F.3d 1215, 1222 (D.C. Cir. 1999)); *see Select Specialty Hosp.-Bloomington, Inc. v. Burwell,* 757 F.3d 308, 312 (D.C. Cir. 2014) (noting that when "'an agency's failure to state its reasoning or to adopt an intelligible decisional standard is . . . glaring . . . we can declare with confidence that the agency action was arbitrary and capricious'" (quoting *Checkosky v. SEC,* 23 F.3d 452, 463 (D.C. Cir. 1994))). At the very least, the agency must have reviewed relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *See Am. Trucking Ass'ns, Inc.,* 724 F.3d at 249 (quoting *State Farm,* 463 U.S. at 43); *see also EPA v. EME Homer City Generation, L.P.,* 134 S. Ct. 1584, 1602 (2014) (holding that agency "retained discretion to alter its course [under a regulation] provided it gave a reasonable explanation for doing so"); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (internal quotation marks and citation omitted)). "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Amerijet Int'l Inc.*, 753 F.3d at 1350 (internal quotation marks omitted; emphasis in original).

## III.    DISCUSSION

The FOIA requests at issue in this lawsuit are somewhat unusual as the plaintiffs are seeking to explore the means by which the CIA and other intelligence agencies maintain secret information and withhold this information from public disclosure. Thus, the present action involves numerous FOIA requests aimed at obtaining agency records related to the processing of

*earlier* FOIA requests, as well as related litigation involving the defendants. As a result of their often self-referential nature, certain of the requests underlying the parties' remaining disputes present novel issues that have not been previously addressed in this Circuit or others. The discussion that follows will address these issues in the following order: First, the plaintiffs' challenge, set out in Count Two, to the CIA's policy of assessing a fee to process MDR requests is discussed. With this lone remaining challenge to a broader policy resolved, consideration of the plaintiffs' remaining FOIA claims will begin with the CIA's argument that NSC failed to exhaust administratively the challenge to the CIA's response to one of the FOIA requests at issue in Count Four. Next, the sufficiency of the CIA's search efforts in connection with the FOIA requests at issue in Counts Seven and Sixteen are considered. Lastly, the plaintiffs' remaining challenges to the defendants' withholdings, in whole or in part, of ninety-five records responsive to the plaintiffs' various FOIA requests are discussed.

## A.   The CIA's MDR Fee Structure (Count Two)

In their amended complaint, the plaintiffs challenge the CIA's MDR Fee Structure on both procedural and substantive grounds. First, under Count One, the plaintiffs assert that the CIA violated the APA in adopting its policy of charging fees to process MDR requests without complying with the notice-and-comment procedures generally applicable to federal agency rulemaking. FAC ¶¶ 19–39. Beyond this alleged procedural error, the plaintiffs complain, in Count Two, that the MDR Fee Structure runs contrary to the IOAA and, as a result, the CIA's decision to adopt the policy was "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law," in violation of the APA. *Id*. ¶¶ 40–50.

After the defendants succeeded in securing the dismissal of the plaintiffs' procedural challenge, *NSC I*, 931 F. Supp. 2d at 105–12, only the plaintiffs' challenge to substantive

provisions of the policy remains in dispute, *see* Joint Summ. at 3. Following a brief overview of the CIA's historical policy regarding fees charged to process MDR requests, as well as the fee structure currently employed by the agency, the plaintiffs' remaining challenge under the APA is considered.

### 1.   *Overview of the MDR Fee Structure*

Established by Executive Order, the MDR Program is an administrative process by which individuals seeking the release of particular classified documents may, with certain exceptions, require an agency to reconsider whether the sought-after documents are in fact properly classified. 75 Fed. Reg. 707 (Dec. 29, 2009) ("E.O. 13526") § 3.5.[5] To obtain declassification review, an MDR requester must submit a request to the agency that classified the document providing "sufficient specificity to enable the agency to locate it with a reasonable amount of effort." *Id.* § 3.5(a)(1). Where an agency determines that information no longer meets the current standards for classification, the agency must declassify and release that information unless continued withholding "is otherwise authorized and warranted under applicable law." *Id.* § 3.5(c).

In addition to setting out the basic parameters for mandatory declassification review, E.O. 13526 authorizes the Director of the Information Security Oversight Office at the National Archives and Records Administration ("NARA") to promulgate regulations to assist agencies in implementing the Order. E.O. 13526 § 5.1; *see* 32 C.F.R. §§ 2001.1 *et seq.* These implementing

---

[5]      This section, titled "Mandatory Declassification Review," provides: "(a) Except as provided in paragraph (b) of this section, all information classified under this order or predecessor orders shall be subject to a review for declassification by the originating agency if: (1) the request for a review describes the document or material containing the information with sufficient specificity to enable the agency to locate it with a reasonable amount of effort; (2) the document or material containing the information responsive to the request is not contained within an operational file exempted from search and review, publication, and disclosure under 5 U.S.C. 552 in accordance with law; and (3) the information is not the subject of pending litigation." E.O. 13526, § 3.5, 75 FR at 717–18**.**

regulations specifically permit agencies, "[i]n responding to mandatory declassification review requests for classified records, [to] charge fees in accordance with [the IOAA] or relevant fee provisions in other applicable statutes." 32 C.F.R. § 2001.33(e).

The CIA's MDR Fee Structure at issue here grew out of two separate sections of an Interim Rule promulgated by the CIA in June 1997 to "implement its obligations under the [FOIA], the Privacy Act, and Executive Order 12958 (or successor Orders) provisions relating to classification challenges by authorized holders, requests for mandatory declassification review, and access by historical researchers." *See* Freedom of Information Act; Privacy Act; and Executive Order 12958; Implementation ("Interim Rule"), 62 Fed. Reg. 32,479 (June 16, 1997) (codified as amended at 32 C.F.R. 1900–01, 1907–09); *see also* FAC ¶ 20. First, with regard to FOIA requests, this Interim Rule provides that "[r]ecords will be furnished without charge or at a reduced rate whenever the Agency determines," *inter alia,* that "it is in the public interest because it is likely to contribute significantly to the public understanding of the operations or activities of the United States Government and is not primarily in the commercial interest of the requester." *See* Interim Rule, 62 Fed. Reg. at 32,483.

To that end, the rule delineates for fee purposes three categories of FOIA requesters: (1) "[c]ommercial use" requesters, who were to be charged for "the full direct costs of searching for, reviewing, and duplicating responsive records (if any)"; (2) "[e]ducational and non-commercial scientific institution" and "representatives of the news media" requesters, who were to be charged only for "reproduction beyond the first 100 pages"; and (3) "[a]ll other" requesters, who were to be charged "the full direct cost of searching for and reproducing responsive records (if any) beyond the first 100 pages of reproduction and the first two hours of search time which will be furnished without charge." *Id.* at 32,484. Second, the Interim Rule provided that MDR

requests "made directly to [the CIA] will be liable for costs in the same amount and under the same conditions" as those set out for FOIA requests. *Id.* at 32,496.

Consistent with this longstanding interim rule, the plaintiffs allege that prior to September 23, 2011, the CIA "rarely if ever charged fees to process MDR requests." *See* FAC ¶ 23 (explaining that "[o]f the multiple frequent MDR requesters surveyed by [the plaintiffs], none recalled ever being charged by CIA for MDR requests"). On that date, however, the CIA published a final rule amending its earlier regulations addressing fees charged to process MDR requests. *See* Mandatory Declassification Review ("Final Rule"), 76 Fed. Reg. 59,032 (Sept. 23, 2011) (codified at 32 C.F.R. §§ 1908, *et seq.*). The Final Rule added 32 C.F.R. § 1908.14, which sets forth new provisions governing whether and how fees are assessed for MDR requests. As relevant here, the new provisions (1) assess reproduction fees for all MDR requests, including a fee of fifty cents per page, $10 per CD, and a minimum fee of $15 per request for reproductions; and (2) assess search and review fees of between $20 and $72 per hour for all MDR requests, which are due "even if [the CIA's] search locates no responsive information or some or all of the responsive information must be withheld under applicable authority." *See* 32 C.F.R. § 1908.14; *see also* FAC ¶ 25.

Since this more recent rule was promulgated, the plaintiffs allege that the CIA "began responding to MDR requests with demands that requesters commit to pay all search, review, and duplication fees at the new fee schedule described in 32 C.F.R. § 1908.14." FAC ¶ 26. Specifically, three of the plaintiffs each submitted one or more MDR requests to the CIA following promulgation of the Final Rule, and the CIA responded to each request by asking the requester to commit to pay the fees outlined in 32 C.F.R. § 1908.14 and holding the request in abeyance until such a commitment was given. *See id.* ¶¶ 27–35.

2.    *Analysis*

The plaintiffs initially asserted three alternative bases for invalidating the MDR Fee Structure, *see* FAC ¶¶ 40–50, but have since abandoned their claims under the IOAA and the Mandamus Act, *see* Pls.' Opp'n Defs.' Mot. Summ J. & Supp. Pls.' Cross-Mot. Part. Summ. J. ("Pls.' Opp'n") at 4, ECF No. 77.  Consequently, the discussion that follows addresses only the plaintiffs' claim that, because the MDR Fee Structure exceeds the agency's authority under the IOAA, the CIA's adoption of the Fee Structure was "not in accordance with law" and, therefore, must be set aside under the APA.[6]  *See* Pls.' Opp'n at 4; Defs.' Reply Supp. Renewed Mot. Summ. J. & Opp'n Pl.'s Cross-Mot. Part. Summ. J. ("Defs.' Reply") at 2, ECF No. 84.

Enacted to ensure that "each service or thing of value provided by an agency . . . to a person . . . is . . . self-sustaining to the extent possible," the IOAA authorizes federal agencies to "prescribe regulations establishing the charge for a service or thing of value provided by the agency."  31 U.S.C. §§ 9701(a), (b).  Such fees must be "(1) fair; and (2) based on–(A) the costs to the Government; (B) the value of the service or thing to the recipient; (C) public policy or interest served; and (D) other relevant facts."  *Id.* § 9701(b).  As the D.C. Circuit has explained, while the "IOAA itself provides little specific direction on how to assess the propriety of user fees . . . , the Supreme Court long ago set forth the considerations that control agency determinations to assess fees for Government services."  *Seafarers Int'l Union of N. Am. v. U.S. Coast Guard*, 81 F.3d 179, 182 (D.C. Cir. 1996).

---

[6]    The plaintiffs similarly "do not challenge CIA's assertion that the fees charged reflect the costs to the agency," Pls.' Opp'n at 5 n.3, and, thus, the agency's argument on that score need not be addressed.  As for the relief requested, the plaintiffs have "retract[ed]" their requests that the Court (1) "order CIA to publish on its website that it is no longer charging fees for MDR requests," and (2) that CIA "contact requesters who were so charged."  *Id.* at 11–12.  The only relief remaining at issue, as a result of these retractions, is to invalidate the existing fee structure and enjoin the CIA from creating a new fee structure "incompatible with this ruling."  *Id.* at 12.

Most significantly, the Supreme Court has "carefully distinguished between a permissible user fee and an unconstitutional tax." *Id.* (citing *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340–41 (1974)). Thus, a "user fee will be justified under the IOAA if there is a sufficient nexus between the agency service for which the fee is charged and the individuals who are assessed." *Id.* at 182–83. This general distinction notwithstanding, user fees "are valid so long as the agency levies 'specific charges for specific services to specific individuals or companies,'" regardless of whether the "ultimate purpose of the [statutory] scheme giving rise to the . . . user fee[] is to benefit the public." *Id.* at 183 (quoting *Federal Power Commission v. New England Power Co.* (*NEPCO*), 415 U.S. 345, 329 (1974)); *see also Engine Manufacturers Ass'n v. EPA*, 20 F.3d 1177, 1180 (D.C. Cir. 1994) ("If the agency does confer a specific benefit upon an identifiable beneficiary . . . then it is of no moment that the service may incidentally confer a benefit upon the general public as well.").

Contending that many MDR requests serve predominately, or even exclusively, public interests, the plaintiffs argue that the CIA's policy of assessing fees on all MDR requesters necessarily runs afoul of the limitations of the agency's authority under the IOAA.[7] Thus, the plaintiffs emphasize that MDR requests ensure that government activities remain open and transparent to suggest that the "ultimate beneficiary" of any MDR request is, in most instances, the general public. Pls.' Opp'n at 6. For that reason, the plaintiffs argue, the CIA's policy of charging fees to process MDR requests cannot be supported under the IOAA. Further, even granting that the IOAA does not categorically preclude the agency from assessing fees to process

---

[7] Beyond their substantive disagreement as to the proper interpretation of the IOAA, the parties hotly contest the degree to which the CIA's interpretation of the statute is entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and its progeny. *See* Pls.' Opp'n at 4–5 (contending that the CIA is entitled to no deference); Defs.' Reply at 2–4. Since, as discussed *infra*, the IOAA, by its plain terms, permits the CIA to assess fees to MDR requesters, the Court need not determine definitively whether the agency's interpretation is otherwise entitled to deference.

all MDR requests, the plaintiffs suggest that the agency's failure to distinguish between "commercial" and "non-commercial" requests in adopting its present MDR fee structure violates the IOAA's exception for government services conveying a primarily public benefit. *Id.* at 9–11. With limited authority on point, the plaintiffs emphasize the broad public interest goals underlying the MDR process, as well as *dicta* in certain decisions of the D.C. Circuit, to argue that the CIA's fee policy violates the IOAA. In the end, however, their reliance on these authorities is insufficient to demonstrate that the agency's fee regime must be rejected as contrary to the statute.

First, while the D.C. Circuit has yet to consider whether the IOAA permits agencies to charge fees to process MDR requests, the plaintiffs suggest that the Circuit has generally drawn a distinction between the production of particular agency records and items for which an agency may permissibly charge a fee. Pls.' Opp'n at 5. Specifically, the plaintiffs rely on *dicta* in *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172 (D.C. Cir. 1996), to argue that the D.C. Circuit has "already opined . . . on the question of whether or not records released by an agency fall under the IOAA." Pls.' Opp'n at 5. In fact, however, the *Oglesby* Court's passing reference to the IOAA provides little support for the plaintiffs' view that the statute prohibits charging a fee to process MDR requests.

Among other issues, *Oglesby* addressed a challenge to the NARA's refusal to grant a fee waiver to a FOIA requester seeking records related to a World War II-era German commander. *Oglesby*, 79 F.3d at 1175, 1176–77. In general, FOIA authorizes the waiver of fees otherwise required under the statute for non-commercial requests that provide general public benefits. *See* 5 U.S.C. § 552(a)(4)(A)(iii). This general fee provision may be superseded, however, by a "statute specifically providing for setting the level of fees for particular types of records." *Id.*

§ 552(a)(4)(A)(vi).   In *Oglesby*, the D.C. Circuit considered whether a statute authorizing the NARA to recover all fees associated with reproducing records in its possession thus permitted the agency to deny an otherwise valid FOIA fee waiver.   *Oglesby*, 79 F.3d at 1177.   Concluding that the waiver denied was permissible under the superseding NARA statute, the Circuit contrasted that statute with the IOAA, which Congress had indicated would *not* supersede the general FOIA fee provision.   *Id.*   The Circuit explained that, whereas the IOAA's reference to "a thing of value" did not describe "particular types of records," the NARA statute applied specifically to "materials transferred to the Archivist's custody," exempting it from the general FOIA fee and waiver provisions.   *Id.*   While the *Oglesby* Court thus made clear that the IOAA does not supplant the fee provisions governing FOIA requests, this observation has no bearing on the separate question, presented here, of whether processing an MDR request constitutes a "service or thing of value provided by the agency" for which an agency may charge a fee under the IOAA.   31 U.S.C. §§ 9701(a), (b).

With *Oglesby* providing little, if any, guidance, the plaintiffs point instead to more general D.C. Circuit authority to argue that "it is axiomatic that the release of government information is something which primarily benefits the public" and, therefore, must fall outside the scope of the CIA's authority to assess fees under the IOAA. Pls.' Opp'n at 6.   In so doing, however, the plaintiffs rely principally on a misreading of authority addressing the limitations on an agency's authority to charge user fees for services that benefit the public.   In particular, the plaintiffs cite *Seafarers International Union of North America v. U.S. Coast Guard*, 81 F.3d 179 (D.C. Cir. 1996), for the proposition that agencies may not charge user fees for services that provide no "special, private benefit" to the requester.   *See* Pls.' Opp'n at 6–7 (quoting *Seafarers Int'l Union*, 81 F.3d at 189 n.3 (Henderson, J., dissenting in part and concurring in judgment)

(quoting *Central & Southern*, 777 F.2d at 730)). Significantly, however, the plaintiffs fail to note that, in describing the contours of an agency's fee-charging authority under the IOAA, they rely on an interpretation of prior Circuit authority specifically disavowed by the majority opinion in *Seafarers International*.

Contrary to the plaintiffs' suggestion, *Seafarers International* emphasized that the existence of a public benefit does not necessarily limit an agency's authority to charge fees under the IOAA. In reviewing prior IOAA cases, the *Seafarers International* Court lamented that the Circuit "sometimes faltered in offering reformulations of the [Supreme] Court's test" for determining whether a particular fee is permissible under the statute. *Seafarers Int'l Union*, 81 F.3d at 183. Specifically, the Circuit explained that these earlier decisions "reformulated [the applicable Supreme Court precedent] 'to require a certain nexus, a threshold level of private benefit, between the regulatee and the agency before a fee can be assessed against the recipient of the service.'" *Id.* at 184 (citing *Electronic Industries Ass'n v. FCC*, 554 F.2d 1109, 1114 (D.C. Cir. 1976)). According to the Circuit, "[t]he problem with this statement of the test is that it suggests that a specific service to an identifiable beneficiary can form the basis for a fee *only* if the service confers such a private benefit." *Id.* (emphasis in original). Rejecting this "misguided" interpretation, the *Seafarers International* majority warned that its earlier decisions "could be misread to mean that an agency must weigh 'public' versus 'private' benefits in determining whether and in what amount to charge fees." *Seafarers Int'l Union*, 81 F.3d at 184. The dissenting opinion, cited by the plaintiffs, took issue with the majority's treatment of these earlier opinions, arguing instead that the Circuit's prior opinions could not reasonably be interpreted to require an agency to demonstrate that its services primarily, or exclusively, benefit a particular party in order to charge fees under the IOAA. *Id.* at 193–95 (Henderson, J.,

dissenting in part and concurring in judgment). Thus, while the dissenting Judge would have preserved the "private benefit" language eschewed by the majority, both opinions would reject any argument that "despite the fact that an agency provides a specific service to an identifiable beneficiary, the agency does not in fact confer a 'private benefit'" justifying the charging of a user fee. *Id.* at 193 (Henderson, J., dissenting in part and concurring in judgment).

Consequently, the plaintiff's reliance on IOAA case law to argue that the agency may not assess a fee for MDR requests because they convey no "special, private benefit" to the requester, Pls.' Opp'n at 6–7, is misplaced. As the *Seafarers International* majority explained, an agency may assess a fee under the IOAA "so long as the agency levies 'specific charges for specific services to specific individuals or companies.'" *Seafarers Int'l Union*, 81 F.3d at 183 (quoting *NEPCO*, 415 U.S. at 349). Here, the parties fiercely dispute whether the benefits stemming from a particular MDR request flow primarily to the individual requester, Defs.' Mem. at 9, or are instead fundamentally public in nature, Pls.' Opp'n at 7. Not disputed, however, is the fact that, in processing a particular MDR request, the CIA performs "specific services to [a] specific individual[] or compan[y]," namely, the requester. *Seafarers Int'l Union*, 81 F.3d at 183 (quoting *NEPCO*, 415 U.S. at 349).

As the defendants correctly note, Defs.' Reply at 7, the MDR process is readily distinguishable in this regard from the separate systemic declassification review process agencies also are required to perform under E.O. 13526. *See* E.O. 13526 § 3.4. This latter process is an ongoing responsibility of all agencies maintaining classified material, *id.*, and is, therefore, not linked to any particular request from a private party for review of specific classified material. By contrast, in processing an MDR request, the CIA reviews only those records the requester has asked the agency to declassify and release. As such, even where records subject to an MDR

request are ultimately released more broadly, the CIA's review of these records is a specific service performed expressly for the individual requester. Accordingly, the plaintiffs' suggestion that the agency is precluded entirely under the IOAA from assessing fees in connection with its processing of MDR requests is incorrect.

Having concluded that the CIA is not categorically barred from imposing fees on MDR requesters, the Court must further consider the plaintiffs' alternative argument that the agency may not charge the same fees to commercial and non-commercial MDR requesters alike. In challenging this aspect of the CIA's present MDR Fee Structure, the plaintiffs do not dispute that the fees charged under the current regime coincide with the costs incurred by the CIA to process an individual MDR request. Pls.' Opp'n at 5 n.3. Nonetheless, the plaintiffs allege that, by decoupling MDR fees from fees charged to FOIA requesters and thereby ignoring any public benefits accruing from non-commercial requests, the CIA sought to make it more difficult for non-commercial requesters to obtain full review of the CIA's declassification decisions in response to their requests. Pls.' Opp'n at 9–11 (explaining that, unlike an agency's withholding under FOIA, the CIA's determinations in response to an MDR request are subject to *de novo* review by the Interagency Security Classification Advisory Panel). According to the plaintiffs, allowing the CIA to avoid *de novo* review of its declassification decisions in response to MDR requests raising significant public interest in disclosure "would be a perversion of the law" and a direct violation of the IOAA. *Id.* at 11. The defendants counter that, to the extent that the agency's processing of an MDR request conveys a benefit to the general public, any such benefit is a consequence of, and entirely dependent on, the original private benefit conveyed to the requester. Defs.' Reply at 9. Since the plaintiffs identify no *independent* public interest served by the disclosure of declassified material, the defendants argue, the IOAA does not bar the

recovery of the full cost of processing both commercial and non-commercial requests. *Id.* at 9–10 & n.7.

The Circuit has never squarely addressed the question whether an agency must prorate fees charged to a private party to reflect accompanying public benefits. Nevertheless, existing precedent supports the defendants' contention that the plaintiffs' arguments on this point are "baseless." *Id.* at 9. As the defendants correctly note, before *Seafarers International*, the D.C. Circuit observed that "whether an agency must allocate a portion of its costs depends not so much on the magnitude of the benefits to the public, . . but rather on the nature of the public benefits and on their relationship to the private benefits produced by the agency action." *Cent. & S. Motor Freight Tariff Ass'n, Inc. v. United States*, 777 F.2d 722, 731 (D.C. Cir. 1985). That is, "[i]f the asserted public benefits are the necessary consequence of the agency's provision of the relevant private benefits, then the public benefits are not independent, and the agency would therefore not need to allocate any costs to the public." *Id.* at 731–32. The *Seafarers International* Court further explained that "a reviewing court, in deciding whether an agency may exact a fee in connection with a particular [service], need not pause to weigh the relative public and private interests underlying the [service], but can instead turn to the relevant statute to determine the substantive requirements [imposed on the agency in connection with providing the service]." *Seafarers Int'l Union*, 81 F.3d at 185. Taken together, these decisions strongly suggest that agencies are not required to prorate costs, even in the case of a user likely to amplify the public benefits of an agency service.

For their part, the plaintiffs offer no support for their contrary contention that the CIA must adjust fees charged to MDR requesters to reflect the public interest aims of non-commercial fee requests. *See generally* Pls.' Opp'n at 9–11. In principle, the plaintiffs' claim that the

current fee structure violates the IOAA stems from their view that, in order to comply with that statute, any MDR fee regime must provide some measure of a public interest fee waiver like that provided under the FOIA statutory fee provision.  *Id.* at 7 (arguing that, like FOIA, "[o]nce an agency releases information in response to an MDR request, that information is automatically publicly available").  Even assuming that, as a policy matter, agencies should treat MDR requests and FOIA requests similarly, however, the plaintiffs point to no statutory or other provision requiring such parity.  While both regimes undoubtedly were designed with the public's interest in open and transparent government in mind, Congress saw fit in enacting the FOIA fee provision to provide relief for non-commercial requesters seeking to advance identifiable public interests.  By contrast, neither E.O. 13526 nor the implementing NARA regulations require agencies to adopt a parallel fee regime for MDR requests.  As a policy matter, such a regime has much to commend it, but imposing such policy, absent any statutory or regulatory mandate to do so, is beyond the purview of this Court

Absent such a mandate, the Court is persuaded that the agency's decision to adopt its current MDR Fee Structure was not arbitrary or capricious or otherwise contrary to law. Accordingly, the defendants' request for summary judgment as to Count Two is granted, and the plaintiffs' request for partial summary judgment on this issue is denied.

### B.     Administrative Exhaustion (Count Four)

The CIA asserts that NSC has not exhausted its administrative remedies as to request F-2012-00857 ("Request 857"), which is one of two separate FOIA requests underlying Count Four.  Defs.' Mem. Supp. Defs.' Renewed Mot. Summ. J. ("Defs.' Mem.") at 12, ECF No. 74. According to the CIA, Request 857 was "submitted the day before [the plaintiff] filed this lawsuit and was not received until the day the lawsuit was filed." *Id.* Consequently, in the

CIA's view, NSC filed suit fewer than twenty days after Request 857 was filed, making this

Court's resolution of this claim improper. *Id.* at 12–13. The plaintiffs counters that Request 857

was added to the present suit in the FAC, which was filed 21 days after the initial complaint in

this matter was filed and 22 business days after the request was submitted to the CIA. Pls.'

Opp'n at 12–13. Thus, according to the plaintiffs, NSC had constructively exhausted its

remedies as to Request 857 by the time the request was added to the suit. *Id.*

In general, FOIA requesters seeking to challenge an agency's response to a particular

request must exhaust available administrative remedies before seeking relief in federal court.

*Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n (CREW)*, 711 F.3d

180, 184 (D.C. Cir. 2013); *see also DeBrew v. Atwood*, 792 F.3d 118, 124 (D.C. Cir. 2015)

("[B]ecause the FOIA provides for an administrative appeal, 'the FOIA's administrative scheme

favors treating failure to exhaust as a bar to judicial review.'" (citing *Hidalgo v. FBI*, 344 F.3d

1256, 1259 (D.C. Cir. 2003))). This general exhaustion requirement notwithstanding, the statute

specifies that, once an agency receives a proper FOIA request, the agency must "determine

within 20 days (excepting Saturdays, Sundays, and legal public holidays) . . . whether to comply

with such request and shall immediately notify the person making such request of such

determination and the reasons therefor." 5 U.S.C. § 552(a)(6)(A)(i). As the D.C. Circuit has

explained, the penalty for failing to abide by this twenty-working-day timeline "is that the

agency cannot rely on the administrative exhaustion requirement to keep cases from getting into

court." *CREW*, 711 F.3d at 189–90.

Here, the parties agree that the plaintiffs' challenge to the CIA's response to Request 857

did not appear in the original complaint. *See* Compl. ¶¶ 57–62; *see also* Defs.' Mem. at 12–13.

Rather, it appeared only in the Amended Complaint, which was filed twenty-two business days

after NSC originally submitted Request 857.  FAC ¶¶ 63–66; *see also* Pls.' Opp'n at 12.

Nonetheless, while recognizing that the Amended Complaint was filed after the twenty-day

exhaustion period, the defendant contends that it is "immaterial" that the plaintiffs' Amended

Complaint replaced entirely its original Complaint and argues instead that the "relevant question

is whether the claim was exhausted *when the plaintiff went to court*."  Defs.' Reply at 10

(emphasis added) (internal alterations, quotations and citations omitted).

In support, the CIA relies on *Murthy v. Schafer*, 579 F. Supp. 2d 110, 114–15 (D.D.C.

2008), but this non-binding authority is readily distinguishable.  In *Murthy*, the plaintiff filed suit

in an employment discrimination action before the relevant statutory deadline for resolving one

of his claims administratively had expired and specifically named, in the initial Complaint, a

cause of action based upon the unexpired claim.  *Murthy*, 579 F. Supp. 2d at 111–12.  The

plaintiff later amended his Complaint after the 180-day period ended, and argued that the

amendment remedied any concern regarding his duty to exhaust available administrative

remedies.  *Id*. at 114–15.  Concluding that "the filing date, not the amendment date, is the

relevant one in assessing his failure to exhaust," the *Murthy* Court dismissed the plaintiff's

unexhausted claim as not properly before the court.  *Id*. at 115.

While bearing certain superficial similarities to the present dispute, the crucial difference

between *Murthy* and the instant matter is that in *Murthy* the unexhausted claim was made in the

initial Complaint, which, presumably, would have caused the agency to cease "its administrative

review procedures" with respect to that claim.  Defs.' Mem. at 10.  By contrast, here, the

plaintiffs made no allegation regarding Request 857 until after the twenty-business-day statutory

exhaustion period had elapsed.  Thus, the defendant agency had no basis to presume that the

plaintiff would seek judicial review of its processing of this request prior to the conclusion of this

period, and there is no reason to believe that allowing this claim to proceed will disrupt any ongoing administrative process.

For this reason, NSC has constructively exhausted its administrative remedies and the defendants' request for summary judgment on this issue is denied. Accordingly, the defendants' request for summary judgment as to the merits of its withholdings in Count Four, *see* Defs.' Mem. at 13 n.7, is addressed below, *infra* Part III.D.2.

### C.     Adequacy of Search Efforts

With these preliminary issues resolved, the Court turns next to the merits of the plaintiffs' remaining FOIA challenges. As previously indicated, this discussion begins with a review of the plaintiffs' outstanding claims contesting the adequacy of the defendant agencies' efforts to identify records responsive to the plaintiffs' FOIA requests at issue in Counts Seven and Sixteen.

### 1.     *Legal Standard*

Upon receiving a FOIA request, federal agencies are "required to perform more than a perfunctory search" to identify potential responsive records. *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011). Instead, the agency bears the burden of demonstrating that it "made a 'good faith effort to conduct a search using methods which can be reasonably expected to produce the information requested.'" *DiBacco*, 795 F.3d at 188 (internal alterations omitted) (quoting *Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999)). To meet this burden, the agency must "demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena*, 180 F.3d at 325 (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)). At the summary judgment stage, an agency may meet this burden by submitting a "'reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all

files likely to contain responsive materials (if such records exist) were searched.'" *Ancient Coin Collectors Guild*, 641 F.3d at 514 (quoting *Valencia–Lucena*, 180 F.3d at 326). Such an affidavit must "'explain in reasonable detail the scope and method of the search conducted by the agency.'" *See Morley*, 508 F.3d at 1121 (internal alterations omitted) (quoting *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982)).

### 2.    *Analysis*

The plaintiffs challenge the adequacy of the defendants' search for records responsive to Counts Seven and Sixteen, each of which addresses FOIA requests submitted by NSC to the CIA.[8] The plaintiffs offer differing bases for challenging the CIA's search efforts with respect to these requests. For this reason, these challenges are addressed separately for each count below.

### a)    **Count Seven**

First, in Count Seven, NSC contests the CIA's response to its request for "any and all declarations or affidavits filed by the Director (or his designee) of the Central Intelligence Agency ('CIA') in three [prior FOIA] lawsuits wherein the states secrets or executive privilege was invoked." Decl. Martha M. Lutz (Apr. 25, 2014) ("Lutz Decl.") ¶ 40, ECF No. 74-4. Seeking summary judgment, the CIA explains that the agency determined that the Office of General Counsel ("OGC") "was the only office reasonably likely to maintain records responsive to NSC's FOIA request seeking copies of declarations or affidavits filed in federal litigation." *Id.* ¶ 45. Thus, to identify potentially responsive records, OGC staff "conducted a search of its electronic and hard copy files for any records pertaining to: the executive privilege, state secrets

---

[8]      The plaintiffs initially challenged the adequacy of the defendants' search for records pertaining to six of the plaintiffs' claims, *see* Pls.' Opp'n at 13 (challenging search efforts in Counts Three, Seven, Ten, Sixteen, Twenty, and Twenty-Six), but has now abandoned other challenges not addressed herein, *see* Pl.'s Surreply Opp'n Defs.' Mot. ("Pl.'s Surreply") at 3–4, ECF No. 89 (abandoning adequacy of search claims for Counts Three, Ten, and Twenty); Joint Summ. at 3 (indicating that only the plaintiffs' challenges in Counts Seven and Sixteen remain in dispute). Consequently, summary judgment is granted to the defendants as to the adequacy of their search for records responsive to the FOIA requests at issue in all other counts.

privilege, invoked privileges, and the party names for each of the federal court cases NSC included in its request." *Id.* ¶ 46. Based on this search, the agency identified ten responsive records responsive, eight of which have been released in full and two of which have been withheld in full. *Id.* ¶ 46; Pls.' Opp'n. at 14.

Arguing that the CIA's search was inadequate, the plaintiffs note that four of the released documents "explicitly reference[] other responsive records" that were not produced to NSC. *Id.* Specifically, the plaintiffs point to the following referenced documents not produced to NSC: (1) a copy of a CIA regulation that was attached to one of the produced affidavits; (2) a classified affidavit submitted for *in camera* review by the Secretary of Defense in a FOIA action litigated in the 1970s; (3) an additional classified declarations submitted for *in camera* review in a second case from the 1980s. Pls.' Opp'n. at 15. The plaintiffs further suggest that the agency has yet to explain why these materials, which the plaintiffs assert are responsive to NSC's request, were not accounted for in the CIA's response to that request. *Id.* at 14–15. Though recognizing that mere speculation regarding the existence of undiscovered records does not render an agency's search inadequate, the plaintiffs suggest that the three purportedly responsive documents they have identified "satisf[y] the threshold for a finding that the [CIA's] search was inadequate." *Id.* at 16.

In response, the agency notes that each of the records identified by the plaintiffs was either produced to NSC or not responsive to NSC's underlying FOIA request. In particular, the agency's declarant explains that the CIA regulation identified by the plaintiffs, which itself is not an affidavit or declaration and therefore arguably not responsive to NSC's request, *was* produced to NSC along with the responsive affidavit to which it was attached. Decl. Martha M. Lutz (July 11, 2014) ("Sec. Lutz Decl.') ¶ 11, ECF No. 84-1. Indeed, the record produced to NSC, which

the agency provided to the Court, clearly demonstrates that the regulation at issue was produced in connection with the responsive affidavit. *See id.*, Ex. C at 7 (bearing the same internal tracking number as the affidavit itself). In light of this evidence, the plaintiffs' effort to cast the agency's prior declarations averring that this document was included in its initial production as an instance of the agency's "lack of candor," Pl.'s Surreply Opp'n Defs.' Mot. ("Pl.'s Surreply") at 4–5, ECF No. 89, is somewhat ironic. On the contrary, the evidence submitted by the parties more readily supports the credibility of the agency's description of the relevant search and subsequent production in response to NSC's request.

Along similar lines, the plaintiffs' speculation regarding the existence of additional, as-yet undiscovered affidavits or declarations falling within the scope of its request is far too thin a reed to support its present contention that the agency's search was inadequate. The CIA does not dispute that two affidavits produced to NSC refer to other declarations and affidavits submitted by the government in the relevant FOIA actions. Defs.' Mem. at 13. Instead, the agency's declarant explains that these latter declarations and affidavits "are not from the Director of Central Intelligence or his designee, nor are they identified as such in the released documents." Sec. Lutz Decl. ¶ 12. Given that NSC's request was explicitly limited to materials "filed by the Director (or his designee) of the Central Intelligence Agency ('CIA')," the agency argues that the failure to produce these other materials in response to NSC's FOIA request "do[es] not cast doubt on the adequacy of the CIA's search." Defs.' Mem. at 13. The plaintiffs counter that language describing these other, unreleased declarations makes clear that they fell within the scope of NSC's original request. Pl.'s Surreply at 3–4. In particular, the plaintiffs note that the then-Director of Central Intelligence explained in a produced declaration that additional *ex parte* declarations were "made available to the Court by Special Agents of the CIA" and "maintained

pursuant to appropriate security procedures at CIA Headquarters." *Id.* at 8. (emphasis omitted). Relying on this language, the plaintiffs dismiss as "disingenuous" the CIA's assertion that the referenced declarations were not responsive to NSC's FOIA request. *Id.*

To a degree, the parties' present dispute turns less on the adequacy of the CIA's search efforts than on the proper scope of NSC's original request. For instance, the language highlighted by the plaintiffs leaves some ambiguity as to who *prepared* any other declarations proffered by the government in the relevant cases. Interpreted broadly, NSC's request for declarations "filed by" the Director of Central Intelligence or his designee may be understood to encompass declarations *produced* by others that were nonetheless *filed* by these identified officials. *LaCedra v. Executive Office of U.S. Attorneys*, 317 F.3d 345, 348 (D.C. Cir. 2003) (explaining that agencies generally must "construe a FOIA request liberally"). Even granting such a broad construction, however, the plaintiffs provide little to suggest that the agency conducted an inadequate search. Indeed, the agency's declarant specifically notes that OCG "searched its records for declarations asserting the state secrets privilege or executive privilege or generally invoking privilege in the named cases *without limiting such searches* to declarations by the Director of Central Intelligence or [his] designee." Sec. Lutz Decl. ¶ 12 (emphasis added). By expanding its search to include *any* declarations filed in the cases identified by NSC that invoked *any* privilege to withhold responsive records, the agency effectively mitigated any remaining ambiguity in its initial interpretation of NSC's request.

In sum, while the plaintiffs may be correct that the agency did provide declarations filed by the government in the cases identified in NSC's FOIA request, they point to no evidence in the record showing that any such declarations were *responsive* to that request. To the extent that the plaintiffs now seek these additional declarations, they are free to attempt to obtain those

records through a second, more broadly worded request. In this case, however, the agency has met its burden of demonstrating that its search for responsive records was "reasonably calculated to uncover all relevant documents." *Valencia-Lucena*, 180 F.3d at 325 (internal quotations omitted).

### b)   Count Sixteen

In Count Sixteen, the plaintiffs challenge the CIA's search efforts in response to NSC's request for records "pertaining to the search tools and indices available to the components in the Director of the Central Intelligence Agency Area ('DCIA Area') for conducting searches of their respective records in response to FOIA requests." Lutz Decl. ¶ 87. In its request, NSC explained that it sought both records that describe any such search tools and indices, as well as the "actual contents of the indices[, *i.e.*], if an index contains 1000 terms that can be used in a search, then [NSC sought] a list of those 1000 terms." *Id.* ¶ 88. Since this request referred to records maintained by the Director's Area, the agency tasked only that directorate with searching for potentially responsive documents. *Id.* ¶ 92. Specifically, the agency's declarant explains that individuals with personal knowledge of the search tool and indices used by Director's Area searched the Area's electronic records systems and conducted a manual search for records potentially responsive to NSC's request. *Id.* ¶ 93. These searches yielded two responsive documents, one of which was released to NSC in redacted form and the other of which was withheld in full. *Id.* ¶ 94.

Contending that the agency has failed to conduct an adequate search, the plaintiffs contrast NSC's present request with a separate, but similar, request at issue in one of the related cases filed by NSC prior to the instant action. *See* Pls.' Opp'n at 19–25; *supra* note 1 (describing related cases). In this earlier request, NSC sought the same categories of materials, *i.e.*, records

pertaining to search terms and indices, from the CIA's Office of Information Management Services ("IMS"). *Nat'l Sec. Counselors v. CIA (NSC II)*, 960 F. Supp. 2d 101, 127 (D.D.C. 2013). After the CIA identified only three responsive records, NSC challenged the agency's search on the grounds that the agency: (1) failed to identify any responsive search indices; and (2) declined entirely to search certain agency databases for responsive records. *Id.* at 152. Denying summary judgment, this Court agreed that the agency's "vague and conclusory" description of its search provided no assurance that the agency conducted an adequate search in response to NSC's request. *Id.* The agency was afforded an additional opportunity, however, to explain "what parameters were used to accomplish [its] search, *i.e.*, whether the CIA searched for the indices themselves or what search terms the CIA used to identify responsive records." *Id.* at 151–53. In response, the CIA more recently provided additional information regarding its search, as well as further explanation regarding the means by which IMS personnel search their own records systems. *Nat'l Sec. Counselors v. CIA*, Nos. CV 11-443, 11-444, 11-445, 2016 WL 4621060, at *11 (D.D.C. Sept. 6, 2016) (indicating that "the two databases used primarily by IMS staff to conduct searches of its own records included neither indices nor automated search tools to identify potentially responsive records"). In light of this more fulsome description, the Court granted the CIA's renewed request for summary judgment as to the adequacy of its search efforts in that case. *Id.*

This most recent decision notwithstanding, the request at issue here sweeps far more broadly than the request previously considered by the Court. While NSC previously sought only records from within IMS, NSC now seeks similar material from the entire Director's Area, which is comprised of multiple CIA offices—*including* IMS—"directly responsible to the Director of the CIA." Pls.' Opp'n at 23 (quoting Lutz Decl. ¶ 13). Emphasizing the broader scope of this

more recent request, the plaintiffs suggest that the agency's failure to identify more responsive documents demonstrates that the agency failed to conduct an adequate search. For instance, the plaintiffs suggest that publicly available sources "identify at least eighteen different records systems in fifteen offices [in the Director's Area], each of which presumably has search tools and indices." *Id.* at 25. Likewise, the plaintiffs point to numerous declarations filed by the CIA in this case and others indicating that agency personnel regularly consider which "search tools, indices, and terms to employ" to identify potentially responsive records. *Id.* at 20–21 (emphasis omitted) (quoting relevant filings). Supposing that records pertaining to these search tools and indices must be maintained by the larger group of offices captured by NSC's current request, the plaintiffs argue that the agency's identification of only two responsive records was presumptively inadequate. *Id.*

In response, the CIA argues that the plaintiffs, in opposing summary judgment, assert for the first time that NSC intended the terms "search tools" and "indices" to "have the same meaning as used in declarations drafted by CIA attorneys in litigation." Defs.' Reply at 16. So construed, the defendants' argue, NSC's request for all records "pertaining to the search tools and indices available to" each component of the Director's Area is "breathtakingly broad." *Id.* For example, the defendants suggest that such an interpretation would require the agency to produce "standard training and help documents regarding search functions for [standard email programs and operating systems], and on and on, through every searchable program and system in more than a dozen components and suboffices." *Id.* at 16–17. Suggesting that such a request would be unduly burdensome, the agency argues that its interpretation of NSC's request as seeking "records describing generally how components in the Director's Area search their records" was reasonable. *Id.* at 17 (citing Sec. Lutz Decl. ¶ 18). The plaintiffs contest this

characterization and argue that, even construed liberally, NSC's present request would be no more burdensome that other searches the agency has conducted in response to similarly broad FOIA requests. *Id.*

Setting aside the parties' dispute regarding the likely burden imposed by the search envisioned by the plaintiffs, the CIA has failed to demonstrate that it conducted an adequate search under even its preferred interpretation of the plaintiff's initial request. Indeed, the description offered by the agency is markedly similar to the initial description provided by the agency, and rejected by this Court, in connection with NSC's narrower request for search materials used by IMS. There, as here, the agency's declarant averred simply that personnel responsible for conducting searches within the relevant agency components reviewed their own records to attempt to identify documents responsive to NSC's current request. *Compare NSC II*, 960 F. Supp. 2d at 151 (explaining that the CIA's declarant in that case explained that NSC's request "was sent to IMS professionals who had personal knowledge of what search tools and indices were available and personally used by IMS personnel to search IMS records systems because they themselves use the search tools and indices references in the request," and that those employees "electronically searched the IMS records system as well as manually searched for independently known records that were responsive to Plaintiff's request"); Sec. Lutz Decl. ¶ 18 (averring that NSC's present request was assigned to "Information Management Technology Officers assigned to the Director's Area – who had personal knowledge of how Director's Area records systems are searched because they themselves search Director's Area records systems" and that these employees "searched electronically for responsive documents and manually searched for independently known responsive documents"). Thus, in both instances, the agency provided little information regarding "what parameters were used to accomplish the search, *i.e.*,

whether the CIA searched for the indices themselves or what search terms the CIA used to identify responsive records." *NSC II*, 960 F. Supp. 2d at 152.  While the agency has more recently supplemented its initial declarations in the related case with a more detailed description of its search for responsive IMS records, the agency has thus far offered no such clarification here.  This lack of specificity is particularly problematic given the apparent discrepancies between the ultimate returns from each of these related searches.  For instance, the agency has provided no explanation for the fact that NSC's original request, which sought search materials from IMS—a subcomponent of the Director's Area—yielded more results than NSC's present, more broadly framed request for such materials from the entire Director's Area.  *Compare NSC II*, 960 F. Supp. 2d at 127 (indicating that the CIA's search within IMS yielded three documents) *with* Lutz Decl. ¶ 94 (indicating that agency's search of the entire Director's Area yielded only two documents).

In sum, the agency has failed to demonstrate that its search in response to NSC's more broadly framed request was reasonably designed to identify responsive records in each of the components comprising the Director's Area.  Accordingly, the defendants' request for summary judgment on Count Sixteen with respect to the adequacy of the CIA's search is denied.

*       *       *

To summarize, summary judgment is granted to the CIA on Count Seven and denied on Count Sixteen with regard to the adequacy of the CIA's search.  With respect to Count Sixteen, however, further explication by the CIA may demonstrate that the search was, indeed, adequate, such that summary judgment for the CIA is appropriate.  Consequently, the CIA is provided an opportunity to supplement its initial declarations as to its search for documents responsive to the plaintiffs' request.

### D.    Remaining Challenged Withholdings

With the plaintiffs' challenges to the CIA's search efforts resolved, consideration of the pending motions concludes with a review of the parties' remaining disputes regarding the defendants' responses to twelve FOIA requests submitted to either the CIA or ODNI.  First, in Count Eleven, the plaintiffs challenge the CIA's refusal to confirm or deny the existence of records responsive to NSC's request for records related to the destruction of the CIA's office at the World Trade Center on September 11, 2001.  Beyond this blanket denial, the plaintiffs contest the defendants' withholding, in full or in part, of ninety-five documents responsive to ten of the plaintiffs' FOIA requests.  Combined *Vaughn* Index at 1–17.  Specifically, the plaintiffs challenge the defendants' withholdings under Exemptions 1, 3, and 5 of materials responsive to the requests at issue in Counts Four, Seven, Eight, Nine, Ten, Sixteen, Seventeen, Twenty, Twenty-One, and Twenty-Three.  *Id.*  In many instances, the defendants invoke multiple exemptions to justify their withholdings in response to these requests.

To facilitate review of these remaining challenges, the discussion that follows addresses the challenged withholdings in order, beginning with the CIA's refusal to confirm or deny the existence of records responsive to the FOIA request at issue in Count Eleven, as well as the ODNI's complete withholding of two documents in Count Twenty-Three, under Exemption 1 and E.O. 13526.[9]  Next, the CIA's decision to withhold all or part of ninety-two documents, pursuant to Exemption 3 and either the Central Intelligence Agency Act ("CIA Act"), 50 U.S.C. § 3507, or the National Security Act, 50 U.S.C. § 3024(i), is considered.  Finally, the CIA's

---

[9]    The CIA also relies on Exemption 1 to support its withholdings in Counts Seven, Eight, Nine, and Ten, and Twenty-One, with the plaintiffs contesting each of numerous such withholdings on both procedural and substantive grounds.  Combined *Vaughn* Index at 2–16; Pls.' Opp'n at 43–46; Pls.' Surreply at 11–14.  Since the Court ultimately resolves the parties' substantive disputes with respect to these records in the context of Exemption 3, the Court need not consider the procedural issues raised by the plaintiffs in challenging the agency's alternative basis for withholding these records in full or in part.

withholding of portions of one document responsive to the FOIA request at issue in Count Twenty, pursuant to deliberative process privilege and Exemption 5, is reviewed.

### 1.   *Exemption 1*

Under FOIA Exemption 1, records that were "[s]pecifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order" may be withheld from disclosure.  5 U.S.C. § 552(b)(1).  Thus, to withhold information under Exemption 1, an agency must show that the information has been classified in compliance with the classification procedures set forth in the applicable Executive Order and that only information conforming to that Order's substantive criteria for classification has been withheld.  *See ACLU v. U.S. Dep't of Justice*, 640 F. App'x 9, 10–11 (D.C. Cir. 2016); *Judicial Watch*, 715 F.3d at 941 (discussing "substantive and procedural criteria for classification"); *Lesar v. Dep't of Justice*, 636 F.2d 472, 483 (D.C. Cir. 1980) ("To be classified properly, a document must be classified in accordance with the procedural criteria of the governing Executive Order as well as its substantive terms."). "'[S]ubstantial weight [is accorded] to an agency's affidavit concerning the details of the classified status of . . . disputed record[s]'" "'[b]ecause courts lack the expertise necessary to second-guess . . . agency opinions in the typical national security FOIA case.'"  *ACLU*, 640 F. App'x at 11 (quoting *ACLU*, 628 F.3d at 619) (internal quotation marks and citations omitted; third and fourth alterations in original).

Here, the defendants assert that information withheld under Exemption 1 is properly classified under either § 1.4(b) or § 1.4(c) of E.O. 13526, which protect from disclosure "foreign government information" and information concerning "intelligence activities (including covert action), or intelligence sources or methods."  E.O. 13526 §§ 1.4(b), (c); Lutz Decl. ¶ 151; Decl.

Jennifer L. Hudson (June 27, 2013) ("Hudson Decl.") ¶ 35, ECF No. 74-8. Beyond withholding particular records in whole or in part, this Order permits agencies responding to a FOIA request to "refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors." E.O. 13526 § 3.6(a). Such a response is referred to in the FOIA context as a "*Glomar* response." [10]

### a)        Count Eleven – CIA *Glomar* Response

Count Eleven centers on NSC's request for all CIA records "documenting any loss of records from the destruction of the CIA office in 7 World Trade Center ("WTC") on 11 September 2001." FAC ¶ 109. Two weeks after receiving this request, the CIA issued its final response to NSC, which stated, in relevant part, "in accordance with section 3.6(a) of Executive Order 13526, the CIA can neither confirm nor deny the existence or nonexistence of records responsive to your request. The fact of the existence or nonexistence of requested records is currently and properly classified. . . . Therefore, your request is denied pursuant to FOIA exemptions (b)(1) and (b)(3)." Lutz Decl. ¶ 66. In other words, the agency denied NSC's request and issued a *Glomar* response, pursuant to FOIA Exemptions 1 and 3.

---

[10]        *Glomar* responses are "named for the Hughes Glomar Explorer, a ship used in a classified CIA project 'to raise a sunken Soviet submarine from the floor of the Pacific Ocean to recover the missiles, codes, and communications equipment onboard for analysis by United States military and intelligence experts.'" *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1171 (D.C. Cir. 2011) (quoting *Phillippi v. CIA*, 655 F.2d 1325, 1327 (D.C. Cir. 1981)). In the 1986 Freedom of Information Reform Act, Congress codified in 5 U.S.C. § 552(c) the use of a *Glomar* response for the following three limited categories of agency records: (1) law enforcement records described in 5 U.S.C. § 552(b)(7)(A), which if disclosed could reasonably be expected to interfere with enforcement proceedings; (2) informant records; and (3) certain classified records maintained by the FBI. Pub. L. No. 99–570, §§ 1801–04 (1986); *see* 5 U.S.C. § 552(c) (for these excluded categories of records, allowing agencies to "treat the records as not subject to the requirements of this section"); *see also Benavides v. Drug Enf't Admin.*, 976 F.2d 751, 752–53 (D.C. Cir. 1992) (per curiam) (construing the phrase "not subject to the requirements of this section" to "permit a Glomarization where the information's status has not been officially confirmed, but to permit analysis under other exemptions like that afforded any other document sought under FOIA, where the status has been so confirmed").

The plaintiffs challenge this response on both procedural and substantive grounds. First, procedurally, the plaintiffs contend that the fact that records responsive to NSC's FOIA request do or do not exist, which the plaintiffs describe as the "*Glomar* fact," has not itself been properly classified and, as a result, the CIA may not rely on FOIA Exemption 1 to withhold this information. Pls.' Opp'n at 47–51. Second, substantively, the plaintiffs argue that, because the existence of the CIA's WTC office has been reported by various fora, the agency cannot now assert that the existence of that office remains classified. *Id*. at 51–53.

Turning first to the plaintiffs' procedural objection, this Court has considered and rejected this exact argument in *Mobley v. CIA*, 924 F. Supp. 2d 24, 47 (D.D.C. 2013), *aff'd on other grounds*, 806 F.3d 568 (D.C. Cir. 2015). There, as here, the FOIA applicant argued that the CIA's *Glomar* response was procedurally unsound where the agency failed to show that it followed the necessary steps in asserting that the existence or nonexistence of records responsive to the plaintiff's FOIA request was classified. *Id*. at 47. In both instances, the perceived procedural flaw was the agency's failure to establish either the date on which this information was determined to be classified or the duration of this classification. *Id*. at 48; Pls.' Opp'n at 47. While noting that this view finds some support in the text of E.O. 13526, *Mobley*, 924 F. Supp. 2d at 47, the Court in *Mobley* ultimately relied on the D.C. Circuit's interpretation of the identical provision in a predecessor Executive Order to hold that "if the agency affidavit plausibly explains the danger of the expected damage to national security or foreign relations from confirming or denying the existence of records, the existence of records *vel non* is properly classified under Executive Order 12958 and justifies the Agency's invocation of Exemption 1," *id*. at 50 (internal quotations and alterations omitted) (quoting *Wolf v. CIA*, 473 F.3d 370, 376 (D.C. Cir. 2007)).

While the plaintiffs acknowledge that the Court has already thoroughly considered and rejected this argument, they offer an additional affidavit from a purported "expert witness on the meaning of [E.O. 13526] and classification policy" to bolster their argument that the Court should revisit its earlier holding.  Pls.' Opp'n at 47 n.38.[11]  This additional evidence aside, the plaintiffs' rehashed arguments provide no basis for reconsidering the Court's prior resolution of this issue.  As before, recognizing the fundamental difference between a *Glomar* response and other classified information, as well as longstanding principle that FOIA does not require agencies to create records in response to FOIA requests, the CIA is not required to establish a declassification timeline in order to "properly classif[y]" a *Glomar* fact under Executive Order 13526.  *Accord Mobley*, 924 F. Supp. 2d at 49.  As such, the agency followed the proper procedures in declining to confirm or deny the existence of agency records responsive to NSC's FOIA request.

The plaintiffs' substantive objection to the CIA's *Glomar* rests on their contention that, because the existence of the CIA's WTC office has been reported by the news media and acknowledged in official materials prepared by two other agencies, the CIA cannot now assert that the existence of this office remains properly classified.  Pls.' Opp'n at 51–53.  In support, the plaintiffs correctly note that, where classified information has been officially acknowledged, "its disclosure may be compelled even over an agency's otherwise valid exemption claim."  Pls.' Opp'n at 51 (citing authorities).  With this in mind, the plaintiffs highlight two news articles, each published soon after the September 11, 2001 attacks, describing the destruction of the

---

[11]     Setting aside the questionable tactic of offering an "expert witness" to opine on the proper interpretation of an Executive Order, *see Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge[.]"), the legal opinions offered by the plaintiffs' witness—who, despite his notable experience and qualifications, is not an attorney, *see* Pls.' Opp'n, Ex. 1 at 4, ECF No. 77-25—essentially parrot those advanced by the plaintiffs themselves.

CIA's WTC office and agency efforts to recover records previously stored at that office. *Id.* at

51–52. According to the plaintiffs, the publication of these two articles in short succession

suggests that the information reported therein was officially disclosed to the articles' authors. *Id.*

at 52. Along similar lines, the plaintiffs point to recent reports prepared by the National Institute

of Standards and Technology and the Federal Emergency Management Agency recognizing this

office as evidence that these agencies "presumably" consulted with the CIA in connection with

this disclosure. *Id.*

      The plaintiffs concede that, in order to be officially acknowledged, information must

"have been made public through an official and documented disclosure," *id.* (citing *Fitzgibbon v.*

*CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)), and that disclosure by one agency does not preclude

*another* agency from withholding that information as classified, *id.*; *see Frugone v. CIA*, 169

F.3d 772, 774 (D.C. Cir. 1999) ("[W]e do not deem 'official' a disclosure made by someone

other than the agency from which the information is being sought."). Nonetheless, while

pointing to no official, documented disclosure *by the CIA* of the existence of a WTC office, the

plaintiffs rely on these cited materials to suggest that "[f]or [the] CIA to maintain that the

existence of this office is still properly classified is to strain credulity to the breaking point."

Pls.' Opp'n at 52–53.

      The plaintiffs' incredulity notwithstanding, their suggestion that the CIA has officially

acknowledged the existence of a WTC office rests entirely on their own speculation as to steps

"*presumably*" taken by the agency in connection with prior disclosure of this information by

*others*. *Id.* at 52 (emphasis added). Moreover, contrary to the plaintiffs' view that the CIA has

failed to refute such speculation, Pls.' Surreply at 14, the agency's declarant explicitly avers that

the "CIA has not officially acknowledged the existence or non-existence of a clandestine CIA

office at the location at issue in [NSC's FOIA] request." Sec. Lutz Decl. ¶ 30. Put simply,

confronted with the agency's explicit disavowal of any formal disclosure, the plaintiffs' reliance

on stray references in four documents prepared by sources outside the agency over the course of

thirteen years is insufficient to demonstrate that the agency has *in fact* officially disclosed

information it now seeks to withhold.

Consequently, summary judgment is granted to the defendants as to the CIA's issuance of

a *Glomar* response in Count Eleven.

### b) Count Twenty-Three – ODNI Exemption 1 Withholdings

Beyond challenging the agency's use of a *Glomar* response in Count Eleven, the

plaintiffs' contest the ODNI's withholding, under Exemption 1, of two documents responsive to

the FOIA request at issue in Count Twenty-Three. Combined *Vaughn* Index at 18. Count

Twenty-Three stems from NSC's submission of a FOIA request to ODNI seeking all records

"describing, discussing, implementing, or authorizing delegations or authorizations made by the

ODNI to other government agencies that allow them to take independent action to 'protect

intelligence sources and methods' pursuant to [the National Security Act]." Hudson Decl. ¶ 17.

In connection with this request ODNI identified seventeen responsive documents, four of which

were initially produced to NSC in full, and thirteen of which were withheld in full. *Id.* ¶ 19.

Upon re-review, the agency later released three of the records originally withheld in full in

redacted form to NSC. *Id.* ¶ 22.

Of the remaining withheld documents, "five are classified internal [Staff Summary Forms

("SSFs")], which are internal forms used within the ODNI to properly and thoroughly document

staff actions and recommendations for senior officials." *Id.* ¶ 37. Such documents "are used

when ODNI staff is seeking approval of a particular action, signature on a document, or for

purely informational purposes." *Id.* In particular, the SSFs withheld here "provided the DNI with information about the relevant cases and requested that the DNI authorize other [intelligence] agencies to rely on the National Security Act to protect sources and methods information in certain records in various types of cases including a court martial, a criminal prosecution, and FOIA cases." *Id.* According to ODNI's declarant, "[a]cknowledging the involvement of one or more [intelligence] agencies in these cases would compromise specific sources, intelligence interests and methods implicated in the underlying litigation." *Id.* This information is thus classified as SECRET, with the agency's declarant explaining that its disclosure "could reasonably be expected to cause serious damage to national security." *Id.*

The plaintiffs limit their challenge to ODNI's withholdings in Count Twenty-Three to SSFs pertaining to FOIA cases, Pls.' Opp'n at 42 n.36, of which the final Combined *Vaughn* Index indicates there are two, *see* Combined *Vaughn* Index at 17–18. Contending that the agency's submissions lack sufficient "evidentiary support" to meet the agency's burden of justifying its withholding, the plaintiffs argue that the agency's declarant offers no basis for concluding that the SSFs at issue here were properly withheld in full. Pls.' Opp'n at 53. Specifically, the plaintiffs suggest that, even crediting the assertion that an agency's involvement in a particular FOIA action is properly classified, "that . . . does not mean that there is no segregable information in the documents in question." Pls.' Surreply at 14. For instance, the plaintiffs propose redacting any case names, such that the redacted SSF "would simply reveal that certain agencies were involved in an unknown case." *Id.* Alternatively, "releasing everything except the names of the agencies would simply reveal that unknown agencies were involved in a particular case." *Id.* In either event, the plaintiffs argue, the released materials

would avoid any risk of acknowledging the involvement a particular agency in identifiable FOIA actions. *Id.*

The plaintiffs raised the possibility of releasing purportedly segregable material in the SSFs only in their Surreply, *see generally* Pls.' Opp'n, leaving the defendants with little opportunity to respond directly to the plaintiffs' proposed course. In any event, however, the agency's declarant avers that, based on her "line-by-line" review of the withheld SSFs, "[n]o non-exempt information is reasonably segregable from the documents, and no other information about these documents can be provided on the public record." Decl. Jennifer Hudson (June 27, 2014) ("Sec. Hudson Decl.") ¶¶ 13, 20, ECF No. 84-2. The agency's declarant elsewhere explains that the withheld SSFs "provided background and rationale behind [each] request for the DNI's approval [to rely on the National Security Act to protect intelligence activities, sources and methods] and provide a section that identified which offices concurred with the recommendation." *Id.* ¶ 17. Given that the withheld records would, by their very nature, include a detailed description of the nature of a particular FOIA action and the national security interests at play in each underlying FOIA request, it not illogical that any non-exempt information included in these documents would not be reasonably segregable. In particular, there is little reason to believe that the simple removal of case names or information identifying the agencies involved in a particular case would sufficiently protect the important intelligence interests and methods described by the ODNI's declarant. Finally, the ODNI's assurances in this regard are bolstered by the agency's decision, after re-review of the records identified in its initial search to partially release three additional records that were previously withheld in full. Hudson Decl. ¶ 29; *accord Looks Filmproduktionen GmbH v. CIA*, No. CV 14-1163 (BAH), 2016 WL 4186652, at *15 (D.D.C. Aug. 5, 2016).

For these reasons, the defendants' request for summary judgment as to ODNI's withholdings in connection with Count Twenty-Three is granted. Since the Court determines that the disputed SSFs may be withheld in full under Exemption 1, the Court need not consider whether, as the agency suggests, these materials are exempt from disclosure under either the attorney/client or the deliberative process privilege.

*          *          *

In sum, summary judgment is granted to the defendants with respect to the CIA's use of a *Glomar* response in Count Eleven. Likewise, summary judgment is granted to the defendants with respect to ODNI's withholdings in Count Twenty-Three.

### 2.    *Exemption 3*

The plaintiffs continue to challenge the complete or partial withholding, under FOIA Exemption 3, of ninety-two responsive records by the CIA. *See* Joint Summ. at 3; Combined *Vaughn* Index at 1–17. These withheld records are responsive to the FOIA requests at issue in Counts Four, Seven, Eight, Nine, Ten, Sixteen, Seventeen, Twenty, and Twenty-One. *See* Combined *Vaughn* Index at 1–17. Following a brief summary of the legal principles underlying the Court's review, these challenged withholdings are addressed below.

As relevant here, Exemption 3 applies to matters "specifically exempted from disclosure by statute . . . if that statute" either (1) "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," or (2) "establishes particular criteria for withholding or refers to particular types of matters to be withheld." *See* 5 U.S.C. § 552(b)(3). The D.C. Circuit has explained that "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the

45

statute's coverage." *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir. 2007) (quoting *Ass'n of Retired Rail Road Workers v. U.S. Rail Road Retirement Board*, 830 F.2d 331, 336 (D.C. Cir. 1987)).

Ten of the plaintiffs' remaining Exemption 3 challenges stem from the agency's withholdings pursuant to Section 6 of the CIA Act, 50 U.S.C. § 3507, while the remaining eighty-two challenged withholdings arise under the National Security Act, 50 U.S.C. § 3024(i). *See* Combined *Vaughn* Index at 1–17. The Supreme Court has held, and the plaintiffs do not contest, that both of these statutes are "withholding statutes" for the purposes of Exemption 3. *Davy v. CIA*, 357 F. Supp. 2d 76, 86 (D.D.C. 2004) (citing *CIA v. Sims*, 471 U.S. 159 (1985)). In the plaintiffs' view, however, the agency improperly withheld certain information that is protected by neither statute. Pls.'s Opp'n at 42. The challenged withholdings under each statute are discussed in turn below.

### a)   CIA Act

The plaintiffs challenge the CIA's withholdings under the CIA Act in ten records responsive to the FOIA requests at issue in Counts Four, Sixteen, and Seventeen. Combined *Vaughn* Index at 1, 16–17.[12] Section 6 of the CIA Act provides that the CIA "shall be exempted from the . . . provisions of any other law which require[s] the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by" the agency. 50 U.S.C. § 3507.

---

[12]   The exact number of records still at issue is somewhat unclear. The plaintiffs' Opposition indicates that the plaintiffs continue to challenge withholdings in eleven records, Pls.' Opp'n at 58, but identifies, at turns, nine or ten such documents, *compare id.* at 42 (indicating that "CIA Doc. Nos. 47, 221–22, 224–25, 245, and 555–58" remain in dispute) *with id.* at 58 (listing, as documents in dispute, "Doc. Nos. 47, 221–22, 224–25, 245 . . . , 555 . . . , and 557–58"). In any event, the final *Vaughn* index provided by the parties includes ten documents for which the agency's CIA Act withholdings remain in dispute, Combined *Vaughn* Index at 1, 16–17, and the Court will thus consider the agency's withholdings under the CIA Act in each of these records.

In a separate action involving NSC, the Court rejected the CIA's broad interpretation of this language to conclude that the CIA may not presumptively withhold pursuant to this section information that falls into six categories, namely, "(1) internal templates utilized by the CIA in tasking FOIA requests; (2) internal rules, policies and procedures governing FOIA processing including classification, referrals, coordinations, and fees; (3) organizational information revealing CIA's internal system of decentralized information management; (4) internal information concerning ways in which CIA is able to store and retrieve information; (5) information about the CIA's core functions, including intelligence activities, intelligence sources and methods, and the collection, analysis, and dissemination of foreign intelligence; and (6) recommendations from FOIA analysts and attorneys about how requests should be administratively processed and routed." *NSC II*, 960 F. Supp. 2d at 184–85 (citations omitted). This interpretation has since been explicitly adopted by at least two other Judges on this Court. *Sack v. CIA*, 53 F. Supp. 3d 154, 169–70 (D.D.C. 2014); *Whitaker v. CIA*, 31 F. Supp. 3d 23, 34 (D.D.C. 2014), *aff'd on other grounds*, *Whitaker v. United States Dep't of State*, 2016 U.S. App. LEXIS 1086 (D.C. Cir. Jan. 21, 2016).

Following this decision, at the request of the parties, *see* Joint Mot. Stay Briefing, ECF No. 68, briefing in this action was stayed to permit the CIA to re-review each of its withholdings under the CIA Act. Min. Order, dated Aug. 23, 2013. As a result of this re-review, the agency released additional material to the plaintiffs previously withheld under the CIA Act and Exemption 3. Defs.' Mem. at 34. Thus, the CIA reports that it has now withheld under the CIA Act only information falling into one of four categories: "1) the names and other personal identifying information of CIA employees; 2) official titles; 3) the organization of personnel, including the names of internal offices and buildings; and 4) information disclosing employees'

duties or functions, including functions related to the protection of intelligence sources and methods; and internal CIA organizational information (including file paths for CIA computer systems)." *Id.* at 34–35; Lutz Decl. ¶ 175.

Nonetheless, despite being provided an opportunity to comply with this Court's prior holding, the CIA acknowledges that certain information still withheld in this case "falls within categories (3) and (4) of the Court's August 2013 opinion for which the Court was skeptical that any justification could be provided." Defs.' Mem. at 37. With respect to this information, the CIA explains that it "respectfully disagrees with this Court's" interpretation of the CIA Act. *Id.*

Understandably frustrated with the CIA's intransigence, the plaintiffs note that, had the agency objected to this holding, it had numerous avenues to seek review or reconsideration of that holding or to otherwise withhold the sought-after material. Pls.' Opp'n at 57. Thus, while the plaintiffs concede that the agency has properly withheld "names, email address, office locations, URLs, and the like," they continue to contest the withholding of information qualifying as "organizational information revealing CIA's internal system of decentralized information management" or "internal information concerning ways in which CIA is able to store and retrieve information." *Id.* Specifically, the plaintiffs object to the withholding of an "internal reference code" in Doc. No. 47 (Count Four), "classification block[s]" in Doc. Nos. 221, 222, 224, 225, and 245 (Count Four), and information regarding "internal databases and how personnel use those databases" in Doc. Nos. 555 and 556 (Count Sixteen) and 557 and 558 (Count Seventeen). *Id.* at 58. Each of these objections is addressed in turn.

First, with respect to the internal reference code redacted from Doc. No. 47, the agency explains that this code "is a series of letters and numbers for an internal tasking that, if aggregated with other such codes would expose *details of CIA's organization and functions*."

Defs.' Reply at 33 (emphasis added).  As the agency correctly suggests, withholding of such material under the CIA Act runs directly counter to this Court's prior holding in *NSC II*.  There, the Court noted that the thrust of the D.C. Circuit's limited guidance as to the scope of the CIA Act is that § 6, "standing alone, only protects 'information on the CIA's personnel and internal structure,' such as the names of personnel, the titles and salaries of personnel, or how personnel are organized within the CIA." *NSC II*, 960 F. Supp. 2d at 175 (internal citation omitted).  As such, the Court explicitly rejected the CIA's withholdings supported by essentially the same language deployed by the agency to justify its withholdings here. *See id.* (denying summary judgment where the CIA sought to withhold material in order to "protect[] from disclosure information about the [CIA]'s organization and functions" (quoting Defs.' Reply in Supp. Mot. Summ J. on Counts 1, 2, 3, 5, 6, 7, 8, 9, 10, and 13 at 7, No. 11–445, ECF No. 35).  As the Court explained, "the plain text of the statute limits protection from disclosure only to the functions and organization *pertaining to or about personnel*, not to all information that relates to such functions and organization." *Id.* (internal citation omitted).  Consistent with this interpretation, because the CIA refers only to the *agency's* organization and functions in justifying its withholdings, with no suggestion that the information withheld pertains to or is otherwise about CIA *personnel*, the defendants' request for summary judgment as to its withholdings in Doc. No. 47 is denied.

With regard to the redacted classification blocks, the CIA's declarant explains that these blocks "contain[] information required by Section 1.6(a) of E.O. 13526," with redacted information withheld to "protect employee identification numbers used to identify CIA personnel and information on how CIA personnel treat classified information and protect intelligence sources and methods, a core function of CIA personnel." Lutz Decl. ¶ 184 n.20.  According to

the agency's declarant, in addition to identifying information of CIA personnel, these blocks include "information regarding how CIA personnel treat classified information and protect intelligence sources and method[s]," including the "use of classification derivatives and how CIA personnel apply these derivatives to specific information." Sec. Lutz Decl. ¶ 35; Defs.' Reply at 33. The agency advances similar arguments in favor of its withholding of information addressing internal agency databases and how those databases are used by CIA personnel. Sec. Lutz Decl. ¶ 36 (explaining that the withheld material includes "references to internal databases, how personnel use those databases, and how personnel operate internal computer systems"); Defs.' Reply at 33.

At first blush, these descriptions provide some indication that the withheld information in these documents falls within the ambit of the CIA Act. At a minimum, in contrast to the reference code withholdings assessed above, the agency at least refers to agency personnel in seeking to justify its withholdings in these documents. Upon closer inspection, however, the agency's cursory references to "CIA personnel" are insufficient to convert the withheld material into information pertaining to or about personnel that would be properly exempt from disclosure under the CIA Act. Indeed, the agency's declarant makes clear that the withheld material "reveals ways in which CIA computer records systems are configured, how these systems are accessed and organized, and how Agency personnel classify and restrict access to sensitive national security information." Lutz Decl. ¶ 184. Seeking, albeit begrudgingly, to draw a "direct nexus to CIA personnel," the agency's declarant explains that "the CIA's computer and recordkeeping systems are an integral part of the regular duties of CIA employees, and the protection of the sensitive information in these systems (and within the CIA more broadly) are one of the core functions of CIA personnel." *Id.* As before, however, while "[i]t is undoubtedly

true that managing, storing, and retrieving information is a function of some, if not all, CIA personnel, . . . the CIA is attempting to augment the scope of [the CIA Act] by withholding information that merely *relates to or concerns* that function." *NSC II*, 960 F. Supp. 2d at 179. "The language of the statute simply does not support such a broad reading." *Id.*

The Court is mindful of potential national security concerns implicated by the wide availability of the types of information the agency seeks to redact from these documents. *See* Lutz Decl. ¶ 185. To the extent that disclosure of the information in these records poses such a risk, there are likely "numerous other ways that the CIA could protect such information from FOIA disclosure," including through the invocation of "the National Security Act, if the information would reveal intelligence sources or methods, or FOIA Exemption 1, if the information is properly classified." *NSC II*, 960 F. Supp. 2d at 179 n.46 (internal citation omitted). For today, however, the agency's exclusive reliance on the CIA Act to withhold material that does not pertain to CIA personnel is misplaced. Accordingly, the defendants' request for summary judgment as to the CIA's withholdings pursuant to the CIA Act in Counts Four, Sixteen, and Seventeen is denied.

### b)       National Security Act

The plaintiffs next challenge the CIA's withholdings, pursuant to Exemption 3 and the National Security Act, in eighty-two documents responsive to the FOIA requests at issue in seven counts. Combined *Vaughn* Index at 1–17.

The National Security Act requires the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i). As interpreted by the D.C. Circuit, this language exempts from disclosure under the FOIA material that the agency "demonstrates . . . 'can reasonably be expected to lead to unauthorized

disclosure'" of intelligence methods or sources. *Wolf v. CIA*, 473 F.3d 370, 377 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)); *see also Larson v. Dep't of State*, 565 F.3d 857, 863 (D.C. Cir. 2009) (allowing for withholding of information that "could provide enough clues to allow some individuals to determine who provided the information to the CIA"). In light of the national security interests implicated by such material, courts give "even greater deference to CIA assertions of harm to intelligence sources and methods under the National Security Act." *Wolf*, 473 F.3d at 377 (citing *Sims*, 471 U.S. at 168–69).

For nearly all of the agency's challenged National Security Act withholdings, the CIA also invokes Exemption 1 as an alternative basis for refusing to disclose otherwise responsive material. Pls.' Opp'n at 54. According to the plaintiffs, because the agency simply "tacked on" Exemption 3 as an alternative basis for its withholdings in these records, "a finding that information is not properly withheld under Exemption [1] will also mean that it is not properly withheld under the National Security Act." *Id.* While the plaintiffs are correct to note the substantial overlap between information properly exempted from disclosure under Exemption 1 and information that must be protected under the National Security Act, their suggestion that material not properly withheld under Exemption 1 cannot be withheld under the National Security Act misses an important distinction between E.O. 13526 and the National Security Act.

Indeed, in challenging the CIA's Exemption 1 withholdings, the plaintiffs raise both procedural and substantive objections to the agency's determination that withheld material is properly classified under E.O. 13526. *See* Pls.' Opp'n at 43–46; Pls.' Surreply at 11–14. Since the procedural requirements set out in that Order do not apply to withholdings under the National Security Act, however, any procedural concerns raised with respect to the CIA's Exemption 1 withholdings have no bearing on the agency's authority to withhold similar material under the

National Security Act and Exemption 3. For this reason, in reviewing the sufficiency of the CIA's justifications for its withholdings under the National Security Act, only the plaintiffs' substantive objections to the CIA's withholdings in these eighty-two documents will be considered.

### (1)    Count Seven

In Count Seven, the plaintiffs' contest the CIA's decision to withhold two classified declarations from former Directors of Central Intelligence (Doc. Nos. 471 and 472) that "contain information about liaison services, CIA sources, intelligence activities and methods, and other classified information." Lutz Decl. ¶ 168. Each of these declarations was submitted by the agency for *in camera* review in prior FOIA actions decided in the early 1980s to support the agency's invocation of the state secrets privilege to withhold certain information from disclosure. *Id.* Specifically, the agency's declarant explains that Doc. No. 471 "explained in detail how classified state secrets could be exposed" through a prior FOIA action and "addressed the harm to national security that would result" should the sought-after records in that case become public. *Id.* Likewise, Doc. No. 472 provided "details about the sensitivities of the identities of liaison services and individual sources who provided information to the CIA as part of [a particular CIA] program, as well as certain clandestine intelligence activities and methods relating thereto." *Id.* Explaining that disclosure of either of these records would "reveal information concerning intelligence methods," the agency argues that these documents may be withheld in full under Exemption 3. *Id.*

In response, the plaintiffs emphasize that these documents were each created over twenty-five years ago and contest the agency's decision to continue to withhold these documents

in response to NSC's present FOIA request.[13]  Specifically,  the plaintiffs  suggest that the CIA

has provided  minimal  justification  for withholding  these records beyond the fact that the

information  included  in these declarations  was classified  at the time the declarations  were

originally  filed.  Pls.' Opp'n at 43, 45 ("CIA argues that Doc. Nos. 471–72 . . . remain properly

classified  because they pertain to intelligence  activities,  sources, or methods, and as evidence for

this assertion,  it attempts to incorporate  by reference whatever reasons the authors gave in those

declarations.").  Arguing  that the CIA must re-review these materials to ensure that they may still

be properly withheld,  the plaintiffs  suggest that the CIA is "in effect asking the Court to opine  on

reasons for classification  provided  to a court three decades ago without actually *reading* them,

just trusting  that they were good."  *Id.* at 45 (emphasis  in original).

The plaintiffs  are certainly correct that information  properly classified  in the past is not

necessarily  properly classified  today.  *See, e.g.,* E.O. 13526 § 1.5(d) (providing  that "[n]o

information  may remain classified  indefinitely"),  § 3.5(3)(c) (directing  "[a]gencies  conducting  a

mandatory  review for declassification  [to] declassify  information  that no longer  meets the

standards  for classification  under" E.O. 13526).  Nonetheless,  their suggestion  that, because the

documents  they seek *may* no longer be properly  classified,  those documents  are automatically

subject to public  disclosure,  misses the mark.  *See id.* (explaining  that information  must be

released upon being declassified  "unless withholding  is otherwise authorized  and warranted

under applicable  law").  In fact, even assuming  that the declarations  the plaintiffs  seek are no

---

[13]      In contesting the agency's withholding of this material pursuant to Exemption 1, the plaintiffs assert that,
due to their age, each of these documents is subject to automatic declassification under E.O. 13526.  Pls.' Opp'n at
46.  As previously explained, however, because this information may be withheld under the National Security Act
regardless of whether its remains properly classified, the Court need not consider whether the automatic
declassification provision of E.O. 13526 applies to these documents.

longer classified, the agency has presented ample evidence to demonstrate that these documents were properly withheld under the National Security Act.

Most significantly, the agency asserts, and the plaintiffs apparently do not contest, that the declarations withheld in Count Seven each "contain information about liaison services, CIA sources, intelligence activities and methods, and other classified information." Lutz Decl. ¶ 168. Indeed, the agency's uncontested assertions regarding the contents of these declarations are further bolstered by the context in which these declarations were submitted. For example, Doc. No. 472 was submitted in connection with a suit involving a group of individuals and organizations opposed to the Vietnam War who challenged various alleged surveillance programs during the war. *Halkin v. Helms*, 690 F.2d 977 (D.C. Cir. 1982). Placing "heavy reliance upon" the declaration at issue here, the district court in that case ruled that the agency's claim that records regarding these activities were protected by the state secrets privilege "had 'overwhelming support' on its merits," *id.* at 986, which holding was ultimately affirmed by the D.C. Circuit, *id.* at 1009. In this light, there is little reason to doubt that the sought-after declarations in this case include information describing intelligence methods properly exempted from disclosure pursuant to the National Security Act.

Accordingly, the defendants' request for summary judgment as to the CIA's withholdings in Doc. Nos. 471 and 472 at issue in Count Seven is granted.

### (2)    Counts Eight, Nine, and Ten

In total, the plaintiffs challenge the withholding, in full or in part, of seventy-seven documents responsive to the four FOIA requests at issue in Counts Eight, Nine, and Ten. *See*

Combined *Vaughn* Index at 2–17.  Since the FOIA requests at issue in these counts sought substantially similar materials, these counts will be discussed in tandem.

The FOIA requests at issue in Counts Eight, Nine, and Ten sought documents filed by third parties in connection with prior cases involving the CIA in this Court and two other jurisdictions.  In each instance, the CIA OGC reviewed unredacted copies of these submissions before they were filed in order to determine whether they included classified information not subject to public disclosure.  Lutz Decl. ¶ 57; Pl.'s Consent. Mot. Ext. Time at 1, n.1, *Boening v. CIA*, No. 07-430 (filed Oct. 1, 2007 D.D.C.), ECF No. 6.  The plaintiffs in this action seek CIA records related to the OGC's determination that some or all of the information in these submissions was classified, thus requiring the submissions to be filed on the public docket in redacted form.

To a degree, the requests at issue in Counts Eight, Nine, and Ten present an unusual variation on the question of whether documents previously sealed by a court are subject to later disclosure under FOIA.  As a general matter, in responding to a FOIA request, federal agencies are permitted to withhold otherwise responsive documents where an existing court order specifically enjoins their release.  In such circumstances, the agency "simply [has] no discretion . . . to exercise" and, thus, "has made no effort to avoid disclosure." *GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*, 445 U.S. 375, 386 (1980).  As the D.C. Circuit has explained, "respect for the judicial process requires the agency to honor" a court order or injunction barring disclosure of sealed materials. *Morgan v. U.S. Dep't of Justice*, 923 F.2d 195, 196 (D.C. Cir. 1991) (citing *GTE Sylvania, Inc.*, 445 U.S. at 386–87).  Thus, where a court circumscribes an agency's ability to produce documents such that the agency has "no discretion" to release the documents, the agency's failure to release documents will not be deemed improper. *See, e.g.,*

*GTE Sylvania*, 445 U.S. at 386 (injunction); *Morgan*, 923 F.2d at 197 (sealing order); *Wagar v. U.S. Dep't of Justice*, 846 F.2d 1040, 1046–47 (6th Cir. 1988) (consent order); *see also Senate of Commw. of P.R. v. U.S. Dep't of Justice*, No. 84-1829, 1993 WL 364696, at *6 (D.D.C. Aug. 24, 1993) ("The Supreme Court has held that records covered by an injunction, protective order, or held under court seal are not subject to disclosure under FOIA." (citations omitted)).

Where sought-after records are withheld pursuant to a court's direction, "the proper test for determining whether an agency improperly withholds records [subject to a court order] is whether the [order], like an injunction, prohibits the agency from disclosing the records." *Morgan*, 923 F.2d at 197 (emphasis in original). The agency bears the burden of demonstrating that responsive records are not subject to disclosure under the terms of a court order, *id.* at 198, and may be required to seek a clarifying order to demonstrate that a requested disclosure is prohibited, *see Judicial Watch, Inc. v. U.S. Dep't of Justice*, 813 F.3d 380, 384 (D.C. Cir. 2016) (vacating summary judgment and remanding to permit the agency to seek clarification regarding the intended effect and scope of relevant court order); *Morgan*, 923 F.2d at 198; *see also Awan v. U.S. Dep't of Justice*, 10 F. Supp. 3d 96, 107 (D.D.C. 2014) (finding "that the defendants have not established the Southern District's sealing order as a proper basis for withholding the over decade old material witness warrant affidavit under the FOIA" where defendants lacked clarifying order), *vacated* 46 F. Supp. 3d 90, 92 (D.D.C. 2014) (concluding "that the government's withholding of the material witness warrant affidavit in compliance with the sealing order does not constitute an improper withholding under the FOIA" after the government obtained clarifying order).

Here, the materials the plaintiffs seek were initially withheld not under an explicit court order, but instead as a result of the CIA's determination that the relevant filings contained

classified information that could not be disclosed publicly. In each instance, the private parties in these prior actions were ordered to submit their proposed filings to the CIA for review and potential redaction before entering these filings on the public docket. While the D.C. Circuit has not had occasion to consider whether materials redacted in this manner are presumptively excluded from FOIA coverage, there is some reason to believe that such disclosure is generally barred. For instance, prior court orders requiring parties to submit filings to the CIA for prefiling review would appear implicitly to direct any unredacted submissions to remain under seal.

As yet, however, the CIA has pointed to no order explicitly prohibiting disclosure of any unredacted materials. With this in mind, the discussion that follows begins by considering whether the agency has met its burden of demonstrating that withheld material is exempt from disclosure under the FOIA pursuant to Exemption 3 and the National Security Act. Where the agency has failed to meet this burden, the Court will provide an opportunity for the agency to identify a court order or other associated rule prohibiting the release of any withheld information at issue in this case.

In Count Eight, NSC requested copies of all records responsive to an earlier FOIA request, submitted in 2008, which itself sought "exhibits submitted in support of the Declaration of Franz Boening in *Boening v. CIA*, Civil Action No. 07-430 (D.D.C.)." Lutz Decl. ¶ 47; *see* FAC ¶ 32. The *Boening* case arose out of a former CIA employee's request for permission from the CIA to publish a memorandum he wrote while employed by the agency in connection with a whistleblower complaint he submitted to the CIA Office of Inspector General ("OIG") regarding alleged CIA activities abroad. Defs.' Reply at 22; *see Boening v. CIA*, 579 F. Supp. 2d 166, 168 (D.D.C. 2008). After the CIA OIG declined to pursue his complaint, the employee sought permission from the CIA Publications Review Board ("PRB") to publish the memorandum he

submitted to the OIG outside the agency. *Boening*, 579 F. Supp. 2d at 168.  The PRB advised the employee that, in order to publish his memorandum publicly, he would be required to remove any official agency formatting and include specific, open source citations for any of his allegations regarding the CIA's activities.  *Id.*  In essence, the agency required the employee to remove any indication that the CIA officially acknowledged any information contained in the memorandum.  *Id.* at 169.

The employee challenged this decision and, in connection with the litigation arising out of that challenge, sought to submit both a declaration describing his preparation of the memorandum and dozens of public news articles the plaintiff claims he relied upon in formulating his allegations.  *Id.* at 171; Defs.' Reply at 22; Pls.' Opp'n at 44.  Given the potentially sensitive information included in the plaintiff's filings, the court directed him to provide his proposed submissions to the CIA for prepublication review before filing them on the public docket.  *See* Min. Orders, dated Oct. 4, 2007 and Jan. 31, 2008, *Boening v. CIA*, No. 07-430.  Upon reviewing the plaintiff's proposed submissions, the CIA concluded that, "in the context of the information already on the record . . . , [the agency] could not approve placing [the submitted articles] on the public record without disclosing classified information."  Sec. Lutz. Decl. ¶ 25.  As a result, the plaintiff was required to file each of the articles he contended he relied upon in drafting his memorandum under seal.  *See id.*  Based on these submissions, the *Boening* Court upheld the CIA's decision to block the publication of the original memorandum. *Boening*, 579 F. Supp. 2d at 171.  In so doing, the court noted that the employee failed to provide adequate citations to the public materials he claimed supported his allegations, thus leaving the impression that the information contained in the memorandum had been officially acknowledged by the agency.  *Id.* Following this ruling, the employee agreed to revise the memorandum to

include the required citations, and the agency permitted him to publish the revised version with "minor redactions." Pls.' Opp'n at 44; *see id.*, Ex. W, ECF No. 72-23.

With the revised version of this memorandum now public, the FOIA request at issue in Count Eight seeks copies of each of the articles submitted under seal by the plaintiff in connection with this prior litigation. FAC ¶ 32. The CIA's search for these exhibits yielded sixty responsive documents (Doc. Nos. 473–531), all of which were withheld in full pursuant to Exemptions 1 and 3. *Id.* ¶ 50. Contending that the agency has failed to demonstrate that these exhibits are properly classified, the plaintiffs note that the CIA ultimately cleared for release the revised memorandum purportedly relying on the same public articles. Pls.' Opp'n at 44–45. In particular, since the now-public version of this memorandum includes citations to various public articles, the plaintiffs argue that the agency's contention that the articles submitted to the Court in *Boening* remain classified, and subject to withholding under Exemption 1, "comes *extremely* close" to bad faith. *Id.* at 45 (emphasis in original).

The defendants respond that, while the CIA ultimately permitted certain articles to be cited in a modified version of the plaintiff's memorandum, this revised memorandum "differed from the original in meaningful ways," such that any connection between the articles submitted as exhibits in the *Boening* case and the original memorandum remains classified. Defs.' Reply at 22–23. Specifically, the agency's declarant explains that edits required by the agency removed any suggestion that the Boening memorandum was an official CIA document or otherwise constituted an official acknowledgment by the CIA that the media reports cited therein were accurate. Sec. Lutz Decl. ¶¶ 25–26. Thus, as modified, the memorandum "no longer created the appearance that as a CIA employee he was confirming whether the speculation in press reporting

was accurate, and CIA agreed that the memorandum, in its revised format, did not contain classified information."   *Id.* ¶ 26.

By contrast, the defendants argue, the association of the submitted articles with the original version of the memorandum, *i.e.*, through their *ex parte* submission in the first FOIA action, "could officially confirm the existence or not" of properly classified information.   Defs.' Reply at 22.   In the agency's view, "by reading the unclassified news articles that discuss specific events and a specific country and knowing that the articles relate to Mr. Boening's allegations, one could infer the classified information that the CIA redacted from Boening's declaration and the related filings."   Lutz Decl. ¶ 169.   Thus, by releasing the documents in this context, the agency would "necessarily reveal that the documents are the exhibits and, in conjunction with the declaration and other filings, would reveal the substance of the classified information withheld from the public record."   *Id.*

The plaintiffs' skepticism on this point is understandable.   Given the disclosure already permitted by the CIA in connection with the Boening memorandum, it is initially difficult to understand how the exhibits the plaintiffs seek would reveal information protected by the National Security Act.   Indeed, while the CIA suggests that the final memorandum differed meaningfully from the original version submitted to the CIA OGC, a comparison between the publicly available memorandum, Pls.' Opp'n, Ex. W, and the redacted version of the original memorandum filed in the *Boening* case, *see* Pl.'s Opp'n Def.'s Mot. Dismiss, Ex. 2, *Boening v. CIA*, No. 07-430 (D.D.C. Nov. 19, 2007), ECF No. 9-3, suggests that the CIA sought only minor changes before allowing the memorandum to be published.   Given the substantial similarities between these documents, the CIA apparently concluded that the inclusion of appropriate citations in the publicly available memorandum sufficiently guarded against any implication that

the agency has officially acknowledged Boening's allegations. Yet, in opposing any additional disclosure, the agency insists that the revelation that articles cited in the public memorandum are the *same* articles submitted in connection with the original Boening memorandum would somehow give the imprimatur of official acknowledgment to Boening's accusations. Lutz Decl. ¶ 169.

At the same time, the Court is sensitive to the unusual circumstances presented by the plaintiffs' present request. In effect, the plaintiffs' FOIA request constitutes a collateral attack on the CIA's initial withholding determinations in the *Boening* case, with the plaintiffs seeking access to materials previously deemed, over no apparent objection, to be properly classified. Since the CIA ultimately allowed the Boening memorandum to be published with minimal alterations, the plaintiffs suggest that the CIA waived any claim that these materials are exempt from disclosure under the FOIA. Pls.' Surreply at 13–14. Under the plaintiffs' proposed rule, then, the agency would be penalized for permitting individuals to publish even third-party accounts of the agency's activities, for fear that, in so doing, the agency has tacitly acknowledged the veracity of those accounts and cannot later withhold information regarding those activities. In that light, the CIA's effort to preserve the fidelity of its original prepublication determination, while also maintaining its ability to allow authors to publish their works with minimal alteration, is not irrational.

Ultimately, however, the Court is not persuaded that, on the record currently presented, the CIA has met its burden of demonstrating that the records it seeks to withhold would reveal intelligence sources or methods. The materials the plaintiffs seek are public, unconfirmed news reports of agency activities abroad. While the agency has made clear that it can neither confirm nor deny the veracity of those reports, the agency has allowed similar (or the same) reports to be

associated with the allegations set out in the public Boening memorandum. The plaintiffs do not seek the release of the *original* Boening memorandum, which the agency asserted would improperly suggest that the agency adopted the allegations set out therein. As such, even assuming the release of this original memorandum would impermissibly reveal protected intelligence methods and sources, the agency offers little support for the proposition that the release of unconfirmed, publicly available media reports would, without more, reveal such information.

Accordingly, the defendants' request for summary judgment as to the agency's withholdings in Count Eight for Doc. Nos. 473–531 is provisionally denied.[14] As explained above, given the uncertain status of any prior court orders governing the release of these materials, the defendants will be permitted to obtain a clarifying order indicating whether these materials must remain under seal pursuant to Exemption 1 and an effective court order. *See Awan v. U.S. Dep't of Justice*, 46 F. Supp. 3d 90, 92 (D.D.C. 2014).

By comparison to the challenged withholdings in Count Eight, the agency's Exemption 3 withholdings in Counts Nine and Ten present a clearer case for non-disclosure under the National Security Act. Counts Nine and Ten address FOIA requests seeking access to filings prepared by one of the individual plaintiffs in an employment discrimination action against the CIA, *Sterling v. Tenet*, as well as any CIA records arising from the agency's decision to require that these submissions to be redacted before being filed publicly. *See* FAC ¶ 99 (in Count Nine, seeking "unredacted copies of briefs [one of the individual plaintiffs] had written in two *Sterling v. Tenet* court cases, No. 01-8073 (S.D.N.Y.) and No. 03-329 (E.D. Va.)"), ¶ 104 (in Count Ten,

---

[14]   For the same reason, the defendants fail to demonstrate that the withheld documents are properly classified pursuant to E.O. 13526, and the defendants' request for summary judgment as to the CIA's decision to withhold these materials pursuant to Exemption 1 is also denied.

seeking "records pertaining to the classification of information in the briefs [the individual plaintiff] wrote in the *Sterling* cases"); Lutz Decl. ¶ 170 (explaining that, because these materials "contained classified information, CIA redacted portions of them before they could be publicly filed"). Following a brief summary of this earlier action, the plaintiffs' present effort to reveal the details of the CIA's internal review of previously sealed materials is considered.

Originally filed as a *pro se* action in the Southern District of New York, *Tenet* was an employment discrimination action brought by a former CIA Operations Officer who alleged that he was discriminated against during his tenure with the agency on account of his race. *Sterling v. Tenet*, 416 F.3d 338, 341–42 (4th Cir. 2005). Before that court, the agency moved to dismiss the plaintiff's claim or, alternatively, to transfer the case to the Eastern District of Virginia, where the agency is located. *Id.* Though declining to dismiss the case entirely, the New York court granted the agency's request to transfer the case, where the agency then renewed its request to dismiss the case on the ground that allowing the plaintiff to pursue his case would threaten the exposure of classified information. *Id.* at 342. The district court agreed, noting that, "to pursue his claim, [the plaintiff] would have to disclose the nature and location of his employment and the employment of those similarly situated." *Id.* Since this information, including both his duties and those of his colleagues, was classified, the district court reasoned that any effort to proffer proof of discrimination would have been barred by the state secrets doctrine. *Id.*

On appeal, the Fourth Circuit agreed that the plaintiff's claim was barred under the state secrets doctrine. *Id.* at 347. Citing both the district court's reliance on the agency's classified declarations, as well as the "highly classified nature of the allegations in [the plaintiff's] own complaint," the circuit thus affirmed the dismissal of the plaintiff's complaint. *Id.* As the court explained, "where 'the very question on which a case turns is itself a state secret, or the

circumstances make clear that sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters,' dismissal is the proper remedy." *Id.* at 348 (quoting *DTM Research, LLC v. AT & T Corp.*, 245 F.3d 327, 334 (4th Cir. 2001)). The plaintiffs here do not contest the Fourth Circuit's characterization of the materials filed by the plaintiff in that case. Instead, the plaintiffs explain that the "express purpose" of their present FOIA requests is to better understand the CIA's decision to classify these materials before they were initially filed. Pls.' Opp'n at 44 n.37.

After initially seeking all agency records related to the plaintiff's filings in both *Sterling* cases, the plaintiffs here agreed to narrow the scope of this request to include only those records addressing an Opposition to the CIA's motion to dismiss or transfer his case from the Southern District of New York to the Eastern District of Virginia. Lutz Decl. ¶ 55; Defs.' Mem., Ex. AA. The Judge presiding over the *Sterling* case in the Southern District of New York ordered the plaintiff to submit this filing to the CIA to permit the agency to withhold any sensitive information from the public version of this filing. *See* Order, *Sterling v. Tenet*, No. 01-cv-8073 (S.D.N.Y. May 14, 2002) (directing the plaintiff to "arrange for his responsive pleading to be delivered to the [CIA]" two months before it would be filed on the public docket). In response to the FOIA request at issue in Count Nine, the agency located this document, along with thirteen accompanying attachments. Lutz Decl. ¶ 56. Five of these documents were released in full, with eight documents produced in redacted form and a ninth document withheld in full, pursuant to Exemptions 1 and 3. *Id.* In Count Ten, the CIA located seven marked-up copies of the filings at issue in Count Nine that include proposed redactions and margin comments, six of which were produced in redacted form with the seventh withheld in full. *Id.* ¶ 62.

As in Count Eight, the plaintiffs contest the agency's purported reliance on its prior classification decisions in connection with this earlier action to justify its withholdings in this case. *See* Pls.' Opp'n at 43–44. Thus, in the plaintiffs' view, the CIA "is in effect asking the Court to take its word that it classified this information properly [originally] and that it is still properly classified for whatever unknown reasons it made that determination, without giving any explanation for that determination." Pls.' Opp'n at 42–43 (footnote omitted). In fact, however, the agency's declarant explains that the agency withheld information in these documents to "protect[] sensitive information about intelligence methods and activities that cannot be described on the public record." Lutz Decl. ¶ 170. Though the agency provides relatively little explication for its assertion that its withholdings in the sought-after materials are intended to protect intelligence sources and methods, the agency's representations in this case are again bolstered by the circumstances giving rise to the FOIA requests at issue in Counts Nine and Ten.

Indeed, as explained above, the materials the plaintiffs seek were filed in connection with an action directly implicating the activities and responsibilities of a clandestine CIA employee. *Sterling*, 416 F.3d at 341 (explaining that a full airing of the plaintiff's claim against the agency "would require disclosure of highly classified information concerning the identity, location, and assignments of CIA operatives"). As a result, significant portions of both the sought-after submissions, *see* Pls.' Opp'n, Ex. F, ECF No. 78–6, and the district court's opinion granting the CIA's motion to transfer the case, *see* Defs.' Mem., Ex. AA, were redacted prior to public filing. In this context, there is little reason to doubt the agency's assertion that information withheld in these materials would reveal intelligence methods and activities. Further, to the extent that the plaintiffs in Count Ten seek internal classification markings and related dissemination control markings, Judges on this Court have held that such markings "could plausibly contain

66

information that may reveal intelligence collection sources or methods protected by the National Security Act, particularly in light of 'the weight of authority counseling deference to CIA in matters involving national security.'" *Looks Filmproduktionen GmbH v. CIA*, No. CV 14-1163 (BAH), 2016 WL 4186652, at *14 (D.D.C. Aug. 5, 2016) (citing authorities).

Thus, even assuming the disclosure the plaintiffs seek is not categorically barred by prior court order, the agency has met its burden of justifying its withholdings in Counts Nine and Ten, pursuant to Exemption 3 and the National Security Act.[15]

### (3)   Count Twenty-One

Count Twenty-One arises out of a FOIA request submitted to the CIA by one of the individual plaintiffs seeking "thirty-two specified documents currently published in the CIA Records Search Tool ("CREST")," which the plaintiffs describe as an "electronic database housed at the National Archives and Records Administration but maintained by CIA." FAC ¶ 177. Along with her request, the requester submitted redacted copies of each of the sought-after documents, explaining "that 'records which are currently published in CREST in redacted form should be reviewed for full release under FOIA.'" Lutz Decl. ¶ 113 (quoting Lutz Decl., Ex. FFF, ECF No. 74-5). In response to this request, the CIA produced redacted versions of each of the sought-after documents. FAC ¶ 178. Arguing that the agency erred in failing to construe her request as seeking the re-review, and full release, of the relevant records, the plaintiff

---

[15]     Again, because the Court concludes that the agency has justified its withholdings under Exemption 3 and the National Security Act, the Court need not opine on the plaintiffs' contention that the sought-after materials are not properly classified and, as a result, not protected from disclosure under Exemption 1, *see* Pls.' Opp'n at 44 n.37; Pls.' Surreply at 11 n.7.

administratively appealed the agency's response before bringing the present action. Lutz Decl. ¶¶ 114–15.

In its initial decision in this matter, the Court agreed with the plaintiffs and denied the defendants' motion to dismiss Count Twenty-One after concluding that the CIA unreasonably interpreted the plaintiff's FOIA request. *NSC I*, 931 F. Supp. 2d at 102. Consistent with this ruling, the CIA began reprocessing the thirty-two documents identified in the plaintiff's request in order to determine whether additional information could be produced to the plaintiff. Lutz Decl. ¶ 116. Four such documents were forwarded to other agencies for processing, three of which have since been released in full and one of which has been released with redactions pursuant to Exemption 3. *Id.* ¶ 116 & n.14. Finally, after the plaintiff subsequently narrowed the scope of the requested re-review to include only those pages previously withheld in full, *id.* ¶ 117, all but one of these pages have been produced to the plaintiff in redacted form, *id.* ¶¶ 118–19. "In sum, of the [thirty-two] documents at issue, [five] were released in full and [twenty-seven] were withheld in part." *Id.* ¶ 119.

Opposing summary judgment, the plaintiffs challenge a single page withheld by the agency in Doc. No. 605.[16] According to the CIA, this page appears in an "[i]nternal memo[] from [a CIA] component[] to [the] Office of Legislative Liaison commenting on proposed testimony regarding proposed legislation, H.R. 4681, the Federal Polygraph Limitation and Anti-Censorship Act of 1984." Combined *Vaughn* Index at 17. This one-page memo, dated February 29, 1984, includes suggestions from the then-Chief of the CIA's Policy Branch regarding the

---

[16] In a supplemental filing, the plaintiffs suggest that they continue to dispute the agency's rejection of the FOIA requester's eligibility for a public interest fee waiver in connection with the FOIA request at issue in Count Twenty-One. *See* Errata, ECF No. 96. Nonetheless, in response to the defendants' request for summary judgment "on all remaining claims," Defs.' Mem. at 1, the plaintiffs make no reference to any remaining dispute on this claim, *see generally* Pls.' Opp'n; Pls.' Surreply. As such, the plaintiffs have waived any further objection on this claim, and summary judgment is therefore granted, as conceded, to the defendants on this issue.

proposed legislation, which are summarized in four bullets. Pls.' Opp'n, Ex. X, ECF No. 77-24. The agency's challenged redaction appears in one of these bullets, which reads, as redacted: "In 1948, the newly formed Central Intelligence Agency began polygraph testing of employee volunteers. [REDACTED] and by 1953, CIA had in place a program to screen its applicants for employment." *Id.* According to the defendants, information redacted from this bullet "would reveal information concerning intelligence activities, sources, or methods" and is therefore subject to withholding under the National Security Act and Exemption 3. Combined *Vaughn* Index at 17.

Arguing that the agency has failed to justify its decision to withhold this information, the plaintiffs contend that the agency has "given *no* reason . . . for classifying the redacted information other than that it would reveal information concerning intelligence activities, sources, or methods." Pls.' Opp'n at 46 (emphasis in original) (internal quotation marks omitted). Again, however, the relative brevity of the agency's explanation for its withholding is supplemented by the substantial information provided by the CIA regarding the purpose and genesis of Doc No. 605. The legislation at issue in this document would have "prevent[ed] the government from imposing prepublication review or polygraph examinations on government employees at all, except in the CIA and NSA contexts." Michael L. Charlson, Comment, *The Constitutionality of Expanding Prepublication Review of Government Employees' Speech*, 72 Cal. L. Rev. 962, 974 (1984) (footnotes omitted). In the context of the surrounding language, the withheld material apparently describes the CIA's use of polygraphs soon after the agency's creation. Moreover, there appear to be meaningful differences between the language proposed in Doc. No. 605 and the final language included in the relevant testimony. *See Federal Polygraph Limitation and Anti-Censorship Act of 1984, Hearing on H.R. 4681 Before the Subcomm. on*

*Civil Serv. of the H. Comm. on Post Office and Civil Serv.*, 98th Cong. 62 (1984) (statement of Gen. Richard G. Stilwell, Deputy Under Sec'y of Def. for Policy) ("In 1947, the newly formed Central Intelligence Agency began using the polygraph in support of operations—for investigation of specific allegations—and for screening of potential employees. By 1950, CIA was screening all applicants for employment with the agency."). As such, it is plausible that the language initially proposed by the agency, and partially redacted here, included information that was not suitable for release.

In sum, the CIA has met its burden of demonstrating that the language withheld from this internal agency memorandum would reveal intelligence methods and is, therefore, exempted from disclosure pursuant to the National Security Act and Exemption 3. Consequently, the defendants' request for summary judgment as to its withholdings for Doc. No. 605 at issue in Count Twenty-One is granted.

### (4)      Remaining Exemption 3 Challenges

Finally, in Counts Four and Twenty, the plaintiffs challenge the CIA's withholding of information related to the use of *Glomar* responses in connection with earlier FOIA requests. First, Count Four involves a request submitted by NSC to the CIA for "all response letters sent to MDR requesters for requests numbered EOM-2012-00300 and higher." FAC ¶ 60. Doc. No. 23 is one such letter, with the underlying MDR request coinciding with a parallel FOIA request in response to which the CIA issued a *Glomar* response "to protect intelligence sources and methods." *See* Pls.' Opp'n, Ex. Z; Sec. Lutz Decl. ¶ 33. According to the CIA, material appearing on an attached "internal routing and information page" was redacted "in order to not disclose the information protected by the Glomar response itself." Sec. Lutz Decl. ¶ 33. Similarly, NSC's request in Count Twenty sought "all template language used by CIA FOIA

analysts to compose response letters to FOIA requesters." FAC ¶ 170. According to the CIA, Doc. No. 566 includes "[s]ample language . . . to use in drafting letters to [respond to] FOIA requests," with the redacted "information discussing [the] use of [a] Glomar response in specific situations." Combined *Vaughn* Index at 17; Pls.' Opp'n, Ex. AA.

Not content with the agency's explanations for its withholdings in these records, the plaintiffs' assert, without elaboration or support, that "[n]one of [the agency's] statements could reasonably be called 'non-conclusory.'" Pls.' Opp'n at 54. The Court disagrees. As explained above, all that an agency must do to meet its burden of invoking a FOIA exception is "describe the justifications for nondisclosure with reasonably specific detail and demonstrate that the information withheld logically falls within the claimed exemption." *Murphy*, 789 F.3d at 209 (internal quotation marks omitted) (quoting *Larson*, 565 F.3d at 862). Here, far from offering a conclusory explanation for its decision to redact a limited amount of information from these two documents, the agency explained that each document directly related to a prior instance in which the agency issued a *Glomar* response in connection with a FOIA request. For obvious reasons, releasing information in response to NSC's present request that had previously been deemed exempt from disclosure under the FOIA would defeat the purpose of issuing such a response in the first instance. Perhaps acknowledging the futility of their opposition to these withholdings, the plaintiffs declined to renew or otherwise expand upon the threadbare reasoning advanced in their initial Opposition in their later Surreply. *See generally* Pls.' Surreply. In any event, the Court is satisfied that the CIA's withholdings in these documents are permissible under Exemption 3 and the National Security Act and, as such, the defendants' request for summary judgment as to these withholdings in Doc. No. 23, responsive to a request at issue in Count Four, and Doc. No. 566, responsive to a request at issue in Count Twenty, is granted.

\*       \*       \*

Accordingly, summary judgment is granted in part and denied in part to the defendants with respect to their withholdings pursuant to FOIA Exemption 3. Summary judgment is granted to the defendants with respect to their withholdings pursuant to the National Security Act in Counts Four, Seven, Nine, Ten, Twenty, and Twenty-One, but summary judgment is denied to the defendants with respect to their withholdings pursuant to the CIA Act for different Doc. Nos. 47, 221, 222, 224, 225, and 245 at issue in Count Four; Doc. Nos. 473–531 at issue in Count Eight; Doc. Nos. 555 and 556 at issue in Count Sixteen; and Doc. Nos. 557 and 558 at issue in Count Seventeen.

### 3.     *Exemption 5 – Deliberative Process Privilege*

In addition to challenging the CIA's withholdings under FOIA Exemptions 1 and 3, the plaintiffs challenge the CIA's partial withholding, pursuant to the deliberative process privilege and Exemption 5, of one document responsive to the FOIA request at issue in in Count Twenty. Following a brief summary of the contours of this common law privilege, the parties' dispute regarding this document is considered.

#### a)     **Legal Standard**

Intended to protect "open and frank discussion" among government officials to enhance the quality of agency decisions, *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001), the deliberative process privilege "protects 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated,'" *Loving v. Dep't of Def.*, 550 F.3d 32, 38 (D.C. Cir. 2008) (quoting *Klamath Water*, 532 U.S. at 8). "To qualify for the deliberative process privilege, an intra-agency memorandum must be both pre-decisional and deliberative."

*Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015) (citing *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C. Cir. 1980)); *Whitaker v. United States Dep't of State*, 2016 U.S. App. LEXIS 1086, at *3–4 (D.C. Cir. Jan. 21, 2016) (per curiam) (internal quotation marks and citation omitted) ("To fall under the privilege's penumbra, documents must be both pre-decisional and deliberative.").

In general, a "document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft,* 421 U.S. 168, 184 (1975)); *see also Leopold v. CIA*, 89 F. Supp. 3d 12, 19 (D.D.C. 2015) (quoting *Petroleum Info. Corp.,* 976 F.2d at 1434). While the D.C. Circuit has observed that the "term 'deliberative' does not add a great deal of substance to the term 'pre-decisional,'" *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014) (citing *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991), "'deliberative' in this context means, in essence, that the communication is intended to facilitate or assist development of the agency's final position on the relevant issue," *id.* (citing *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982)).

"[U]nlike other exemptions where the agency declaration and *Vaughn* index may be read in conjunction to provide an adequate justification for application of an exemption to a class or category of records, to sustain its burden of showing that records were properly withheld under Exemption 5, an agency must provide in its declaration and *Vaughn* index precisely tailored explanations for each withheld record at issue." *NSC II*, 960 F. Supp. 2d at 188. Further, the deliberative process privilege "does not protect documents in their entirety; if the government can segregate and disclose non-privileged factual information within a document, it must."

*Loving*, 550 F.3d at 38 (citing *Army Times Publ'g Co. v. Dep't of Air Force,* 998 F.2d 1067, 1071 (D.C. Cir. 1993)).

**b)      Analysis**

The parties dispute the CIA's withholdings pursuant to the deliberative process privilege in one document responsive to the FOIA request at issue in Count Twenty.  As noted above, this request sought "all template language used by CIA FOIA analysts to compose response letters to FOIA requesters."  FAC ¶ 170.  Among the documents produced to NSC in connection with this request was Doc. No. 565, which the defendants describe as "[s]ample language for IMS personnel to use in drafting letters responding to FOIA requests."  Combined *Vaughn* Index at 17.  Consisting of seven lines of text, the redacted version of that document reads as follows:

> [REDACTED]
>
>           Requester seeks documents in electronic format; documents are not on CDROM at time of request.
>
> You have requested that records responsive to this FOIA request only be provided to you electronically.  I have determined that the releasable information responsive to your FOIA request is not readily reproducible in the requested form or format.  Therefore, we are providing paper copies of the releasable information responsive to this FOIA request.

Pls.' Opp'n, Ex. EE, ECF No. 77-31.

 According to the defendants, the challenged redaction removes "pre-decisional analysis, recommendations and deliberations concerning how to respond to a FOIA request."  Combined *Vaughn* Index at 17.

The plaintiffs note that the CIA's description of the redacted language closely resembles that used by the agency in other contexts to describe "notes made by analysts when processing FOIA requests."  Pls.' Opp'n at 60.  In the plaintiffs' view, however, the "reference document" at issue here "direct[s] analysts to use" the form language included therein and, therefore, cannot

74

be said to have been either pre-decisional or deliberative.  *Id*. at 60–61.  Rather, the plaintiffs

contend, "the withheld portion [of Doc. No. 565] contains *instructions* for when to use the

language and who to consult."  Pls.' Surreply at 15 (emphasis in original).  The defendants

counter that the redacted language "describes the agency's internal deliberative process,

including whom the agency employees consult in determining whether to use the template

language in a final letter."  Defs.' Reply at 37; *see* Sec. Lutz Decl. ¶ 38 ("The withheld

information reflects the Agency's internal deliberative process regarding when to use this

language in response to a FOIA request, including who IMS personnel drafting response letters

should consult in determining whether to use this information in a final letter.").  As support for

their withholding of this information, the defendants rely upon *Tax Reform Research Group v.*

*IRS*, 419 F. Supp. 415, 423–24 (D.D.C. 1976), which approved the withholding of the signatures

of IRS personnel from undisputedly deliberative documents.  Defs.' Reply at 37.  In this way,

through their representations in sworn affidavits and pleadings to this Court, the defendants

suggest that the redacted information consists of a combination of deliberative discussion and the

identifying information or names of CIA employees.

Following *in camera* review of the document at issue, the Court finds that the defendants'

suggestions regarding the nature of the redacted information are misleading and their

withholdings in Doc. No. 565 unjustified.  As previously noted, central to the protection of an

agency's internal deliberative process is the recognition that agency "officials will not

communicate candidly among themselves if each remark is a potential item of discovery and

front page news."  *Klamath Water Users Protective Ass'n*, 532 U.S. at 8–9.  By ensuring that

individuals working in government are free to voice contrary advice, the privilege helps to

improve agency internal communication and government decision-making.  Here, the redacted

line reads, "MUST BE APPROVED BY C/FOIA or C/PIPD before using it." Appearing at the very beginning of the document in question, this line is most clearly understood as an instruction to obtain approval, directed to personnel processing those FOIA requests for which the template language contained in the document may be applicable. Thus, by redacting this information, the agency seeks to withhold general information regarding the manner in which FOIA requests are processed by the CIA. This it cannot do. Directions to deliberate do not themselves constitute deliberation. *See Taxation With Representation Fund v. IRS*, 646 F.2d 666, 681–82 (D.C. Cir. 1981) ("[D]ocuments subject to disclosure include materials that reflect the 'working law' of the agency, in the form of final opinions, *instructions or advice to staff*, interpretative reports (explaining decisions or regulations), and the like." (emphasis added)). Such directions reflect agency protocol, not the "advisory opinions, recommendations, and deliberations" protected by Exemption 5. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975); *see also id.* at 153 ("The affirmative portion of the [FOIA], expressly requiring indexing of . . . 'instructions to staff that affect a member of the public,' 5 U.S.C. § 552(a)(2), represents a strong congressional aversion to 'secret (agency) law' . . . .").

Nor does the inclusion of the titles of personnel who must be consulted regarding a particular topic render this information subject to the deliberative process privilege. Contrary to the defendants' suggestion, *Tax Research Group*—the sole authority cited on this point—offers no support for their position. In that case, a confluence of deliberative discussion and identifying information, *i.e.*, the *names* of the personnel involved, animated the decision to approve the agency's withholding of that identifying information from the FOIA requester. *See* 419 F. Supp. at 423–24. As explained above, the redacted information is not deliberative, nor does it contain

the type of sensitive identifying information withheld in *Tax Research Group*. Consequently, the defendants have proffered no justification for their withholdings in Doc. No. 565.

Accordingly, the defendants' request for summary judgment as to the agency's withholdings in Doc. No. 565 is denied, and the defendants are directed to release Doc. No. 565 in its entirety.

## IV. CONCLUSION

For the reasons discussed above, the defendants' renewed motion for summary judgment is granted in part and denied in part, and the plaintiffs' motion for partial summary judgment is denied. Specifically, the defendants' renewed motion for summary judgment is denied as to (1) Count Four, regarding NSC's exhaustion of administrative remedies for FOIA request F-2012-00857, as well as the CIA's withholdings in Doc. Nos. 47, 221, 222, 224, 225, and 245, under the CIA Act and Exemption 3; (2) Count Eight, with respect to the CIA's withholdings in Doc. No. 473 through Doc. No. 531, under Exemption 1 and Exemption 3; (3) Count Sixteen, with respect to the adequacy of the CIA's search for documents responsive to FOIA request F-2011-01679, as well as the CIA's withholdings in Doc. Nos. 555 and 556, under the CIA Act and Exemption 3; (4) Count Seventeen, with respect to the CIA's withholdings in Doc. Nos. 557 and 558, under the CIA Act and Exemption 3; and (5) Count Twenty, with respect to the CIA's withholdings in Doc. No. 565 under Exemption 5's deliberative process privilege; and granted in all other respects. The parties shall submit jointly a proposed schedule to the Court by November 28, 2016, to govern further proceedings necessary to resolve this matter fully.

An Order consistent with this Memorandum Opinion will issue contemporaneously.

Date: November 14, 2016

_____
BERYL A. HOWELL
Chief Judge